## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Minnesota State College Student Association, Inc., d/b/a LeadMN | Case No. 22-cv-771 |
| Plaintiff, | |
| vs. | |
| Jay Cowles, Rudy Rodriguez, Asani Ajogun, Victor Ayemobuwa, Alex Cirillo, Dawn Erlandson, Jerry Janezich, Roger Moe, Javier Morillo, April Nishimura, Oballa Oballa, Kathy Sheran, George Soule, Cheryl Tefer, and Michael Vekich, in their official capacities as Trustee Members of the Board of Minnesota State Colleges and Universities. | **COMPLAINT** |
| Defendants. | |

Plaintiff Minnesota State College Student Association, Inc. d/b/a LeadMN, for its Complaint against Defendants, the Trustees ("**Trustees**") of the Minnesota State Colleges and University system ("**MNSCU**"), states and alleges as follows:

## INTRODUCTION

1.      LeadMN is an independent, student-led association representing more than 100,000 students at 30 MNSCU community and technical colleges across Minnesota. Its student leaders speak, facilitate student speech and collective engagement, and advocate on behalf of students in the media, before Trustees, and at the Minnesota Legislature.

2.      LeadMN's speech and public advocacy has frustrated Trustees and MNSCU leaders. And since June 2021, Trustees' have refused to collect funds LeadMN

intended to use for assembly and expression protected by the First Amendment in retaliation for LeadMN's past speech and advocacy and to prevent speech disfavored by Trustees and by third parties Trustees favored.

3.      Trustees' violations of the First Amendment were enabled by an independently unlawful structure permitting prior restraint of LeadMN's speech. Minn. Stat. § 136F.22 requires the Board of Trustees to collect funds LeadMN uses for its protected speech, assembly, and advocacy. Trustees, through their policies and practice, assert the right to exercise absolute discretion to "revise or reject," or simply ignore, a proposed change in LeadMN's fees even when elected student representatives across Minnesota voted in favor of the change and the expression it would fund.

4.      Since June of 2021, Trustees have refused to collect LeadMN's proposed fee, and have done so without any written or official decision, findings, or explanation, or even a vote of the Board. Trustees' refusal to act has no limitations or binding guidance restriction Trustees' unfettered discretion to block LeadMN's disfavored speech.

5.      The First Amendment forbids Trustees' refusal to fund speech because of LeadMN's disfavored viewpoint and it forbids such refusal in retaliation for LeadMN's past disfavored speech. Even without its other violations, the mere existence of Trustees' unfettered discretion to refuse to fund LeadMN's speech independently violates the First Amendment because of the risk of intimidation, self-censorship, and undetectable viewpoint discrimination or retaliation.

6.      Through this lawsuit LeadMN seeks prospective injunctive relief from the Court enjoining Trustees' ongoing violations of the First Amendment described below.

## THE PARTIES

7.      The Minnesota State Colleges and Universities system ("**MNSCU**") consists of thirty public community and technical colleges and seven universities across Minnesota.

8.      MNSCU is governed by Defendants, fifteen Trustees including Jay Cowles, Rudy Rodriguez, Asani Ajogun, Victor Ayemobuwa, Alex Cirillo, Dawn Erlandson, Jerry Janezich, Roger Moe, Javier Morillo, April Nishimura, Oballa Oballa, Kathy Sheran, George Soule, Cheryl Tefer, and Michael Vekich, who constitute the Board of Trustees of MNSCU (Defendants, as a collective body, the "**Board**," as individuals "**Trustees**," and each a "**Trustee**"). Trustees are appointed to the Board by the Governor of Minnesota, with the advice and consent of the Minnesota Senate.

9.      The "mission of the [B]oard is to provide programs of study that meet the needs of students for occupational, general, baccalaureate, and graduate education." Minn. Stat. § 136F.05.

10.      The Board has "all powers necessary to govern the state colleges and universities and all related property." Minn. Stat. § 136F.06. The Board's powers include the power to sue and to be sued.

11.      Plaintiff Minnesota State College Student Association, Inc. d/b/a LeadMN ("**LeadMN**") is an independent Minnesota nonprofit corporation that represents and advocates on behalf of students at the 30 MNSCU colleges across Minnesota. LeadMN's members include all students enrolled in at least one credit at a MNSCU community and technical college.

3

12.     LeadMN's principal office is in West St. Paul, Minnesota and its members are located across Minnesota.

## JURISDICTION AND VENUE

13.     This Court has personal jurisdiction over the Board because they are subject to the jurisdiction of a court of general jurisdiction in Minnesota.

14.     The Court has subject matter jurisdiction over this case under 28 U.S.C. § 1331, as this action arises under (1) the First and Fourteenth Amendments to the United States Constitution; (2) 28 U.S.C. § 1343(a)(3), as it is brought to redress deprivations, under color of state law, of rights, privileges, and immunities secured by the United States Constitution; and (4) 42 U.S.C. § 1983, which provides a cause of action for the protection of civil rights; under 42 U.S.C. § 1988(b), as it seeks an award of attorneys' fees; under 28 U.S.C. § 2201(a), as it seeks to secure declaratory relief; and under 28 U.S.C. § 2202, as it seeks to secure permanent injunctive relief.

15.     Venue is proper in the United States District Court for the District of Minnesota under 28 U.S.C. § 1391(b), as all the events giving rise to the claims below occurred within the District.

## LEADMN'S STUDENT-LED GOVERNANCE

16.     LeadMN is governed by, and conducts advocacy through, student leaders elected from its student members.

17.     LeadMN's General Assembly is its highest decision-making authority. The General Assembly is made up of student representatives from all MNSCU community

4

and technical colleges. A quorum representing at least twenty of MNSCU's thirty colleges is required for General Assembly decisions.

18.    The General Assembly elects LeadMN's leaders, including its cabinet officers and Governing Council members. The General Assembly also determines LeadMN's advocacy positions and priorities, as well as its programs, plans, policies, and budget.

19.    After its priorities are determined by the General Assembly, LeadMN's advocacy and programs are carried out by its cabinet officers and by staff employed by LeadMN, under the supervision of its Governing Council of elected student leaders.

20.    LeadMN's staff employees report to its Executive Director. This Executive Director is hired by, and reports to, LeadMN's Governing Council.

## LEADMN'S PUBLIC ADVOCACY

21.    LeadMN's Bylaws describe its purposes:

1. To advocate for students in Minnesota Technical Colleges, Community Colleges, and Consolidated Colleges through their Campus Student Governments (herein referred to as CSG's);

2. To empower the CSG's by organizing, providing, and promoting activities that encourage unity within the student community;

3. To provide opportunities for students to develop their leadership skills;

4. To provide information and advocate on behalf of students to decision makers on issues affecting students;

5. To facilitate and support students to be more visible and active at the local, state, and national level;

6. To establish an effective and efficient network of communication among students, campuses, and LeadMN;

7. To ensure that all student voices are heard through recognizing, encouraging, and supporting diversity in order to foster student community; and

8. To promote higher education equality for all regardless of income, race, ethnic or cultural background, religion, gender, sexual orientation, family or marital status, veteran status, age, physical or mental capacity, level of education, and citizenship status.

22. LeadMN provides information to students, creates opportunities for students to purposefully assemble to communicate and debate with other students, to participate in decisions regarding LeadMN's public positions and advocacy, to participate in leadership and advocacy training, and to become leaders. LeadMN's public advocacy on behalf of students includes petitioning/requesting that elected and appointed government leaders make decisions and exercise their powers or decide contentious issues in favor, or for the good, of the students that LeadMN represents.

23. LeadMN's leaders represent MNSCU students and engage in public advocacy on their behalf. LeadMN's advocacy efforts include speaking with elected and appointed government leaders, offering testimony at legislative hearings and Board meetings, and communicating publicly regarding issues important to MNSCU students.

24. In 2020 alone, LeadMN leaders:

   a. Met with dozens of federal and state officials, including 90 meetings with state legislators advocating for LeadMN's priorities;

   b. Helped 2,985 Minnesota college students to register to vote;

   c. Were quoted in news media more than thirty times; and

   d. Provided testimony at every MNSCU Board meeting.

25.     LeadMN's advocacy on behalf of students means its leaders must challenge, attempt to influence, and potentially criticize the Board and MNSCU's administration. For example, LeadMN has consistently advocated for lower student tuition and opposed Board efforts to raise tuition, including in 2020.

26.     LeadMN worked with legislators to support a freeze in MNSCU tuition at community and technical colleges mandated by the Legislature over a six-year period, from 2013 to 2019. This was important to students, but angered MNSCU leaders, administrators, and Trustees.

27.     In testimony before the Board, LeadMN explained the Board must do more to address racial disparities at MNSCU colleges. LeadMN testified in 2017, "[W]hat has made the last 12 weeks so hard for us as student leaders, [is] to hear the silence of the governing board of the Minnesota State system on one of the most pressing issues on our college campuses – the opportunity gap facing so many of our students."

28.     LeadMN opposed the Board's proposal to add new student fees in 2018 as MNSCU sought to work around the Legislature's tuition freeze. LeadMN's opposition to proposed fees was covered by Minnesota media.

29.     LeadMN has worked with legislators to mandate other higher education reforms on behalf of students, including measures related to student transfers, developmental education, online education resources, and food insecurity. The Board and MNSCU administrators have often viewed these reforms negatively.

30.     In June 2020, LeadMN's Governing Council responded to the murder of George Floyd by calling on the Board to convene a statewide working group to review MNSCU's law enforcement programs.

31.     Also in 2020, LeadMN student leaders raised concerns regarding MNSCU's response to COVID-19. LeadMN surveyed students and publicized their struggles with isolation and mental health. LeadMN's President raised concerns regarding MNSCU's efforts to teach online. The Minneapolis *Star Tribune* quoted her as stating, "I don't feel like I am getting an education. . . . You are practically teaching yourself."

32.     LeadMN continues to publicly advocate for issues that are important to MNSCU students, regardless of their popularity with the Board. For example, in February and March 2022, the *Star Tribune* published a series of articles raising serious questions regarding MNSCU's Chancellor Devinder Malhotra and the Board's response to discrimination and harassment.

33.     LeadMN leaders found these reports deeply troubling because they confirmed LeadMN's experience with certain MNSCU leaders. After these reports surfaced, LeadMN's President had an opportunity to testify before the Board at its March 15-16, 2022, meeting. This opportunity posed a potential dilemma.

34.     LeadMN's leaders believed they must speak out regarding students' serious concerns. LeadMN has consistently advocated for equity, inclusion, empowerment, and integrity. It has assisted students in filing complaints against MNSCU employees who have discriminated against students on the basis of race and other characteristics.

LeadMN has also repeatedly expressed concerns regarding MNSCU's failure to follow through with efforts to eliminate discrimination and to promote diversity and inclusion.

35.    At the same time, the actions, and inaction, of MNSCU's Chancellor and Board in 2021 demonstrated that the Board would likely retaliate in response to LeadMN's public comments and advocacy.

## THE BOARD'S DUTY TO COLLECT FEES THAT FUND LEADMN'S SPEECH, ASSEMBLY, AND PUBLIC ADVOCACY

36.    Minnesota Statute Section 136F.22 ("**Section 136F.22**"), Subdivision 1 requires the Board to recognize two different student associations, one for MNSCU university students and one for community and technical college students.

37.    Pursuant to Section 136F.22, LeadMN is the recognized student association representing students at MNSCU's community and technical colleges.

38.    Minnesota State University Student Association, Inc. d/b/a Students United ("**Students United**") is an independent nonprofit student association. Pursuant to Section 136F.22, Students United is the recognized association representing students at MNSCU's universities.

39.    The Board is required by statute to collect LeadMN's and Students United's fees pursuant to Subdivision 2 of Section 136F.22.

40.    Subdivision 2 allows changes to each association's fee, but any changes must first be submitted and approved by the Board. The statute does not restrict the Board's discretion to "revise or reject the [proposed] fee change" for any reason. Minn.

Stat. § 136F.22. Subd. 2. The Board is not required to disclose its reasons for revising or rejecting any proposed change to an association's fee.

41.     The Board has adopted Policy 3.7, titled "Statewide Student Association" related to Section 136F.22. This policy largely corresponds to the language of Section 136F.22 regarding the collection of fees, but adds that the Board must revise or reject a requested change "during the two board meetings immediately following the fee change submission."

42.     The Board does not believe it is required to follow Policy 3.7. There is no appeal process or higher decision maker if the Board fails to follow its own policies or the requirements of Section 136F.22. Section 136F.22 does not authorize court actions against the Board if the Board fails to follow the statute's requirements.

### THE BOARD'S RETALIATION, VIEWPOINT DISCRIMINATION, AND EXERCISE OF UNFETTERED DISCRETION RELATED TO LEADMN'S FEE PROPOSAL

43.     In 2021, LeadMN's General Assembly considered and adopted a plan to improve student outreach (including communication with and engagement of students), to better facilitate student-to-student communications, to offer new and additional support services to students (such as peer-to-peer support and nonprofessional counseling), to increase and improve LeadMN's solicitation and fundraising efforts independent of the Board's collection of fees, and to create a student newspaper. The General Assembly voted and approved a budget including a proposed increase in the fees to be collected by the Board to $0.61 per credit that would fund these new and additional efforts.

44.     Since 2015, LeadMN's fee has been $0.35 per credit.

45.    In April 2021, LeadMN informed Trustees that it proposed to increase its fee to $0.61 per credit (hereinafter, LeadMN's "**fee proposal**"). This increase would have made LeadMN's per credit fee the same as what the Board had approved for Students United three years earlier and continued to collect on behalf of Students United in 2021.

46.    Before and after LeadMN submitted its fee proposal, Trustees were aware that LeadMN uses funds collected on its behalf by the Board for speech, assembly, and public advocacy, including raising issues and seeking redress with elected and appointed government leaders on behalf of the students it represents.

47.    As part of its request for Trustees to approve its fee proposal, LeadMN informed Trustees that it intended to use the fees collected after approval of its fee proposal for protected speech and assembly, including to improve student outreach (including communication with and engagement of students), to better facilitate student-to-student communications, to offer new and additional support services to students (such as peer-to-peer support and nonprofessional counseling), to increase and improve LeadMN's solicitation and fundraising efforts independent of the Board's collection of fees, and to create a student newspaper.

48.    When Trustees considered LeadMN's fee proposal in May and June 2021, Trustees knew that if they approved the proposal LeadMN would have additional funds that LeadMN would use for speech, assembly, and public advocacy protected by the First Amendment.

49.     When Trustees considered LeadMN's fee proposal in May and June 2021, Trustees knew that a majority of student representatives from schools across Minnesota had voted to approve of LeadMN's fee proposal.

50.     When Trustees considered LeadMN's fee proposal in May and June 2021, Trustees knew that approving the proposal would not reduce tuition or other funding received by MNSCU colleges or its system and instead would be collected from students.

51.     Before 2021, the Board had never rejected a student association's proposed fee increase and had never engaged in substantive deliberations regarding a proposed fee increase.

52.     In 2017, Students United proposed to increase its fee to $0.47 per credit. The Board approved this request without discussion through its Consent Agenda.

53.     In 2018, Students United again proposed to increase its fee from $0.47 to $0.61 per credit. The Board again approved this request without discussion through the Board's Consent Agenda.

54.     The Board did not seek out additional third party comment and did not attempt to generate opposition to Students United's fee increases in 2017 or 2018.

55.     Students United had not been critical of MNSCU's Chancellor or the Board. Students United did not oppose the Board's recent proposals to increase student tuition.

56.     At all times relevant to this lawsuit, the Board has known that LeadMN uses fees collected pursuant to Section 136F.22 for public advocacy and speech.

57.     When Trustees and Chancellor Malhotra became aware of LeadMN's fee proposal in 2021, they knew that some of the additional fees collected by the Board would be used for speech and public advocacy.

58.     Chancellor Malhotra, Board Chair Jay Cowles, and other Trustees have been unhappy with LeadMN's public advocacy critical of Chancellor Malhotra's and of the Board's actions and decisions.

59.     When MNSCU's Chancellor, Board Chair Jay Cowles, and other Trustees learned of LeadMN's fee proposal, they covertly worked to generate opposition to LeadMN's request.

60.     Trustees violated Minnesota's Open Meeting Law by deliberating about LeadMN's fee proposal outside of a public meeting. Trustees sought to evade disclosure and public scrutiny of their efforts to scuttle LeadMN's fee proposal.

61.     Trustees and MNSCU administrators, including Chancellor Malhotra, covertly coordinated opposition to LeadMN's fee proposal outside of public meetings using group text messaging and electronic "chat" tools.

62.     In an electronic chat message sent to Board Finance Committee Chair/Trustee Roger Moe, a Trustee stated, "Chancellor's office will arrange a zoom of the three of us to discuss LeadMN request. . . . Have spoken with three other trustees; [Chancellor] Devinder [Malhotra] forwarded [LeadMN's Executive Director's] email with suggestions." LeadMN was not included in these discussions. Neither Chancellor Malhotra nor any other MNSCU representative copied LeadMN or otherwise sent LeadMN the referenced email message or "suggestions" to LeadMN.

63.     Trustee Dawn Erlandson sent a text message to a 10-person group text that included other Trustees. She suggested that Trustees use the Board's authority related to LeadMN's fee proposal to retaliate against LeadMN for its public testimony and advocacy opposing the Board's efforts to increase student tuition.

64.     Trustee Erlandson suggested someone should inform state legislators that LeadMN "oppose[d] tuition [increases proposed by the Board] yet are seeking yet another fee increase?"

65.     Trustee Michael Vekich responded to Trustee Erlandson's text, "Concur." He added that he had "operational questions" he intended to "address with [Finance Committee] chair Moe."

66.     MNSCU Director of Government Relations responded to Trustee Vekich's text, "I have not had legislative conversations regarding the increase as ***the process is prescribed to be between the students and the BOT*** [Board of Trustees]." (emphasis added).

67.     In response to LeadMN's fee proposal, MNSCU leaders and administrators communicated with third parties to arrange for and coordinate opposition to LeadMN's fee proposal.

68.     The Minnesota Association of Professional Employees ("**MAPE**") is a labor union representing certain MNSCU employees.

69.     MAPE is aware of LeadMN's advocacy on behalf of students who have been subject to discrimination by MAPE members.

70.     Neither MAPE nor MNSCU is responsible for, or entitled to restrict, LeadMN's use of fees collected by the Board.

71.     Trustees coordinated with MAPE representatives in opposition to LeadMN's fee proposal. MAPE had not opposed Students United's fee increase proposals and Trustees had not coordinated with MAPE representatives regarding opposition to Students United's fee increase proposals.

72.     MAPE raised concerns with the Board regarding LeadMN's proposed use of fees collected by the Board as a result of its fee proposal. MAPE was concerned that LeadMN's proposal might displace MAPE members and that LeadMN volunteers or employees may communicate with students, rather than MAPE members.

73.     In response to the criticism from MAPE, Trustee Moe requested that campus student governments submit letters to the Board regarding LeadMN's proposal.

74.     Trustees worked with college presidents, administrators, and student government leaders to generate opposition to LeadMN's fee proposal. The Board did not request comment or opposition to Students United's requests for fee increases in 2017 or 2018.

75.     Student government leaders from every MNSCU college had already participated, or could have participated, in LeadMN's General Assembly that approved LeadMN's fee proposal and adopted its plans for the use of any additional fees.

76.     The Board required LeadMN to meet with MNSCU college presidents regarding its fee proposal. College presidents are not members of LeadMN and have

never been a part of LeadMN's or any other student association's decision making process regarding a fee proposal.

77.    Students United was not required to meet with MNSCU college presidents.

78.    On May 19, 2021, LeadMN's proposed fee was discussed by the Board's Finance Committee. During this meeting, Finance Committee Chair Moe informed LeadMN that its fee proposal involved three Board decisions: (1) whether or not the Board would approve any increase; (2) if it approved an increase, how much; and (3) how the funds collected would be spent. He stated that the third issue, how funds would be spent, was the important question in this case and that the Board's decision hinged on what fees collected would be "used for and how that relates to [MNSCU] campuses and . . . our partners."

79.    Finance Committee Chair Moe has never referred to LeadMN as a "partner."

80.    At all times relevant to LeadMN's 2021 fee proposal, Finance Committee Chair Moe and other Trustees were aware they could not lawfully dictate how LeadMN spent fees the Board collected.

81.    The Finance Committee took no action on LeadMN's fee proposal on May 19. Meeting minutes state that LeadMN's request was "an informational item, there was no vote taken."

82.    MNSCU's Chancellor opposed LeadMN's fee increase because he believed that LeadMN had not sufficiently consulted with him in advance, that LeadMN did not

share a joint common goal with MNSCU administrators, and that LeadMN had not worked collaboratively with MNSCU administrators.

83.     After the Finance Committee meeting, LeadMN asked to meet with Trustees about its fee proposal and to answer Trustees' questions. Other stakeholders have met with Trustees individually regarding Board business. However, Board Chair Cowles refused to allow LeadMN's leaders to meet with other Trustees.

84.     Board Chair Cowles met with LeadMN representatives on June 2, 2021. In this meeting, he acknowledged "the reality . . . that we [the Board] have absolutely no oversight about any of what you [LeadMN], what services you choose to provide. The only thing that we have oversight of is your fee." Nonetheless, Chair Cowles stated that he and other Trustees intended to leverage the Board's ability to revise or reject LeadMN's fee proposal to control LeadMN. He stated that the Board might not approve LeadMN's fee proposal because LeadMN had not or might not work in "true collaboration or partnership with our system" or its Chancellor.

85.     According to Board Policy 3.7, the Board was required to "revise or reject [LeadMN's proposed] fee change during the two board meetings immediately following [LeadMN's] submission" in April 2021 of its proposal to increase its fees.

86.     The Board did not revise or reject LeadMN's fee proposal at its May 2021 meeting or its June 2021 meeting.

87.     Minutes of the Board's May 2021 meeting state only that Finance Committee Chair Moe informed the Board that the Finance Committee "heard a first reading from LeadMN on a Fee Proposal."

88.     LeadMN's fee proposal was discussed by the Board's Finance Committee on June 16, 2022. Finance Committee Chair Moe asked Committee members to consider a motion stating "The Finance Committee recommends that the Board of Trustees accepts the increase of the MSCSA (dba LeadMN) fee from $.35 to $.61 per credit hour beginning fall semester 2021." The motion was made and seconded. Finance Committee members voted not to approve the motion by a vote of two to five.

89.     The Finance Committee did not make any findings regarding this motion or LeadMN's fee proposal. The Finance Committee did not issue any decision or provide any explanation orally or in writing regarding the failure of this motion or LeadMN's fee proposal.

90.     The Finance Committee did not consider any alternatives to the motion read by Finance Committee Chair Moe regarding LeadMN's fee proposal.

91.     The Finance Committee did not consider revising LeadMN's fee proposal to allow an increase in fees that would be used for speech or advocacy.

92.     If the Finance Committee's decision was based on aspects of LeadMN's proposed use of fees that would be collected, the Committee did not consider approving a revised fee increase that would fund those aspects of LeadMN's proposal that the Committee did not find objectionable, or that MAPE or other "partners" of the Committee did not find objectionable.

93.     The Board discussed LeadMN's fee proposal during the regular Board meeting also on June 16. Board Chair Cowles informed Trustees that LeadMN's proposal

would not be voted on by the Board because the Finance Committee had not approved a motion asking the Board to approve LeadMN's proposal.

94.    The only reference to LeadMN's proposal in the minutes of the Board's June 16 meeting is "LeadMN Fee Proposal (Second Reading) did not pass in Finance Committee and will be removed from the consent agenda."

95.    The Board did not revise, reject, or take any other action regarding LeadMN's fee proposal at its June 16 meeting or at any other meeting.

96.    The Board has never voted on LeadMN's fee proposal.

97.    The Board has never made any findings or issued any written decision regarding LeadMN's fee proposal or its refusal to the fee proposed.

98.    The Board never considered any alternatives to authorize a partial fee increase for LeadMN or a fee increase to be spent on speech that the Board did not find objectionable.

99.    At the Board's June 16 meeting, Board Chair Cowles summarized why LeadMN's fee proposal was not brought before the Board. He stated there was "need for accountability and collaboration" and that before the Board would approve funding, LeadMN must meet "with the chancellor, campus leadership, student Senate leadership and gain their support . . . ."

100.    At the end of the Board's discussion regarding LeadMN's fee proposal on June 16, a Trustee summarized concerns regarding a retaliatory "undercurrent" in the Board's refusal to consider LeadMN's fee proposal, stating:

> I need to understand the culture around this, sort of the feeling around this, it felt to me as a new member that there's another undercurrent issue about student pressure being placed on [MNSCU's] administration to achieve what they see as a need. And how the [MNSCU] system sees that, and reacts to that. And it concerns me that we not be creating a negativity in . . . how we think about student organizations and their advocacy work and their desire to increase their capacity to influence the system that that I'd like to have a more forthright conversation about what the culture is about that in the system.

101.    The Board has not increased the fee collected for LeadMN after LeadMN's submission of its fee proposal in 2021. The Board and MNSCU colleges collected the same fee for LeadMN during the 2021-2022 school year as they collected during the 2020-2021 school year.

102.    The Board has not adopted any policy change or other measure that constrains the Board's unfettered discretion to engage undetectable viewpoint discrimination in response to a fee proposal submitted by LeadMN or Students United.

## CLAIM FOR RELIEF

### COUNT I
**VIOLATION OF THE RIGHTS TO FREEDOM OF SPEECH, ASSEMBLY, AND TO PETITION THE GOVERNMENT FOR REDRESS OF GRIEVANCES AS GUARANTEED BY THE FIRST AMENDMENT TO THE UNITED STATES CONSTITUTION**

103.    LeadMN realleges each of the foregoing paragraphs, herein.

104.    Defendants are constrained by the First Amendment to the United States Constitution as applicable to the states through the Fourteenth Amendment.

105.    LeadMN is entitled to determine how to spend member fees collected on its behalf.

106.    LeadMN's 2021 fee proposal was approved by student representatives through its General Assembly.

107.    LeadMN regularly engages in activities and expression protected by the First Amendment, including speech and facilitating the speech of students and student leaders, assembly and facilitating the assembly of students and student leaders, and petitioning (and facilitating the students and student leaders petitioning) the Government for redress of grievances (i.e., public advocacy).

108.    LeadMN has used and will continue to use fees collected by the Board to fund protected speech, assembly, and public advocacy (which includes LeadMN petitioning/requesting that elected and appointed government leaders make decisions and exercise their powers or decide contentious issues in favor of or for the good of the students that LeadMN represents).

109.    Before Trustees failed to act on LeadMN's fee proposal, and before Trustees refused to collect additional fees proposed in that proposal, Trustees knew that LeadMN intended to use additional fees proposed in LeadMN's fee proposal to fund speech, assembly, and public advocacy protected by the First Amendment.

110.    In May and June 2021, Trustees knew that after approval of LeadMN's fee proposal, LeadMN intended to use the additional fees collected to improve student outreach (including communication with and engagement of students), to better facilitate student-to-student communications, to offer new and additional support services to students (such as peer-to-peer support and nonprofessional counseling), to increase and

improve LeadMN's solicitation and fundraising efforts independent of the Board's collection of fees, and to create a student newspaper.

111. The General Assembly voted and approved a budget including a proposed increase in the fees to be collected by the Board to $0.61 per credit that would fund these new and additional efforts.

112. After LeadMN submitted its 2021 fee proposal, the Board did not revise or reject the proposal, and instead the Board refused to act on the fee proposal.

113. The Board has not collected any additional fees requested by LeadMN's 2021 fee proposal at any time.

114. The Board refused in June 2021 and continues to refuse to act on LeadMN's 2021 fee proposal, and refused and continues to refuse to collect the fee proposed by LeadMN through such proposal, in retaliation for LeadMN's speech, assembly, and/or public advocacy protected by the First Amendment.

115. The Board refused in June 2021 and continues to refuse to act on LeadMN's 2021 fee proposal, and refused and continues to refuse to collect the fee proposed by LeadMN through such proposal, because of the content and/or viewpoint of LeadMN's speech, assembly, and/or public advocacy.

116. The Board has favored other groups because they engaged in and/or were likely to engage in, speech, assembly, and/or public advocacy favored by the Board or favored by the third parties the Board prefers.

117. The Board refused in June 2021 and continues to refuse to act on LeadMN's 2021 fee proposal, and refused and continues to refuse to collect the fee proposed by

LeadMN through such proposal, because of third parties' views regarding the content and viewpoint of LeadMN's speech, assembly, and/or public advocacy protected by the First Amendment.

118.   The Board refused and continues to refuse to act on LeadMN's 2021 fee proposal, and has refused and refuses to collect the fee proposed by LeadMN through such proposal, because of third parties' desires to retaliate against LeadMN because of LeadMN's speech, assembly, and/or public advocacy protected by the First Amendment.

119.   The Board believes it may "revise or reject" a proposed fee change by a student association:

    a.   For any reason;

    b.   with unbridled discretion;

    c.   without narrow, objective, definite, and binding standards that limit the Board's discretion;

    d.   without a written order or written findings that identify the factual and legal basis for the Board's decision;

    e.   without a binding deadline; and

    f.   without an appeal process available to the association.

120.   The Board made no findings and did not issue any decision regarding its refusal to collect the fee proposed by LeadMN.

121.   The Board is not required to publicly state, explain, or identify the reasons for rejecting or for refusing to collect a fee proposal.

122.   The Board exercises unbridled discretion to revise, reject, or refuse to act on a student association fee change.

123.   The Board has not adopted written policies which limit its discretion or protect the rights of LeadMN or other student associations.

124.   The Board did not take action on LeadMN's fee proposal and has not collected the additional fees requested by LeadMN because it had, or it believed it had, unbridled discretion to reject or to simply refuse to take action on LeadMN's fee proposal.

125.   There are no standards, and certainly no narrow, objective, definite, or binding standards, that guide or constrain the Board's decisions, action, or inaction regarding any fee proposal made by LeadMN or another student association.

126.   The Board is free, or believes it is free, to apply different standards for requests by different student associations without notice or justification.

127.   There is no deadline by which the Board must revise or reject LeadMN's fee proposal or other fee change.

128.   The Board has ignored the requirement of its limited policy, Policy 3.7, that requires the Board to revise or reject a fee proposal "during the two board meetings immediately following the fee change submission."

129.   The Board's decision on LeadMN's fee proposal is final. There is no process of appeal or higher decision maker that could reverse the Board's decision.

130.    The Board's unfettered discretion to amend or reject a fee change proposal allows it to engage in unlawful retaliation, unlawful content discrimination, or unlawful viewpoint discrimination without detection.

131.    LeadMN and Students United feel pressure to censor their speech to please the Board and Chancellor in order to obtain approval for fees needed for its advocacy, representation, and services on behalf of its members.

132.    The Board did not consider any amendment or partial increase or less restrictive alternative to refusing to act on LeadMN's fee proposal.

133.    All acts set forth herein of the Board and its agents, servants, employees, or persons acting at its behest or direction, were done, and are continuing to be done under the color and pretense of state law and pursuant to the Board's policies, practices and/or customs.

134.    The Board's foregoing Board actions and inaction are not lawful time, place, or manner regulations, as they were not narrowly tailored to serve a significant government interest, and do not leave open ample alternative channels for collection of fees necessary for communication.

135.    The Board's content and viewpoint-based restrictions are not supported by a compelling government interest and are not narrowly tailored or the least restrictive means to accomplish a compelling governmental interest.

136.    The Board's refusal to act on LeadMN's fee proposal constitutes content-based and viewpoint-based restriction of speech and of assembly.

137.    The Board, and the Board's agent Chancellor Malhotra, unlawfully retaliated against LeadMN because of its protected speech, expression, and public advocacy by refusing to act on and refusing to collect the fee proposed by LeadMN.

138.    The Board's actions and its policies, practices and/or customs, on their face and as applied to LeadMN, violate, and violated the Free Speech and Freedom of Assembly Clauses of the First Amendment to the Constitution of the United States.

139.    The Board's actions, policies, practices and/or customs, on their face and as applied to LeadMN, unlawfully chill, deter, and restrict, and chilled, deterred, and restricted, LeadMN and its members' exercise of its right to speech, assembly, and to engage in public advocacy.

140.    LeadMN has no adequate remedy at law to correct the continuing deprivations of its rights.

141.    As a direct result of the foregoing violations of LeadMN's First Amendment rights to the freedom of speech and assembly, as alleged above, LeadMN is suffering irreparable harm for which there is no adequate remedy at law. LeadMN is therefore entitled to injunctive relief.

142.    LeadMN is entitled to recover its attorneys' fees pursuant to 42 U.S.C. § 1988 and FED. R. CIV. P. 54(d).

## PRAYER FOR RELIEF

WHEREFORE, LeadMN prays for judgment against Defendants and that this Court:

A.     Adjudge, decree, and declare the rights and other legal relations of the parties to the subject matter in controversy in order that such declarations shall have the force and effect of final judgment and that the Court retain jurisdiction of this matter for the purpose of enforcing the Court's Orders;

B.     Pursuant to 28 U.S.C. § 2201, declare the aforementioned unlawful actions of the Board, and the Board's unlawful policies and practices described above to be in violation of the First and Fourteenth Amendments to the United States Constitution;

C.     Pursuant to 28 U.S.C. § 2202, FED. R. CIV. P. 65, and 42 U.S.C. § 1983, permanently enjoin Defendants and the Board from: (i) refusing to collect a fee for LeadMN of at least $0.61 per credit; (ii) revising, rejecting, or refusing to collect a fee proposed by, or funds on behalf of, a student association because of the content or viewpoint of the association's speech, assembly, or public advocacy; (iii) revising, rejecting, or refusing to collect a fee proposed by, or funds on behalf of, a student association in retaliation for students' or the association's speech, assembly, or public advocacy; (iv) revising, rejecting, or refusing to collect a fee proposed by, or funds on behalf of, a student association without narrow, objective, definite, and binding standards that limit the Board's discretion; (v) revising, rejecting, or refusing to collect a fee proposed by, or funds on behalf of, a student association without written findings that identify the factual and legal basis for such decision; (vi) revising, rejecting, or refusing

to collect a fee proposed by, or funds on behalf of, a student association without a binding deadline; (vii) revising, rejecting, or refusing to collect a fee proposed by, or funds on behalf of, a student association without an appeal process available to the association; (viii) revising, rejecting, or refusing to collect a fee proposed by, or funds on behalf of, a student association because of a third party's opinion regarding the content or viewpoint of a student association's speech, assembly, or public advocacy; and (ix) revising, rejecting, or refusing to collect a fee proposed by, or funds on behalf of, a student association because of a third party's desires to retaliate against an association because of the association's speech, assembly, or public advocacy.

D.      Pursuant to 42 U.S.C. § 1988 and FED. R. CIV. P. 54(d), award LeadMN its reasonable attorneys' fees and costs;

E.      Grant such other and further relief as the Court deems equitable, just, and proper.

Dated: March 31, 2022                    **CROSSCASTLE PLLC**

By: /s/Samuel W. Diehl
    Samuel W. Diehl (#388371)
333 Washington Avenue N.
Ste 300-9078
Minneapolis, MN 55401
P: (612) 429-8100
F: (612) 234-4766
Email: sam.diehl@crosscastle.com

**ATTORNEYS FOR PLAINTIFF MINNESOTA STATE COLLEGE STUDENT ASSOCIATION, INC. D/B/A LEADMN**

4868-4416-3858, v. 8