## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| Minnesota State College Student Association, Inc., d/b/a LeadMN,<br><br>Plaintiff,<br><br>vs.<br><br>Jay Cowles, Rudy Rodriguez, Asani Ajogun, Victor Ayemobuwa, Alex Cirillo, Dawn Erlandson, Jerry Janezich, Roger Moe, Javier Morillo, April Nishimura, Oballa Oballa, Kathy Sheran, George Soule, Cheryl Tefer, and Michael Vekich, in their official capacities as Trustee Members of the Board of Minnesota State Colleges and Universities.<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 22-cv-00771-ECT-ECW<br><br><br><br><br>**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |

## <u>INTRODUCTION</u>

LeadMN is an independent, student-led association representing more than 100,000 students at 30 MNSCU community and technical colleges across Minnesota. Its student leaders and staff speak and advocate on behalf of public college students in the media, with Defendants, MNSCU's Trustees, and other government leaders. It also facilitates the collective assembly and expression of students by developing student leaders, hosting regular assemblies of college student association leaders to select its leaders and determine how it will speak, advocate, and serve college students.

LeadMN's speech and public advocacy has frustrated Trustees and MNSCU leaders. As a result, since June 2021, Trustees' have refused to collect funds LeadMN

intended and intends to use for speech, assembly, and expression protected by the First Amendment.  Evidence shows that Trustees desired to retaliate in response to LeadMN's past speech and advocacy and to refuse new funding that they knew would be used to increase and amplify LeadMN's speech.

Trustees' violations of the First Amendment were enabled by an unlawful fee review process that operates as an unlawful prior restraint on LeadMN's speech. Minnesota Statute Section § 136F.22 ("Section 136F.22") requires the Board[1] to collect funds LeadMN uses for its protected speech, assembly, and advocacy. Trustees and MNSCU leaders know fees collected for LeadMN fund its speech. They also know that if they refused LeadMN's request for additional fees, they could diminish LeadMN's fees. As the Supreme Court has long recognized, "virtually every means of communicating. . . requires the expenditure of money." *Buckley v. Valeo*, 424 U.S. 1, 19 (1976). By refusing LeadMN's request, the Board would "necessarily reduce the quantity of [LeadMN's] expression by restricting the number of issues discussed, the depth of their exploration, and the" number of students reached by LeadMN's speech and advocacy. *Id*.

The Board's processes and policies implementing Section 136F.22, and used to consider student association fee requests, allow Trustees to retaliate and engage in viewpoint discrimination without detection. In refusing to collect LeadMN's fees, the Board had no guidelines or limitations, issued no decision, made no findings, cited no evidence, and simply never acted at all. This unbridled discretion in considering student

---

[1] Defendants are referenced as the "Board," when referring to the governing body, and as "Trustees," and each a "Trustee" when referring to them as individual(s).

association fee requests to fund speech and advocacy operates as a prior restraint in violation of the First Amendment— "the most serious and the least tolerable infringement on First Amendment rights." *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976). The mere existence of the Board's unlawful prior restraint scheme is unlawful and must be enjoined. *See City of Lakewood v. Plain Dealer Pub. Co*., 486 U.S. 750, 757-58 (1988); *Viewpoint Neutrality Now! v. Regents of Univ. of Minn.* 516 F.Supp.3d 904, 920-923 (D. Minn. 2021) (citing *Southworth v. Board of Regents of Univ. of Wis. Sys*. ("*Southworth II*"), 307 F.3d 566, 579 (7th Cir. 2002)); *Secretary of State of Md. v. Joseph H. Munson Co., Inc*., 467 U.S. 947, 964 n. 12 (1984). Because LeadMN has demonstrated Defendants are in violation of its First Amendment rights, its requested preliminary injunction must issue. *See Phelps–Roper v. Troutman*, 662 F.3d 485, 488 (8th Cir. 2011) (*per curiam*).

## FACTUAL BACKGROUND

## I.   DEFENDANTS

The Minnesota State Colleges and Universities system ("MNSCU") consists of thirty public community and technical colleges and seven universities across Minnesota. (Compl.[2] ¶7.) MNSCU is governed by Defendants, the fifteen Trustees who constitute its Board.

---

[2] In his sworn Declaration ("Dean Decl.") Michael P. Dean verifies the factual allegations in LeadMN's Complaint, Docket No. 1 ("Compl."). (Dean Decl. ¶2.) These allegations are cited herein only as "Compl. ¶#.".

## II.     LEADMN AND ITS SPEECH AND STUDENT ADVOCACY

LeadMN is an independent Minnesota nonprofit corporation. LeadMN's members include all students enrolled in at least one credit at a MNSCU community and technical college. (*Id.* ¶11.) LeadMN is governed by, and conducts advocacy through, student leaders elected from its student members at its General Assembly. (*Id.* ¶16.) This Assembly is the association's highest decision-making authority. The General Assembly is made up of student representatives from all MNSCU colleges. A quorum representing at least twenty of MNSCU's thirty colleges is required for the assembly's decisions. (*Id.* ¶17.) The General Assembly elects LeadMN's leaders and determines LeadMN's advocacy positions, programs, plans, policies, and budget. (*Id.* ¶18.)

After its priorities are determined by the General Assembly, LeadMN's advocacy, speech, and programs are carried out by its student officers and staff employed by LeadMN. (*Id.* ¶19.) LeadMN's staff report to its Executive Director. (*Id.* ¶20.) LeadMN's Bylaws describe its purposes, including:

1.  To advocate for students in Minnesota Technical Colleges, Community Colleges, and Consolidated Colleges through their Campus Student Governments (herein referred to as CSG's);
2.  To empower the CSG's by organizing, providing, and promoting activities that encourage unity within the student community;
3.  To provide opportunities for students to develop their leadership skills;
4.  To provide information and advocate on behalf of students to decision makers on issues affecting students;
5.  To facilitate and support students to be more visible and active at the local, state, and national level;

6. To establish an effective and efficient network of communication among students, campuses, and LeadMN;

7. To ensure that all student voices are heard through recognizing, encouraging, and supporting diversity in order to foster student community; and

8. To promote higher education equality for all . . . .

(*Id.* ¶21.)

LeadMN provides information to students, creates opportunities for students to purposefully assemble to communicate and debate with other students, participate in decisions regarding LeadMN's public positions and advocacy, participate in leadership and advocacy training, and become leaders. LeadMN's public advocacy on behalf of students includes petitioning/requesting that elected and appointed government leaders make decisions and exercise their powers or decide contentious issues in favor, or for the good, of the students that LeadMN represents. (Compl. ¶22.) LeadMN's leaders represent MNSCU students and engage in public advocacy on their behalf. LeadMN's advocacy efforts include speaking with elected and appointed government leaders, offering testimony at legislative hearings and Board meetings, and communicating publicly regarding issues important to MNSCU students. (*Id.* ¶23.) In 2020 alone, LeadMN leaders:

- Met with dozens of federal and state officials, including 90 meetings with state legislators advocating for LeadMN's priorities;

- Helped 2,985 Minnesota college students to register to vote;

- Were quoted in news media more than thirty times; and

- Provided testimony at every MNSCU Board meeting.

(*Id.* ¶24.)

LeadMN's advocacy on behalf of students means its leaders must challenge, attempt to influence, and potentially criticize the Board and MNSCU's administration. For example, LeadMN has consistently advocated for lower student tuition and opposed Board efforts to raise tuition, including in 2020. (*Id.* ¶25.) LeadMN worked with legislators to support a freeze in MNSCU tuition at community and technical colleges mandated by the Legislature over a six-year period, from 2013 to 2019. This was important to students, but angered MNSCU leaders, administrators, and Trustees. (*Id.* ¶26.)

LeadMN testified before the Board that it must do more to address racial disparities, including raising serious questions for the Board in 2017. (*Id.* ¶27.) LeadMN's work opposing Board efforts to add new student fees in 2018 was publicized. (*Id.* ¶28.) LeadMN has worked with legislators to mandate other higher education reforms on behalf of students, including measures related to student transfers, developmental education, online education resources, and food insecurity. The Board and MNSCU administrators have often viewed these reforms negatively. (*Id.* ¶29.) In June 2020, LeadMN's Governing Council responded to the murder of George Floyd by calling on the Board to convene a statewide working group to review MNSCU law enforcement programs. (*Id.* ¶30.)

LeadMN student leaders raised concerns regarding MNSCU's response to COVID-19. LeadMN surveyed students and publicized their struggles. Its's President raised concerns regarding MNSCU's efforts to teach online. The Star Tribune quoted her

as stating, "I don't feel like I am getting an education. . . . You are practically teaching yourself." (*Id.* ¶31[3].) LeadMN continues to publicly advocate for issues that are important to students, regardless of their popularity with the Board.

LeadMN leaders found recent *Star Tribune* reports describing the Chancellor's and Board's response to discrimination and harassment deeply troubling. These reports confirmed LeadMN's experience. However, when LeadMN's student President had an opportunity to testify before the Board, the opportunity posed a potential dilemma. (*Id.* ¶32, 35.) Student leaders believed they must speak out regarding students' serious concerns, consistent with LeadMN's longtime advocacy supporting equity, inclusion, empowerment, and integrity. (*Id.* ¶34.) At the same time, the actions, and inaction, of MNSCU's Chancellor and Board in 2021 demonstrated that the Board would likely retaliate in response to LeadMN's public comments and advocacy. (*Id.* ¶35.)

III.   **THE BOARD'S DUTY TO COLLECT FEES THAT FUND LEADMN'S SPEECH, ASSEMBLY, AND ADVOCACY**

Subdivision 1 of Section 136F.22 requires the Board to recognize two different student associations, one for university students and one for community and technical college students. (*Id.* ¶36.) Pursuant to Section 136F.22, LeadMN is the recognized student association representing students at MNSCU's community and technical colleges. (*Id.* ¶37.) And Minnesota State University Student Association, Inc. d/b/a Students United is the nonprofit student association recognized for MNSCU University students pursuant to Section 136F.22. (*Id.* ¶38.)

---

[3] *See also* Kimble Decl. Ex. 13.

The Board is required by statute to collect LeadMN's and Students United's fees pursuant to Subdivision 2 of Section 136F.22. (*Id.* ¶39.) Subdivision 2 allows changes to each association's fee, but any changes must first be submitted and approved by the Board. The statute does not restrict the Board's discretion to "revise or reject the [proposed] fee change" for any reason. Minn. Stat. § 136F.22. Subd. 2; (Compl. ¶40.) The Board adopted Policy 3.7, titled "Statewide Student Association" related to Section 136F.22. This policy largely corresponds to Section 136F.22 regarding the collection of fees, but adds that the Board must revise or reject a requested change "during the two board meetings immediately following the fee change submission." (Compl. ¶41.) The Board does not believe it is required to follow Policy 3.7. (*Id.* ¶42.)

## IV.  THE BOARD'S RETALIATION, VIEWPOINT DISCRIMINATION, AND EXERCISE OF UNFETTERED DISCRETION RELATED LEADMN'S FEE PROPOSAL

In 2021, LeadMN's General Assembly considered and adopted a plan to expand its efforts on behalf of students, including:

- improving its outreach, communication with, and the engagement of students in its advocacy and efforts to support students;

- facilitating student-to-student communications, advising, and counseling through new and additional support services to students;

- increasing and improving solicitation and fundraising efforts independent of the Board's collection of fees;

- creating an online student engagement platform and student newspaper. (*Id*. ¶¶43, 47.)

8

LeadMN's General Assembly voted and approved these efforts and its budget. This budget included a proposed fee increase to $0.61 per credit to fund and enable these efforts. (*Id.*) When they considered its proposal, Trustees were aware that a majority of student representatives at the General Assembly had approved the proposal. (*Id*. ¶49.)

Since 2015, LeadMN's fee has been $0.35 per credit. (*Id.* ¶44.) In April 2021, LeadMN informed Trustees that it proposed to increase its fee to $0.61 (LeadMN's "2021 fee proposal"). This increase would have increased LeadMN's per-credit fee to match the level approved by the Board for Students United three years earlier. (*Id.* ¶45.) Before and after LeadMN submitted its fee proposal, Trustees were aware that LeadMN uses funds collected on its behalf by the Board for speech, assembly, and public advocacy, including raising issues and seeking redress with elected and appointed government leaders on behalf of the students it represents. (*Id.* ¶46.) However, LeadMN hoped that the Board would approve its fee proposal similar to the two Students United proposals approved by the Board without debate in 2017 and 2018. (*Id.* ¶52-53.) In considering Students United's proposal, the Board did not seek out additional third-party comment and did not attempt to generate opposition. (*Id.* ¶54.) That association had not been critical of MNSCU's Chancellor or the Board and had not opposed the Board's recent proposals to increase student tuition. (*Id.* ¶55.)

When LeadMN's student leaders presented its fee proposal to the Board for approval , they explained how funds collected by the Board are and would be used for LeadMN's protected speech. (*Id*. ¶¶48, 56.) LeadMN explained that funds collected by the Board had enabled LeadMN's past advocacy and speech, including:

- advocacy with state and federal legislators in support of investments in MNSCU colleges, open educational resources, students' basic needs, and mental health funding, among other priorities.

- leadership in the fight for policy changes to better support student success through Developmental Education Reform, Transfer Pathways, Hunger Free Campus Act, and the Mental Health Awareness Act; and

- efforts to promote civic engagement on campuses by coordinating voter registration efforts registering over 10,000 students and helping Minnesota lead the nation in youth voter turnout in 2018 and be runner-up in 2020.

(Dkt 12 Declaration of Janine Kimble ("Kimble Decl.") Ex. 9 (Dkt. 12-7) pp. 183-84 of 264 .) LeadMN made clear that its proposed increase in funding had been approved by assembled student representatives from MNSCU colleges across Minnesota at LeadMN's General Assembly. (*Id.* p. 184 of 264.)

When Trustees considered LeadMN's fee proposal in May and June 2021, they knew that if they approved the proposal LeadMN would use the additional funds collected for speech, assembly, and public advocacy protected by the First Amendment. (Compl. ¶48.) MNSCU records demonstrate that when its Chancellor, Board Chair, and other Trustees learned of LeadMN's fee proposal, they covertly worked to generate opposition to LeadMN's request. (*Id.* ¶59; Dean Decl. Exs B-G, K-L.) They violated Minnesota's Open Meeting Law by deliberating about LeadMN's fee proposal outside of a public meeting. Trustees sought to evade disclosure and public scrutiny of their efforts to scuttle LeadMN's fee proposal. (*Id.* ¶60; Dean Decl. Exs. A, G.)

Trustees and MNSCU administrators, including Chancellor Malhotra, covertly coordinated opposition to LeadMN's fee proposal outside of public meetings using group text messaging and electronic "chat" tools. (Compl. ¶61; Dean Decl. Exs. A, G.) In an

electronic chat message sent to Board Finance Committee Chair/Trustee Roger Moe, a Trustee stated, "Chancellor's office will arrange a zoom of the three of us to discuss LeadMN request. . . . Have spoken with three other trustees; [Chancellor] Devinder [Malhotra] forwarded [LeadMN's Executive Director's] email with suggestions." (Dean Decl. Ex. G.) LeadMN was not included in these discussions. Neither Chancellor Malhotra nor any other MNSCU representative copied LeadMN or otherwise sent LeadMN the referenced email message or "suggestions" to LeadMN. (*Id.*; Compl. ¶62.)

Trustee Dawn Erlandson sent a text message to a 10-person group text that included other Trustees. She suggested that Trustees *use* the Board's authority related to LeadMN's fee proposal to retaliate against LeadMN for its public testimony and advocacy opposing the Board's efforts to increase student tuition. (Compl. ¶63; Dean Decl. Ex. A.) Trustee Erlandson suggested someone should inform state legislators that LeadMN "oppose[d] tuition [increases proposed by the Board] yet are seeking yet another fee increase?" (Compl. ¶64; Dean Decl. Ex. A.) Trustee Michael Vekich responded to Trustee Erlandson's text, "Concur." He added that he had "operational questions" he intended to "address with [Finance Committee] chair Moe." (Compl. ¶65; Dean Decl. Ex. A.) MNSCU Director of Government Relations responded to Trustee Vekich's text, "I have not had legislative conversations regarding the increase as the process is prescribed to be between the students and the BOT [Board of Trustees]." (emphasis added). (Compl. ¶66; Dean Decl. Ex. A.) In response to LeadMN's fee proposal, MNSCU leaders and administrators communicated with preferred third parties

to arrange for and generate opposition to LeadMN's fee proposal. (*Id.* ¶67; Dean Decl.

Exs. B-C, K-L.)

LeadMN's fee proposal was considered by the finance subcommittee of MNSCU's

Board on May 19 and June 16, 2021. (Kimble Decl. Exs. 10-11.) LeadMN's student leaders

informed Trustees that additional funds received after approval of its proposal would be

used to expand LeadMN's speech. They informed the Board that increased fees from its

the fee proposal would fund:

- Marketing, outreach, and student engagement efforts to better connect students from across the entire MNSCU system to each other through LeadMN, to build a sense of belonging, including through enhanced online engagement platforms and establishing a student newspaper; (Kimble Decl. Ex. 1 at 2:26:44-2:26:56, 2:30:00-2:30:14.)

- To hire benefits navigators to communicate with and educate students regarding federal, state, local, and private benefits potentially available to them; (*Id*. Ex. 1 at 2:25:46-2:26:16.)

- Outreach staff to improve LeadMN's student engagement efforts at the 34 MNSCU colleges LeadMN serves; (*Id*. Ex. 1 at 2:29:41-2:30:23.) and

- To expand the group's fundraising efforts by hiring a new LeadMN development director. (*Id*. Ex. 1 at 2:29:49-2:29:59.)

One of LeadMN's student leaders summarized the goal of LeadMN's fee proposal for the

Board, "Raising our fee at the end of the day is an investment for students in their voice

and in their success." (*Id*. Ex. 2 at 1:18:13-1:18:19.) Trustees and third-party allies of

Trustees had other ideas about LeadMN's speech.

The Minnesota Association of Professional Employees ("MAPE") is a labor union

representing certain MNSCU employees. (*Id.* ¶68.) MAPE is aware of LeadMN's

advocacy on behalf of students who have been subject to discrimination by MAPE

members. (*Id.* ¶69.) After coordination with the Board, on May 19, a representative of MAPE informed Trustees that LeadMN's proposed efforts "will be harmful to students and employees." (*Id.* Ex. 1 at 2:32:59-2:33:31.) MAPE's criticisms focused on LeadMN's speech, alleging students may be "misled" or wrongly "advised" by LeadMN and that MNSCU "campuses may not choose to create new positions to meet the needs of students or leave open positions unfilled with the understanding that [counseling and advising] resources will be provided" by LeadMN. (*Id*. Ex. 1 at 2:33:48-2:34:42 .) (5/19 Finance recording.) MAPE was concerned that MAPE union members, not LeadMN representatives, should be speaking with students.

For their part, at finance subcommittee meetings in May and June 2021, Trustees raised concerns specifically regarding LeadMN's speech, including that they had received a "couple of letters from student Senate organizations that have expressed opposition to the fee" proposal—ignoring that a majority of student government organization ***approved*** the fee proposal at LeadMN's General Assembly. Trustees and MNSCU leaders expressed concerns, similar to MAPE's, that LeadMN's proposed student counseling and advising was speech that should be undertaken by MNSCU employees or preferred "partners", but not LeadMN. Such comments included:

- "If we bring in other people [LeadMN] to do those things [proposed by LeadMN] it defeats the purpose of what paid administrators or paid professionals on campus are supposed to do . . . ." (*Id*. Ex. 2 at 2:10:10-2:10:23.)

- "I am very concerned that we are trying in some way . . . to replicate or displace the people that are already on campus. . . . [Counseling and advising students is] our obligation. It is not LeadMN's job. I appreciate very much what

you're trying to do. But this isn't the right way to do it . . . ." (*Id*. Ex. 2 at 1:55:45-1:56:44.)

- "[M]y question for Minnesota state [leaders] is to what extent . . . would [LeadMN's proposed] services be helpful, would they supplement, would they interfere, would they aid, would they . . . complement" MNSCU's advice and communications with students. (*Id*. Ex. 2 at 1:28:43-1:29:13.)

- "[A]n alternative that you could do in order to have a direct influence with students who really are focused on the students' concerns [for mental health resources is] instead of building [capacity] within your own organization, create grants and target them to where you see they need to go" to pay for MNSCU resources. (*Id*. Ex. 2 at 2:07:06-2:07:21.)

- If LeadMN is allowed to "bring in other people to [communicate with students] it defeats the purpose of what paid administrators or paid professionals on campus are supposed to do. And . . . that becomes a waste of money. [I]f we have counselors on campus and . . .students feel as if they're not doing their job or they feel not heard, then maybe [the Board] should look into that aspect" rather than approve LeadMN's activities. (*Id*. Ex. 2 at 2:10:11-2:10:34.)

In addition to their apparent preference for other preference, MNSCU Leaders and Trustees made comments indicating a desire to retaliate for LeadMN's past failure to be "collaborative" or a "partner" with MNSCU leaders. Trustees and MNSCU leaders:

- Sent text messages suggesting Trustees and MNSCU leaders inform legislators that after opposing their tuition increases, LeadMN was now proposing increasing its fee; (Compl. ¶¶64-67; Dean Decl. Ex. A.)

- Stated "there is a need on [the Board's] part to recognize the need for ***accountability*** and ***collaboration*** with those parties who offer those services or suggest to offer those services on our campuses" (Compl. ¶99.)

- After noting that LeadMN had, in fact, followed its guidelines for approving its fee proposal, a Trustee stated that LeadMN's process of communication preferred third parties "does not appear . . . to have been the kind of collaborative process that we constantly recognize and try to engage in." (Kimble Decl. Ex. 2 at 2:22:21-2:22:21.)

- LeadMN had not or might not work in "true collaboration or partnership with our system" or its Chancellor. (Compl. ¶84.)

14

Trustees had worked with college presidents, administrators, and student government leaders to generate opposition to LeadMN's fee proposal. The Board did not request comment or opposition to Students United's requests for fee increases in 2017 or 2018. (*Id.* ¶74; Dean Decl. Exs. B-G, K-L.) MNSCU's Chancellor opposed LeadMN's fee increase because he believed that LeadMN had not sufficiently consulted with him in advance, that LeadMN did not share a joint common goal with MNSCU administrators, and that LeadMN had not worked collaboratively with MNSCU administrators. (*Id.* ¶82.)

Only the Board had authority regarding LeadMN's fee proposal. Nonetheless, the Board required LeadMN to meet with MNSCU college presidents regarding its fee proposal. (*Id.* ¶76.) Students United had not been required to meet with MNSCU college presidents. (*Id.* ¶77.) LeadMN had already fulfilled its decision-making process that allowed student government leaders from every MNSCU college to participate in LeadMN's General Assembly. (*Id.* ¶75.)

After the May Finance Committee meeting, LeadMN asked to meet with Trustees about its fee proposal and to answer Trustees' questions. Other stakeholders have met with Trustees individually regarding Board business. However, Board Chair Cowles refused to allow LeadMN's leaders to meet with other Trustees. (*Id.* ¶83.) Board Chair Cowles finally met with LeadMN representatives on June 2, 2021. In this meeting, he acknowledged "the reality . . . that we [the Board] have absolutely no oversight about any of what you [LeadMN], what services you choose to provide. The only thing that we have oversight of is your fee." Nonetheless, Chair Cowles stated that he and other Trustees intended to leverage the Board's ability to revise or reject LeadMN's fee

proposal to control LeadMN. He stated that the Board might not approve LeadMN's fee

proposal because LeadMN had not or might not work in "true collaboration or

partnership with our system" or its Chancellor. (*Id.* ¶84.)

    In the end, seven members of the Board's Finance Committee were the only

Trustees to consider LeadMN's fee proposal. Some of the five members that ultimately

blocked Board consideration of the proposal made comments that appeared to be

retaliatory or that indicated a desire that MNSCU personnel speak with students, rather

than LeadMN. (Kimble. Decl. Ex. 2.) Finance subcommittee members were informed by

the subcommittee's Chair shortly before they voted to block LeadMN's proposal on June

16, 2021, that:

> Our responsibility is to make a decision on [LeadMN's
> proposed] fee increase. And now we've heard what they intend
> to do with the fee increase. And ***so the question would be, is
> that something we want to go along with?***

(Kimble Decl. Ex. 2 at 2:13:55-2:14:32 (emphasis added).) Finance Committee members

voted against approving a motion to forward by a vote of two to five. (Compl. ¶88.)

    The Finance Committee did not make any findings regarding this motion or

LeadMN's fee proposal. The Finance Committee did not issue any decision or provide

any explanation orally or in writing regarding the failure of this motion or LeadMN's fee

proposal. (*Id.* ¶89.) The Finance Committee did not consider any alternatives to the

motion read by Finance Committee Chair Moe regarding LeadMN's fee proposal. (*Id.*

¶90.)  The Finance Committee did not consider revising LeadMN's fee proposal to allow

an increase in fees that would be used for speech or advocacy. (*Id.* ¶91.) If the Finance

Committee's decision was based on aspects of LeadMN's proposed use of fees that would be collected, the Committee did not consider approving a revised fee increase that would fund those aspects of LeadMN's proposal that the Committee did not find objectionable, or that MAPE or other "partners" of the Committee did not find objectionable. (*Id.* ¶92.)

Even though its Policy 3.7 purports to require the Board to related to revise or reject a requested student association fee change "during the two board meetings immediately following the fee change submission." (*Id*. ¶41.) However, the full MNSCU Board never voted on LeadMN's proposal. (*Id*. ¶42.) The Board did discuss LeadMN's fee proposal during its regular Board meeting also on June 16. However, Board Chair Cowles informed Trustees that LeadMN's proposal would not be voted on by the Board because the Finance Committee had not approved a motion asking the Board to approve LeadMN's proposal. (*Id.* ¶93.) The only reference to LeadMN's proposal in the minutes of the Board's June 16 meeting is "LeadMN Fee Proposal (Second Reading) did not pass in Finance Committee and will be removed from the consent agenda." (*Id.* ¶94.) In the end, the Board:

- did not revise, reject, or take any other action regarding LeadMN's fee proposal at its June 16 meeting or at any other meeting. (*Id.* ¶95.)

- never voted on LeadMN's fee proposal. (*Id.* ¶96.)

- never made any findings or issued any written decision regarding LeadMN's fee proposal or its refusal to the fee proposed. (*Id.* ¶97.)

- never considered any alternatives to authorize a partial fee increase for
  LeadMN or a fee increase to be spent on speech that the Board did not find
  objectionable. (*Id.* ¶98.)

- has not increased the fee collected for LeadMN after LeadMN's submission of
  its fee proposal in 2021. (*Id.* ¶101.)

- collected the same fee for LeadMN during the 2021-2022 school year as they
  collected during the 2020-2021 school year. (*Id.* ¶101.)

At the Board's June 16 meeting, Board Chair Cowles summarized why LeadMN's
fee proposal was not brought before the Board. He stated there was "need for
accountability and collaboration" and that before the Board would approve funding,
LeadMN must meet "with the chancellor, campus leadership, student Senate leadership
and gain their support . . . ." (*Id.* ¶99.) At the end of this discussion, a Trustee
summarized concerns regarding a retaliatory "undercurrent" in the Board's refusal to
consider LeadMN's fee proposal, stating:

> I need to understand the culture around this, sort of the feeling
> around this, it felt to me as a new member that there's another
> undercurrent issue about student pressure being placed on
> [MNSCU's] administration to achieve what they see as a need.
> And how the [MNSCU] system sees that, and reacts to that.
> And it concerns me that we not be creating a negativity in . . .
> how we think about student organizations and their advocacy
> work and their desire to increase their capacity to influence the
> system that that I'd like to have a more forthright conversation
> about what the culture is about that in the system.

(Kimble Decl. Ex. 3 at 1:06:37-1:07:48.)

<u>**ARGUMENT**</u>

## I.      PRELIMINARY INJUNCTION STANDARD

The Court has broad power to order preliminary injunctive relief pursuant to Rule 65 of the Federal Rules of Civil Procedure. As the Court is aware, in the Eighth Circuit a plaintiff seeking injunctive relief must normally establish:

1.      The threat of irreparable harm to the movant;

2.      The balance between the harm to the moving party and the injury that granting the injunction will inflict on the other party;

3.      The probability that the movant will succeed on the merits; and

4.      The public interest.

*Dataphase Sys., Inc. v. C L Sys., Inc.*640 F.2d 109, 114 (8th Cir. 1981). "The third factor, probable success on the merits, is frequently considered the most important," *Am. Dairy Queen v. New Line Prod.*, *Inc.*, 35 F. Supp. 2d 727, 729 (D. Minn. 1998). However, "[w]hen a plaintiff has shown a likely violation of his or her First Amendment rights, the other requirements for obtaining a preliminary injunction are generally deemed to have been satisfied." *Troutman*, 662 F.3d at 488; *see also Minn. Citizens Concerned for Life, Inc. v. Swanson*, 692 F.3d 864, 870 (8th Cir. 2012); *Seaton v. Wiener*, 22 F.Supp.3d 945, 949 (D. Minn. 2014). The Supreme Court has made clear that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *see also Johnson v. Minneapolis Park and Recreation Bd.*, 729 F.3d 1094, 1101 (Minn. 2013). LeadMN will therefore address the merits of its First Amendment claim first.

## II.   A PRELIMINARY INJUNCTION SHOULD ISSUE BECAUSE TRUSTEES VIOLATED AND REMAIN IN VIOLATION OF THE FIRST AMENDMENT

LeadMN is an independent nonprofit and its speech, assembly, and public advocacy are protected by the First Amendment. *See Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 354-55 (2010). The Supreme Court has long recognized that "virtually every means of communicating . . . requires the expenditure of money." *Buckley*, 424 U.S. at 19. LeadMN's speech is not exempt from this fundamental reality. And by refusing funds LeadMN requested to expand its speech through its 2021 fee proposal, the Board "necessarily reduce[d] the quantity of [LeadMN's] expression by restricting the number of issues discussed, the depth of their exploration, and the size of the audience reached." *Id*.

LeadMN's First Amendment rights are not diminished because MNSCU's Board collects fees on its behalf. *See Viewpoint Neutrality Now!*, 516 F.Supp.3d at 917 ("[S]peech . . . funded through a student-services fee is student speech (i.e., private speech), not the university's own speech (i.e., government speech).") (parentheticals in original) (citing *Bd. of Regents of Univ. of Wis. Sys. v. Southworth*, 529 U.S. 217, 233-235 (2000)); *cf. Legal Services Corp. v. Velazquez*, 531 U.S. 533, 542 (2001). State action to "control or suppress speech may operate at different points in the speech process," and at each point is equally unlawful. *Citizens United v. Fed. Election Com'n*, 558 U.S. 310, 336 (2010).

Government actions impacting funding to be used for speech are equally subject to First Amendment scrutiny as more direct impacts on speech. For example, "the government offends the First Amendment when it imposes financial burdens on certain speakers based

on the content of their expression." *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 828-29 (1995) (citing *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 108, 123 (1991)); *Legal Services Corp. v. Velazquez*, 531 U.S. 533, 542 (2001). Likewise, state-imposed limits on the amount or percentage a group may spend on speech violate the First Amendment, even if the limitation is content- and viewpoint-neutral. *See, e.g.*, *Schaumburg v. Citizens for a Better Environment*, 444 U.S. 620, 634 (1980) (finding "protecting the public from fraud, crime and undue annoyance" was a substantial government interest, but insufficient to justify a limitation on nonprofit spending on fundraising). "The First Amendment mandates that [courts] presume that speakers, not the government, know best both what they want to say and how to say it." *Riley v. Nat.Fed. of the Blind of N.C., Inc.*, 487 U.S. 781, 790–91 (1988).

The First Amendment protects student association funding and fundraising, no less than other regulated speech.  As the Second Circuit summarized:

> The level of funding a [student] group receives may serve as an expression of approval or disapproval of the group's message. And the amount allocated to a group, whether a lot or a little, can skew debate on issues on which the group advocates a position.

*Amidon v. Student Ass'n of State Univ. of N.Y. at Albany*, 508 F.3d 94, 101 (2d Cir. 2007); *see also Viewpoint Neutrality Now!*, 516 F.Supp.3d at 925 (citing *Forsyth County v. Nationalist Movement*, 505 U.S. 123, 133 (1992)). It is clear from Board member comments that the Board's motives in refusing to approve LeadMN's fee proposal were unlawful—namely retaliation for LeadMN's past speech and viewpoint discrimination

disfavoring LeadMN's intended speech. However, for purposes of this motion, the Court need not determine the Board's actual motive for rejecting LeadMN's proposed funding.

The Board's violation of the First Amendment is evident from even a cursory examination of the unbridled discretion exercised by the Board in refusing LeadMN's 2021 fee proposal. As summarized by the Board's Finance Subcommittee Chair:

> Our responsibility is to make a decision on [LeadMN's proposed] fee increase. And now we've heard what they intend to do with the fee increase. And **so the question would be, is that something we want to go along with?**

(Kimble Decl. Ex. 2 at 2:13:55-2:14:32 (emphasis added).) This understanding of the Board's discretion contravenes the "very purpose of the First Amendment . . . ." *Riley v. Nat. Fed. of the Blind of N.C., Inc.*, 487 U.S. 781, 791 (U.S. 1988). The Board failed to accept that "even with the purest of motives, the government may not substitute its judgment as to how best to speak for that of speakers and listeners; free and robust debate cannot thrive if directed by the government." *Id*.

Subdivision 2 of Section 136F.33 allows changes to LeadMN's fees, but mandates that such changes be submitted to and approved by the Board which purportedly may "revise or reject" a proposed change in LeadMN's fees without limitation or guidelines in statute or Board policy. The Board's understanding of this discretion allowed it to reject LeadMN's 2021 fee proposal:

- For any reason, or more accurately, for no publicly disclosed reason or rationale;

- Without any findings or written decision susceptible to legal challenge and judicial review;

- Without any binding guideline or limitations more rigorous than "is that something we want to go along with?"

- Without any criteria dictating when the Board may or must deny or may or must grant any submitted fee proposal;

- Without consideration by the full Board;

- Without any deadline mandating if or when the full Board must vote up or down on a fee proposal;

- Without any avenue for judicial review; and

- Without regard for the majority vote of student representatives at LeadMN's General Assembly who had approved LeadMN's fee proposal and intended uses of the fees.

The Board's processes and policies allowing it to reject for student association fee proposals with unbridled discretion—knowing this decision would limit LeadMN's speech and advocacy—constitutes an unlawful prior restraint and violate the First Amendment. *See, e.g.*, *Viewpoint Neutrality Now!*, 516 F.Supp.3d at 920-23 (citing *Southworth II*, 307 F.3d at 579); *Joseph H. Munson Co., Inc.*, 467 U.S. at 964 n. 12; *City of Lakewood*, 486 U.S. at 757. The Board's funding approval scheme is unlawful even if the Board had never exercised its discretion to suppress speech:

> First, the mere existence of the licensor's unfettered discretion, coupled with the power of prior restraint, intimidates parties

into censoring their own speech, even if the discretion and power are never actually abused. . . . Self-censorship is immune to an "as applied" challenge, for it derives from the individual's own actions, not an abuse of government power.

Second, the absence of express standards makes it difficult to distinguish, "as applied," between a licensor's legitimate denial of a permit and its illegitimate abuse of censorial power. Standards provide the guideposts that check the licensor and allow courts quickly and easily to determine whether the licensor is discriminating against disfavored speech. Without these guideposts, post hoc rationalizations by the licensing official and the use of shifting or illegitimate criteria are far too easy, making it difficult for courts to determine in any particular case whether the licensor is permitting favorable, and suppressing unfavorable, expression.

*City of Lakewood*, 486 U.S. at 757-58.

Such prior restraints are unlawful whether they relate to approval of a parade permit, access to a government created forum, or access to funding to be used for speech. *See Shuttlesworth v. City of Birmingham*, 394 U.S. 147 (1969) (parade permit); *Forsyth County v. Nationalist Movement*, 505 U.S. 123 (1992) (assembly ordinance); *Viewpoint Neutrality Now!*, 516 F.Supp.3d at 920-23 (citing *Southworth II*, 307 F.3d at 579) (student group funding); *Amidon*, 508 F.3d at 101 (student group funding). In *Secretary of State of Maryland v. Joseph H. Munson Co., Inc*., the Supreme Court considered a content- and viewpoint-neutral statute that designed to protect charities from excess fees by forbidding payments for fundraising expenses of "more than 25% of the amount raised." 467 U.S. at 950. Lower courts approved the statute because it "included a provision authorizing a waiver of the percentage limitation" when the "25% limitation would effectively prevent a charitable organization from raising contributions." *Id*. at 952. The Supreme Court

24

disagreed, finding the fundraising limitation would potentially limit some charitable fundraising efforts which inevitably involve protected speech. *Id*. at 963-64. The Court found arguments regarding the waiver provision unavailing.

> [P]lacing discretion in the hands of [a state] official to grant or deny a license . . . creates a threat of censorship that by its very existence chills free speech. [C]harities whose First Amendment rights are abridged by the fundraising limitation simply would have traded a direct prohibition on their activity for a licensing scheme that, if it is available to them at all, is available only at the unguided discretion of" a state official.

*Id*. n. 12.

Here, the Board's asserted power to reject or restrain LeadMN's funding used for private speech is an unlawful "prior restraint." *See*, *e.g.*, *Blue Moon Ent., LLC v. City of Bates City, Mo.*, 441 F.3d 561, 565 (8th Cir. 2006). "[P]rior restraints on speech and publication are the most serious and the least tolerable infringement on First Amendment rights." *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976). Any such regulation bears "a heavy presumption against its constitutional validity" and "without narrow, objective, and definite standards to guide the licensing authority, is unconstitutional." *Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 558 (1975) (quoting *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 n. 10 (1963)); *see also Blue Moon*, 441 F.3d at 565. The Board's unlimited discretion is not constrained by any "narrow, objective, and definite standards to guide" its funding decisions, unlawfully may "impose a restraint for a [un]specified and" indefinite period, and do not "provide for prompt judicial review." *Blue Moon*, 441 F.3d at 565. Either Section 136F.22 or binding Board policy must prevent the Board continuing to exercise such "unbridled discretion." *Id.* Such standards

are necessary because if public officials are allowed "unduly broad discretion in determining whether to grant or deny a permit, there is a risk that [they] will favor or disfavor speech based on its content." *Thomas v. Chicago Park Dist.*, 534 U.S. 316, 323 (2002); *see Viewpoint Neutrality Now!*, 516 F.Supp.3d at 920 (citing *Southworth II*, 307 F.3d at 579).

Because the Board is in violation of the First Amendment, an injunction must issue. Plaintiffs' proposed order outlines the specific injunctive relief required to remedy Defendants' specific violations.

## II.   WHILE FINDINGS ARE NOT REQUIRED, THE REMAINING *DATAPHASE* FACTORS ALSO SUPPORT ISSUANCE OF A PRELIMINARY INJUNCTION IN FAVOR OF LEADMN

### A.   LeadMN is suffering, and will imminently suffer, irreparable harm

As set forth above, MNSCU has violated Plaintiffs's rights under the First Amendment and RLUIPA. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Elrod v. Burns,* 427 U.S. 347, 373 (1976). Therefore, "[i]n the context of First Amendment cases, courts normally assume irreparable injury." *Jihad v. Fabian*, 680 F. Supp. 2d 1021, 1031 (D. Minn. 2010) (internal quotation omitted). "This principle applies with equal force to the violation of RLUIPA rights because RLUIPA enforces First Amendment freedoms, and the statute requires courts to construe it broadly to protect religious exercise." *Opulent Life Church*, 697 F.3d at 295.

Here, Plaintiffs has demonstrated a likelihood of success on the merits of its claims, and therefore has shown it will suffer irreparable harm if the preliminary

injunction does not issue. *See Phelps-Roper*, 545 F.3d at 690) (citing *Marcus v. Iowa Pub. Television*, 97 F.3d 1137, 1140-41 (8th Cir. 1996); *Kirkeby v. Furness*, 52 F.3d 772, 774 (8th Cir. 1995)); *see also Northshor Experience, Inc. v. City of Duluth*, 442 F. Supp. 2d 713, 719 (D. Minn. 2006).

## B. The balance of harm favors an injunction

In First Amendment cases, the balance of equities "favors the constitutionally-protected freedom of expression." *Phelps-Roper*, 545 F.3d at 690. Like the irreparable harm factor, the balance of equities factor is generally determined by examining the plaintiff's likelihood of success on the merits. *Id.* The harm to First Amendment freedoms that Plaintiffs will suffer is substantially greater than any minimal harm that MNSCU would suffer from the Court's granting of the injunction. *See, e.g.*, *Northshor Experience*, 442 F. Supp. 2d at 719. "The rights of [MNSCU] will only be curtailed to the extent required by law." *Wickersham*, 71 F. Supp. 2d at 1075. This factor weighs in favor of the injunction.

## C. The public interest will be served by an injunction

"[I]t is always in the public interest to protection constitutional rights." *Phelps-Roper*, 545 F.3d at 690; *see also Kirkeby*, 52 F.3d at 775. Because the public interest favors core First Amendment freedoms and Plaintiffs have shown that their core First Amendment freedoms are at stake, this factor supports a preliminary injunction. *See, e.g.*, *Iowa Right to Life Committee, Inc. v. Williams,* 187 F.3d 963, 970 (8th Cir. 1999).

## <u>CONCLUSION</u>

LeadMN needs relief from the Court to enjoin the Board's unlawful prior restraint. For the reasons set forth above, the Court should grant its proposed preliminary injunction.

Dated: April 25, 2022

**CROSSCASTLE PLLC**

By: *s/ Samuel W. Diehl.)*
    Samuel W. Diehl (#388371)
333 Washington Avenue N.
Ste 300-9078
Minneapolis, MN 55401
P: (612) 429-8100
F: (612) 234-4766
Email: sam.diehl@crosscastle.com

*Counsel for Plaintiff*