## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Minnesota State College Student Association, Inc., d/b/a LeadMN,<br><br>Plaintiff,<br><br>vs.<br><br>Jay Cowles, Rudy Rodriguez, Asani Ajogun, Victor Ayemobuwa, Alex Cirillo, Dawn Erlandson, Jerry Janezich, Roger Moe, Javier Morillo, April Nishimura, Oballa Oballa, Kathy Sheran, George Soule, Cheryl Tefer, and Michael Vekich, in their official capacities as Trustee Members of the Board of Minnesota State Colleges and Universities.<br><br>Defendants. | Case No. 22-cv-00771-ECT-ECW<br><br>**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS** |

## INTRODUCTION

Defendants' motion must be denied because their arguments are insufficient to overcome the ample plausible allegations and claims in LeadMN's Complaint. Seeking to ignore the Complaint's allegation, they improperly ask the Court to accept an alternative narrative belatedly fabricated from whole cloth. This tactic cannot succeed.

As the Court is well aware, the Court must "tak[e] all facts alleged in the complaint as true, and mak[e] reasonable inferences in favor of [LeadMN,] the nonmoving party." *Smithrud v. City of St. Paul*, 746 F.3d 391, 397 (8th Cir. 2014) (citing *Cent. Platte Natural Res. Dist. v. U.S. Dep't of Agric.*, 643 F.3d 1142, 1148 (8th Cir. 2011)). Ironically, Defendants' attempts to distract the Court from Defendants' violations, only serve to

1

accentuate their obvious violations. Defendants' effort to preserve the unbridled discretion wielded by the Board to withhold funding for speech merely highlights Defendants violations.

Defendants argue Trustees are free to ignore LeadMN's right to free speech and the approval of elected student government leaders representing the students who will actually pay the fees at issue (and who then benefit from the advocacy and speech those fees would fund). What threshold and standard do Defendants' propose to limit their discretion? Merely, if the Board does not "want to go along with" the speech LeadMN "intend[s] to [fund] with the fee increase." (Kimble Decl. Ex. 2 at 2:13:55-2:14:32.)

In a desperate attempt to preserve their unbridled discretion, the Board insists that this federal Court must defer to the Board's discretion "balance[ing of] cost and noncost factors and . . . choices among public policy alternatives," even when such balancing never occurred and the Board never announces what "policy alternatives" it chose or why. (Dkt 11 ("Defs Mem.") p. 14.) Defendants likewise assert that federal and the U.S. Constitution must yield to the Board's discretion "when the [Board's] finding is properly supported by the evidence," even when the Board made no finding whatsoever. (*Id*.)

Defendants' argument would fail as a matter of law based on the documents and recordings submitted by Defendants with their motion. Of course, there is no basis to affirm the Board's unbridled discretion because of deference or otherwise. Defendants ignore that their legislative deference argument has been soundly rejected by the Eighth Circuit twice. *See Stanley v. Magrath*, 719 F.2d 279 (8th Cir. 1983); *Maitland v. Univ. of Minn*., 260 F.3d 959, 963 (8th Cir. 2001).

State higher education leaders like the Board "are essentially administrators who oversee the operation of a state educational institution." *Stanley*, 719 F.2d at 284. They are not not immune from § 1983 liability even if Minnesota "state law may characterize their activity as 'legislative' for some purposes . . . ." *Id*. Deferring to the Board, as requested by Defendants "would leave [it] too free to violate the Constitution." *Id.* Defendants "argument proves too much." *Id*. at 285. Defendants' motion must be denied.

## ARGUMENT

I.  **Defendants May Not Ignore the Complaint's Numerous Allegations Regarding LeadMN's Funding and Speech, and the Board's Motivations**

Defendants' effort to advance an alternative factual narrative based solely on the arguments of counsel may be most obvious from their arguments regarding LeadMN's funding and speech, and the Board's obvious retaliatory motives.

### A.  **The Board's refusal to collect fees requested by LeadMN stopped LeadMN from speaking and objectively chills speech**

Defendants ask "the Court [to] dismiss LeadMN's Complaint in its entirety and with prejudice because the Complaint does not plausibly allege LeadMN's speech was chilled." Defendants later explain this unsupported conclusion means that the Board's "adverse action (denying [LeadMN's] fee increase proposal) would not chill a person of ordinary firmness from continuing the activity . . . ." (Defs Mem. pp. 2, 11.) Defendants' likewise argue that "the Complaint does not plausibly allege" the Board's unlimited discretion might be used to impact LeadMN's speech because "whether a fee proposal is approved is unrelated to whether LeadMN can speak or what it can speak about." (*Id*. pp. 17-18.)

The Complaint, and matters embraced by the Complaint, eliminate any doubt that upon approval by the Board, LeadMN would use its additional funding for speech. And at all times the Board knew LeadMN would use funds collected on its behalf by the Board for speech, assembly, and public advocacy, including raising issues and seeking redress with elected and appointed government leaders on behalf of the students it represents. (*Id.* ¶46.)

When LeadMN's student leaders presented its fee proposal to the Board for approval, they explained how funds collected by the Board were already being used for LeadMN's protected speech and that additional funds would similarly be used for speech upon Board approval, for. (*Id.* ¶¶48, 56.) LeadMN informed the Board that funds it collected were used for speech and advocacy, enabling LeadMN's:

- advocacy with state and federal legislators in support of investments in MNSCU colleges, open educational resources, students' basic needs, and mental health funding, among other priorities.

- leadership in the fight for policy changes to better support student success through Developmental Education Reform, Transfer Pathways, Hunger Free Campus Act, and the Mental Health Awareness Act; and

- efforts to promote civic engagement on campuses by coordinating voter registration efforts registering over 10,000 students and helping Minnesota lead the nation in youth voter turnout in 2018 and be runner-up in 2020.

(Dkt 12 Declaration of Janine Kimble ("Kimble Decl.") Ex. 9 (Dkt. 12-7) pp. 183-84 of 264.)

When Trustees considered LeadMN's fee proposal in May and June 2021, they knew that if they approved the proposal, LeadMN would use the additional funds collected for speech, assembly, and public advocacy protected by the First Amendment. (Compl.

¶¶48. 59-57.) When LeadMN's fee proposal was considered by the finance subcommittee of MNSCU's Board on May 19 and June 16, 2021, LeadMN's student leaders informed Trustees that additional funds received after approval of its fee proposal would be used for additional speech. (*Id*. ¶¶46-47.) LeadMN informed the Board that increased fees from the fee proposal would fund:

- Marketing, outreach, and student engagement efforts to better connect students from across the entire MNSCU system to each other through LeadMN, to build a sense of belonging, including through enhanced online engagement platforms and establishing a student newspaper; (Kimble Decl. Ex. 1 at 2:26:44-2:26:56, 2:30:00-2:30:14.)

- To hire benefits navigators to communicate with and educate students regarding federal, state, local, and private benefits potentially available to them; (*Id*. Ex. 1 at 2:25:46-2:26:16.)

- Outreach staff to improve LeadMN's student engagement efforts at the 34 MNSCU colleges LeadMN serves; (*Id*. Ex. 1 at 2:29:41-2:30:23.) and

- To expand the group's fundraising efforts by hiring a new LeadMN development director. (*Id*. Ex. 1 at 2:29:49-2:29:59.)

One of LeadMN's student leaders summarized the goal of LeadMN's fee proposal for the Board, stating: "Raising our fee at the end of the day is an investment for students in t***heir voice and in their success***." (*Id*. Ex. 2 at 1:18:13-1:18:19 (emphasis added).)

Both Defendants and third-parties recognized in May and June 2021, that LeadMN's fee proposal was intended to enable its speech. A representative of the Minnesota Association of Professional Employees ("MAPE") criticized LeadMN's intended speech that would have been funded by approval of LeadMN's fee proposal, alleging students may be "misled" or wrongly "advised" by LeadMN and that MNSCU "campuses may not choose to create new positions to meet the needs of students or leave

open positions unfilled with the understanding that [counseling and advising] resources will be provided" by LeadMN. (*Id*. Ex. 1 at 2:33:48-2:34:42.) (5/19 Finance recording.) MAPE asked the Board to prefer the right of MAPE union members to speak with students, instead of LeadMN's representatives. (Compl. ¶72.)

Trustees and MNSCU leaders discussing LeadMN's fee proposal noted that the funding that LeadMN would receive would pay for LeadMN's speech. (*Id*. ¶78.) Trustees' statements echoed MAPE's concerns regarding whether LeadMN or preferred "partners" should be allowed to speak. For example, Trustees stated:

- "If we bring in other people [LeadMN] to do those things [proposed by LeadMN] it defeats the purpose of what paid administrators or paid professionals on campus are supposed to do . . . ." (Kimble Decl. Ex. 2 at 2:10:10-2:10:23.)

- "I am very concerned that we are trying in some way . . . to replicate or displace the people that are already on campus. . . . [Counseling and advising students is] our obligation. It is not LeadMN's job. I appreciate very much what you're trying to do. But this isn't the right way to do it . . . ." (*Id*. Ex. 2 at 1:55:45-1:56:44.)

- "[M]y question for Minnesota state [leaders] is to what extent . . . would [LeadMN's proposed] services be helpful, would they supplement, would they interfere, would they aid, would they . . . complement" MNSCU's advice and communications with students. (*Id*. Ex. 2 at 1:28:43-1:29:13.)

- "[A]n alternative that you could do in order to have a direct influence with students who really are focused on the students' concerns [for mental health resources is] instead of building [capacity] within your own organization, create grants and target them to where you see they need to go" to pay for MNSCU resources. (*Id*. Ex. 2 at 2:07:06-2:07:21.)

- If LeadMN is allowed to "bring in other people to [communicate with students] it defeats the purpose of what paid administrators or paid professionals on campus are supposed to do. And . . . that becomes a waste of money. [I]f we have counselors on campus and . . .students feel as if they're not doing their

job or they feel not heard, then maybe [the Board] should look into that aspect" rather than approve LeadMN's activities. (*Id.* Ex. 2 at 2:10:11-2:10:34.)

The Board has, of course, not collected the fees necessary for LeadMN's speech. (Compl. ¶¶101-02.) There is no dispute that the Board's refusal to collect LeadMN's proposed fee has dramatically reduced funding LeadMN must have to speak and fulfill its expressive mission and purposes. (*Id.* ¶¶21-26, 101-102, 109, 114.) During the 2021-2022 school year alone, the Board's refusal to collect fees on behalf of LeadMN has reduced funding available for speech, assembly, and public advocacy by more than $450,000.[1]

Defendants cannot, by conclusory argument, escape the obvious reality that the refusing to collect funds on LeadMN's behalf actually stopped, not just chilled, its speech. The Supreme Court has long recognized that "virtually every means of communicating . . . requires the expenditure of money." *Buckley v. Valeo*, 424 U.S. 1, 19 (1976). By refusing funds LeadMN requested to expand its speech through its 2021 fee proposal, the Board "necessarily reduce[d] the quantity of [LeadMN's] expression by restricting the number of issues discussed, the depth of their exploration, and the size of the audience reached." *Id.*

---

[1] MNSCU's Statewide Student Association Fee Report shows that in the fall semester of 2021, LeadMN's student members enrolled in 934,217 credit hours at MNSCU's two-year colleges. (Kimble. Decl. Ex. 6.) These members enrolled in an additional 830,775 credit hours in the current spring semester. (*Id.* Ex. 7.) If approved, the additional $0.26 requested by LeadMN would have resulted in $458,897.92 in fees. Moreover, LeadMN intended to use additional fees collected by the Board to bolster its fundraising efforts. (Compl. ¶¶43, 47; Kimble Decl. Ex. 1 at 2:29:49-2:29:59.) Fundraising is protected by the First Amendment in its own right. *See, e.g.*, *Secretary of State of Md. v. Joseph H. Munson Co., Inc.*, 467 U.S. 947, 962 (1984); *Riley v. Nat.Fed. of the Blind of N.C., Inc.*, 487 U.S. 781, 790–91 (1988). And LeadMN's improved fundraising would have generated additional funds that could be used for speech and advocacy.

> The level of funding a [student] group receives may serve as an expression of approval or disapproval of the group's message. And the amount allocated to a group, whether a lot or a little, can skew debate on issues on which the group advocates a position.

*Amidon v. Student Ass'n of State Univ. of N.Y. at Albany*, 508 F.3d 94, 101 (2d Cir. 2007). State action to "control or suppress speech may operate at different points in the speech process," and at each point is equally unlawful. *Citizens United v. Fed. Election Com'n*, 558 U.S. 310, 336 (2010).

Ignoring LeadMN's Complaint allegations and the law, Defendants' assert that LeadMN's retaliation "claim fails because the adverse action (denying a fee increase proposal) would not chill [the speech of] a person of ordinary firmness" is unsupported by law or fact. (Defs. Mem. p. 11 (parenthesis in original).) Defendants perplexingly assert that an undisputed reduction in the funding available for LeadMN's speech, assembly, and public advocacy by more than $450,000 is analogous to an individual plaintiff who was denied "access to documents." *Eggenberger v. West Albany Tp.,* 820 F.3d 938, 943 (8th Cir. 2016); (Defs Mem. p. 11.)

Defendants continue by arguing that because LeadMN has continued to speak (as it must fulfill its purpose and mission) the funding available to engage in speech is irrelevant. (Defs Mem. p. 11.) However, the relevant "question is not whether the plaintiff . . . was deterred," but rather "[w]hat would a person of 'ordinary firmness' have done in reaction to the" adverse action alleged. *Garcia v. City of Trenton*, 348 F.3d 726, 727 (8th Cir. 2003). The First Amendment's objective test regarding chilling speech does not require a plaintiff to lose $450,000 in funding.

Under this Circuit's binding precedent, even the "retaliatory *issuance of parking tickets* would chill the speech of a person of ordinary firmness." *Garcia*, 348 F.3d at 727 (emphasis added). Of course, threats to funding or financial interests may chill speech, retaliation that implicates financial interests or funding—like parking tickets—may objectively chill speech even if the funding is not withheld. The mere "threat of the loss of [a financial benefit] in retaliation for speech may chill speech on matters of public concern" regardless of whether funding is actually denied. *Board of Cnty. Com'rs, Wabaunsee Cnty., Kan. v. Umbehr*, 518 U.S. 668, 674 (1996); *see also Stanley v. Magrath*, 719 F.2d 279, 283 (8th Cir. 1983).

"[C]onstitutional violations may arise from the deterrent, or 'chilling,' effect of governmental [action] short of a direct prohibition against the exercise of First Amendment rights." *Umbehr*, 518 U.S. at 674. The Board could "'not deny a benefit to a person on a basis that infringes his constitutionally protected . . . freedom of speech' even if he has no entitlement to that benefit." *Id*. (quoting *Laird v. Tatum*, 408 U.S. 1, 11 (1972); *Perry v. Sindermann*, 408 U.S. 593, 597 (1972)). The Board is required to collect fees from LeadMN's members by Section 136F.22, the Board's refusal to collect more than $450,000 of funding necessary for LeadMN's speech actually prevented its speech, and obviously would chill the speech of any person of "ordinary firmness."

### B. Defendants cannot ignore evidence that retaliation motivated the Board's refusal to collect LeadMN's requested fee

LeadMN's Complaint alleges that the Board's refusal to approve LeadMN's funding was motivated, in part, by the Board's desire to retaliate in response to

LeadMN's past speech. Ignoring its allegations, Defendants argue "the Complaint does not plausibly allege that the action (denial of the proposed fee increase) was retaliatory." (Defs Mem. p. 12.) Defendants' argument depends on the Court simply ignoring the Complaint's allegations.

Perhaps the most conspicuously absent Complaint allegation refers to statements by a Trustee on June 16, 2021, regarding her belief that retaliation motivated the Board's rejection of LeadMN's requested fees. (Compl. ¶100.) The trust explained that the Board and other MNSCU system leaders appeared to react negatively to LeadMN's attempts to influence MNSCU to achieve what students "see as a need" and in how MNSCU's Board and leaders "think about student organizations and their advocacy work and their desire *to increase their capacity to influence the system*" through speech and advocacy. (*Id*.; *see* Kimble Decl. Ex. 3 at 1:06:44-1:07:47.)

The impression of this Trustee may have arisen from private conversations with Trustees and MNSCU leaders. However, the Trustee may have simply heard comments quoted in the complaint euphemistically alluding to LeadMN's failure to "partner," "cooperate," or "collaborate" with the Board and MNSCU leaders. These comments included the Board Chair's statements that the Board might not approve LeadMN's fee proposal because LeadMN had not or might not work in "true collaboration or partnership with our system" or its Chancellor. (Compl. ¶84.) And later that the Board had not approved LeadMN's fee proposal because of a "need for accountability and collaboration" and that LeadMN must demonstrate cooperate by meeting "with the chancellor, campus leadership, student Senate leadership and gain[ing] their support . . .

." (*Id.* ¶99.) And MNSCU's Chancellor, who covertly collaborated with Board leaders, indicated he opposed an increase in its funding for speech because LeadMN did not share a joint common goal with MNSCU administrators, and was not sufficiently collaborative with MNSCU administrators. (*Id.* ¶¶59-61, 82.) Likewise, LeadMN's Complaint accurately alleges that  Chancellor Malhotra, Board Chair Jay Cowles, and other Trustees have been unhappy with LeadMN's public advocacy critical of Chancellor Malhotra's and of the Board's actions and decisions. (*Id.* ¶58.)

Unlike most of the Complaint's allegations, Defendants ineffectively attempt to minimize Trustee Erlandson and Trustee Vekich's group text messages specifically suggesting the Board retaliate in regard to LeadMN's fee proposal because of LeadMN's earlier speech and advocacy opposing the Board's efforts to increase student tuition. (*Id.* ¶¶63-66.) Defendants assert that these retaliatory texts could not be relevant because "neither of those trustees was on the Finance Committee" and therefore, were "non-decisionmakers." (Defs. Mem. p. 13.) This argument is objectively false.

Trustee Vekich was, in fact, a member of the Board's Finance Committee in May and June 2021. (Kimble Decl. Ex. 10 p. 15 of 26 (Finance Committee Meeting Minutes for May 29, 2021, stating "Committee members present: . . . Michael Vekich."); Ex. 11 p. 18 of 28 (Finance Committee Meeting Minutes for June 16, 2021, similarly listing Trustee Vekich).) And even though Trustee Erlandson was not an official member of the Finance Committee, she attended both the May 19 and June 16 Finance Committee meetings for at least several hours during which she questioned LeadMN's

representatives. (*See Id*. Ex. 1 at 25:51-26:27, 1:08:10-1:08:14, and 2:48:20-2:49:01; Ex. 2 at 1:20:23-1:21:28, 1:22:06-1:22:57, 1:42:37-1:44-26.)[2]

Of course, there is no basis for Defendants' argument that only members of the Finance Committee were decisionmakers. Minn. Stat. § 136F.22 provides that the entire Board "may revise or reject [a student association] fee change." The Statute does not authorize delegation of the Board's responsibility. *See also* Minn. Stat. § 136.06, subd. 2 ("The board is responsible for its operations and necessary decisions unless these are specifically delegated by law to a state department or agency."); (Board Policy 3.7 (*available at* https://www.minnstate.edu/board/policy/307.html (accessed May 13, 2022).) And while the Board refused to do so, Board Chair Cowles admitted at the June 16, 2021, Finance Committee meeting that the full board could overrule the Finance Committee's decision. (Kimble Decl. Ex. 2 at 2:35:52-2:39:00.) In sum, every Trustee is a "decisionmaker" and LeadMN's Complaint provides ample allegations for its retaliation claim to survive Defendants' motion to dismiss.

## C. Defendants' counsel may not belatedly manufacture findings or dispute the Board's unfettered discretion clearly alleged in the Complaint

As set forth in LeadMN's Complaint, the Board has refused to collect LeadMN's proposed fee without any written or official decision, findings, or explanation, or even a vote of the Board. (Compl. ¶4.) Finance Committee members did vote to reject a motion

---

[2] Curiously, while Finance Committee meeting minutes purport to list "Other board members present" at the Finance Committee meeting (for example, both the May 19 and June 16 minutes note the presence of Board Chair Jay Cowles), Trustee Erlandson was not listed in either minutes as an "other board member[] present." (Kimble Decl. Ex. 10 p. 15 of 26; Ex. 11 p. 18 of 28.)

stating, "The Finance Committee recommends that the Board of Trustees accepts the increase of the MSCSA (dba LeadMN) fee from $.35 to $.61 per credit hour beginning fall semester 2021." (Kimble Decl. Ex. 11 p 25 of 28.) The only explanation or summary offered to members of the Finance Committee or LeadMN regarding that committee's vote was Committee Chair Moe's uncontradicted summary that:

> Our responsibility is to make a decision on [LeadMN's proposed] fee increase. And now we've heard what they intend to do with the fee increase. And ***so the question would be, is that something we want to go along with?***

(Kimble Decl. Ex. 2 at 2:13:55-2:14:32 (emphasis added).) In sum, the Board believes it is entitled to exercise discretion to deny LeadMN's funding necessary for it to speak even though the Board knew:

- LeadMN is a private association;

- LeadMN's request would not reduce tuition or other funding received by MNSCU colleges or the system; and

- A majority of student government leaders (i.e., individuals who would pay and who represented other students who would pay the additional $0.26 fee) had voted to approve the fee proposed at LeadMN's General Assembly.

(Compl. ¶¶43, 50, 75, 89-98, 111.)

As accurately alleged in LeadMN's Complaint, Defendants believe they may "revise or reject" a proposed fee change by LeadMN or Students' United:

- For any reason;

- with unbridled discretion;

- without narrow, objective, definite, and binding standards that limit the Board's discretion;

- without any binding policies that limit its discretion or protect the rights of LeadMN or other student associations.

- without a written order or written findings that identify the factual and legal basis for the Board's decision;

- without publicly stating, explaining, or identifying the reasons for rejecting or for refusing to collect the fee proposal;

- without a binding deadline; and

- without an appeal process available to the association.

(Compl. ¶¶119-130.)

Defendants ineffectively attempt to change these facts by ignoring the Complaint, their own record, and reality. Defendants argue or imply, without citation to evidence (which, of course, does not exist) that the Board:

- rejected LeadMN's fees in some way that was "measured" (without explaining how or what that even means);

- made one or more "finding[s] properly supported by evidence" (without explaining what such finding(s) were, when and how it was adopted, and on what evidence such elusive finding was made); and

- "balance[d] cost and noncost factors and ma[de] choices among public policy alternatives" (without explaining what, where, when, or how the same occurred).

(Defs Mem. pp. 13-15.)[3] And while Defendants attempt to belatedly manufacture findings and evidence from stray remarks at various meetings, attorney arguments are not evidence. (*See, e.g.*, Defs Mem. pp. 6, 14-15.)[4]

## II.   Defendants may not obtain dismissal of LeadMN's Claims regarding the Board's content and viewpoint discrimination without any argument

Defendants suggest that the Court should "dismiss LeadMN's Complaint in its entirety and with prejudice" without referencing LeadMN's claim that the Board refused and continues to refuse to collect fees LeadMN because of the content and viewpoint of LeadMN's speech (including the risk that LeadMN will criticize the Board) and because speech that would be funded if LeadMN's fee proposal were approved might allow

---

[3] Defendants' argument notes certain comments or questions from Finance Committee or Board meetings. Counsel may not belated

[4] Defendants arguments also confusingly assert that Minn. Stat. §136.06 provide discretionary authority for the Board to set student association fees. (Defs Mem. p. 2-3.) However, this argument violates the "well-established rule of statutory interpretation that specific statutory language controls over more general provisions." *United States v. O'Laughlin*, 934 F.3d 840, 841 (8th Cir. 2019) (citing *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012)). Here, the general student fee provision in Minn. Stat. § 136F.06, may not contradict or override the Board's more specific, limited authority regarding student association fee under Section 136F.22. Similarly, Defendants argue in their motion that "[w]hen setting tuition or fees, the Board balances five values" pursuant to Board Policy 5.11. This argument contradicts LeadMN's Complaint. Perhaps more importantly, there is no reference to Board Policy 5.11 in the voluminous May 19 or June 16 Board packets describing LeadMN's fee proposal. (Kimble Decl. Exs. 8-9; *see also id*. Ex. 8 at p/ 164 pf 283 (Agenda Item Summary Sheet regarding LeadMN's fee proposal referencing only Board Policy 3.7.) Of course, Policy 5.11's "Policy objectives" are not mandatory ("Minnesota State seeks to balance . . .") nor are such vague criteria sufficient to limit the Board's unbridled discretion.

LeadMN to communicate with students, rather than MNSCU employees, MAPE union members, or other favored speakers. (*See, e.g.*, Compl. ¶¶2, 3, 4, 5, 25-35, 43-102.) The Board engaged in content and viewpoint discrimination in violation of the First Amendment. "It is axiomatic that the government may not regulate speech based on its substantive content," the message a group will convey, or to "favor one speaker over another. *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995). The First Amendment's protections also forbid "financial burdens on certain speakers based on the content of their expression." *Id*. "Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015) (citing *R.A.V. v. St. Paul*, 505 U.S. 377, 395 (1992); *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 115, 118 (1991)). State action based on "disagreement with the message [a speaker] conveys . . . . must also satisfy strict scrutiny." *Id*. at 164 (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)). Defendants' refusal to fund LeadMN's speech because of what LeadMN intended or might say and to ensure that the Board's favored speakers would communicate with students, cannot survive strict scrutiny.

Even if the Board's refusal to fund LeadMN's speech were only a time, place, and manner restriction subject to intermediate scrutiny—it is not so benign—Defendants bear the burden to demonstrate their refusal to collect LeadMN's requested funding approved by student representatives was intended to regulate "the action it entails, but not because

of the ideas [LeadMN intended to] express[].” *R.A.V. v. City of St. Paul*, 505 U.S. 377, 391 (1992). Moreover, the Board must then demonstrate that its action was “narrowly tailored to serve a significant governmental interest,” that would “not be served sufficiently by means less restrictive of first amendment freedoms.” *A.C.O.R.N. v. Frontenac*, 714 F.2d 813, 818 (8th Cir. 1983). For example, even if the Board had made findings regarding a legitimate governmental interest regarding LeadMN’s peer-to-peer counseling (it did not and could not), the Board would need only limit funding for such counsel and could not prohibit LeadMN’s entire request. The Board cannot demonstrate a “reasonable fit between the means and ends of the regulatory scheme.” *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 561 (2000) (*“Lorillard”*).

Of course, it is now too late for the Board to attempt to justify its refusal to allow funding necessary for LeadMN’s speech. The First Amendment does not allow *post hoc* governmental interests devised and first articulated during litigation. *See City of Lakewood v. Plain Dealer Pub. Co.* (*“Lakewood”*), 486 U.S. 750, 758 (1988); U.S. v. Virginia, 518 U.S. 515, 553 (1996) (Governmental “justification[s] must be genuine, not hypothesized or invented post hoc in response to litigation.”); *Seattle Affiliate of Oct. 22nd Coal. to Stop Police Brutality, Repression & Criminalization of a Generation v. City of Seattle*, 550 F.3d 788, 801 (9th Cir. 2008) (impermissible post hoc rationalizations are especially likely when officials are not required to provide reasons for a licensing denial). Even if Defendants had not waived their right to seek dismissal of LeadMN’s content and viewpoint discrimination claim—they did by failing to explain any reason

why—Defendants' motion to dismiss would otherwise fail to allow dismissal of this claim.

### III.   Defendants "Legislative Deference" Argument Fails as a Defense, But Demonstrates the Board's Unlawful, Unfettered Discretion

Defendants boldly assert that Minnesota state law requires this Court to defer to the Board's rejection of LeadMN's fee proposal because the Board's "finding is properly supported by the evidence." (Defs Mem. p. 15 (citing *In re Qwest's Wholesale Service Quality Standards*, 678 N.W.2d 58, 62 (Minn. Ct. App. 2004)).) Defendants fail to inform the Court that this argument has been repeatedly rejected by the Eighth Circuit.[5]

And factually, Defendants' argument ignores LeadMN's Complaint's (undisputed) allegations that the Board made no findings, cited no evidence, evaluated no criteria, or otherwise found or considered facts on which the Court could defer. Ultimately, Defendants' "legislative deference" argument only demonstrates the urgent need for injunctive relief from the Court. Even in the face of LeadMN's suit, Defendants' continue to wield its unfettered discretion to violate the First Amendment with impunity.

---

[5] It is unclear how Defendants could ignore controlling law and assert its legislative deference argument in good faith. MNSCU's Board of Trustees and MNSCU member schools are regularly sued pursuant to Section 1983 claims. *See, e.g.*, *Patil v. Minn. State Univ., Mankato*, No. 12–1052 (JRT/JSM), 2012 WL 7807608 (D. Minn. 2012); *Onyiah v. St. Cloud State Univ.*, 655 F.Supp.2d 948 (D. Minn. 2009); *Tademe v. Saint Cloud State Univ.*, 328 F.3d 982, 988 (8th Cir. 2003); *Portz v. St. Cloud State University*, 297 F.Supp.3d 929 (D. Minn., 2018); *Phillips v. Minn. State Univ. Mankato*, 2009 WL 5103233, at *2 (D. Minn.,2009); *Egerdahl v. Hibbing Cmty. Coll.*, 72 F.3d 615, 618–20 (8th Cir.1995); *Latour v. Minneapolis Cmty. & Technical Coll.*, No. C7–00–1649, 2001 WL 185085, at *2 (Minn. Ct. App. Feb.27, 2001). Neither MNSCU nor any MNSCU member school has ever successfully escaped liability from a Section 1983 claim through a Minnesota state legislative deference defense.

LeadMN's First Amendment claim, asserted pursuant to Section 1983, is not limited by Minnesota state law, decisions of the Minnesota Supreme Court or Court of Appeals, or any other state court or agency. The Supremacy Clause mandates that the United States Constitution and federal statutes "shall be the supreme law of the land; and the judges in every state shall be bound thereby, anything in the Constitution or laws of any State to the contrary notwithstanding." U.S. Const. Art. VI. cl. 2. The State of Minnesota and its courts are subject to limitations imposed by the Supremacy Clause. And the Board and any Minnesota state agency action "must . . . pass[] constitutional muster." *Republican Party of Minn. v. White*, 416 F.3d 738, 748 (8th Cir. 2005); *see also Gist v. Atlas Staffing, Inc*., 910 N.W.2d 24, 33 (Minn. 2018) ("Under the Supremacy Clause of the United States Constitution, federal law preempts conflicting state law.").

Defendants fail to note that the Eighth Circuit has twice rejected its arguments regarding legislative deference. In *Stanley v. Magrath*, this Circuit rejected the University of Minnesota's Board of Regents argument that their challenged action was "a legislative act and hence that they are immune from § 1983 liability [for violation of the First Amendment] under the doctrine of legislative immunity." *Stanley*, 719 F.2d at 284. The court found that notwithstanding the Regents' express authority "to enact laws for the government of the university" perpetuated by the Minnesota Constitution, Regents "are essentially administrators who oversee the operation of a state educational institution." *Id.* As such, the Eight Circuit found the Board of Regents were not immune from § 1983 liability even if Minnesota "state law may characterize their activity as 'legislative' for some purposes . . . . ." *Id*.

The Eighth Circuit explained the policy underlying its holding:

> There are instances in which the members of bodies other than state legislatures may have legislative immunity from suit under § 1983. The governing body of a state-supported institution of higher learning, we think, cannot qualify for such protection. ***Such a rule would leave such bodies too free to violate the Constitution***. For example, if defendants' argument is accepted, they could adopt a rule forbidding the admission of any Baptists, and no § 1983 suit could do anything about it. The argument proves too much. "To state [the proposition]," as Mr. Chief Justice White was fond of remarking, "is to answer it."

*Id*. at 285 (emphasis added) (quoting *Toledo Newspaper Co. v. United States*, 247 U.S. 402, 419 (1918)). The Eighth Circuit affirmed *Stanley*'s holding in 2001, rejecting the Board of Regents renewed attempt to assert legislative immunity in response to a Section 1983 claim. *See Maitland v. Univ. of Minn*., 260 F.3d 959, 963 (8th Cir. 2001). The Board's authority is merely a function of statute unlike the Board of Regents' limited legislative authority under Minnesota's Constitution. As such, Defendants may not ignore this controlling law.

Notwithstanding its ineffectiveness as a defense, Defendants' legislative deference argument is highly relevant to this case. Defendants' argument demonstrates the unlawful discretion wielded by the Board in refusing to act on LeadMN's fee proposal. The unlawfulness of the Board's refusal is further illustrated by Defendants' attempts to backfill unlawful deficiencies through the arguments of counsel.

Defendants characterize the Board's consideration of LeadMN's fee proposal as a "broad discretionary determination[]" to which the First Amendment, Section 1983, and this federal Court must yield "absent clear and convincing evidence of an unjust or

unreasonable determination on the part of the Board." (Defs Mem. pp. 14-15.)

Defendants boldly assert that their unfettered discretion entitled the Board to "consider

and balance numerous cost and non-cost factors," "public policy concerns," among

"numerous other[]" factors Defendants decline to name when "weighing" LeadMN's fee

proposal. (*Id.*) In sum, consistent with the Eighth Circuit's warning in *Stanley*,

Defendants' argument regarding legislative deference effectively claims that the

astounding breadth of the Board's discretion authorizes the Board to "free[ly] to violate

the Constitution." *Stanley*, 719 F.2d at 285.

## IV. Defendants Effort to Avoid Scrutiny of Their Prior Restraint Are Unsupported and Unavailing

The First Amendment will not allow Defendants' to preserve the unbridled

discretionary to withhold funding for speech (already approved by elected student

government leaders) based on whether the Board "want[s] to go along with" the speech

LeadMN "intend[s] to [fund] with the fee increase." (Kimble Decl. Ex. 2 at 2:13:55-

2:14:32.) LeadMN has pleaded a valid First Amendment prior restraint claim.[6]

LeadMN is an independent nonprofit and is not a government agency or subsidiary

of MNSCU. (Compl. ¶11; *see also* Kimble Decl. Ex. 8 p. 225 of 283) Through Minn.

---

[6] Defendants mischaracterize LeadMN's prior restraint claim by arguing that LeadMN
insists that the Court find Section 136F.22 is facially unconstitutional. This
mischaracterizes LeadMN's claim. While the Board may not be allowed to continue to
wield unlimited discretionary authority to "revise or reject [a] fee change" proposed by a
student association for any reason, including disapproval of the association's speech.
These deficiencies may be cured in several ways, including by adding statutory language
or by the Board's adoption of a binding policy that it may not simply ignore and that
cures the First Amendment ailments of the Board's current prior restraint.

Stat. § 136F.22, the Minnesota Legislature mandated that the Board collect fees from the individual student members of LeadMN. LeadMN's First Amendment rights are not diminished because MNSCU's Board collects fees on its behalf. *See Viewpoint Neutrality Now!*, 516 F.Supp.3d at 917 ("[S]peech . . . funded through a student-services fee is student speech (i.e., private speech), not the university's own speech (i.e., government speech).") (parentheticals in original) (citing *Bd. of Regents of Univ. of Wis. Sys. v. Southworth*, 529 U.S. 217, 233-235 (2000)); *cf. Legal Services Corp. v. Velazquez*, 531 U.S. 533, 542 (2001).[7]

As discussed above, there is no dispute that Trustees knew that LeadMN intended to use the fees it requested for speech. State action to "control or suppress speech may operate at different points in the speech process," and at each point is equally unlawful. *Citizens United v. Fed. Election Com'n*, 558 U.S. 310, 336 (2010). Government actions impacting funding to be used for speech are equally subject to First Amendment scrutiny as more direct impacts on speech. For example, "the government offends the First

---

[7] During the June 16, 2021, Finance Committee meeting Trustee Erlandson and MNSCU General Counsel Gary Cunningham engaged in a colloquy regarding whether approval of LeadMN's fee proposal could potentially create liability for MNSCU. There was no legal or factual basis for Erlandson and Cunningham to raise this irrelevant specter. In June 2004, MNSCU and St. Cloud State University ("SCSU") successfully obtained dismissal of claims of liability for the actions of a student newspaper. *See* June 7, 2004, Order for Summary Judgment, *Richard D. Lewis v. St. Cloud State University and Minnesota State College & University System*, Ramsey County District Court Case No. 62-C2-04-002244; (May 13, 2022, Declaration of Samuel W. Diehl ("Diehl Decl.") Ex. M/) The Court accepted MNSCU and SCSU's argument that because the First Amendment prohibits government control of student organization's speech, "then we can't be responsible" for resulting claims and "[t]here is nothing about . . . funding [student groups] which creates liability" for MNSCU or SCSU for the actions of student groups. (May 13, 2022, Declaration of Samuel W. Diehl, Ex. N pp. 4:9-19 (Transcript of June 4, 2004 Hearing on MNSCU and SCSU's Motion for Summary Judgment).)

Amendment when it imposes financial burdens on certain speakers based on the content of their expression." *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 828-29 (1995) (citing *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 108, 123 (1991)); *Legal Services Corp. v. Velazquez*, 531 U.S. 533, 542 (2001). Likewise, state-imposed limits on the amount or percentage a group may spend on speech violate the First Amendment, even if the limitation is content- and viewpoint-neutral. *See, e.g.*, *Schaumburg v. Citizens for a Better Environment*, 444 U.S. 620, 634 (1980) (finding "protecting the public from fraud, crime and undue annoyance" was a substantial government interest, but insufficient to justify a limitation on nonprofit spending on fundraising). "The First Amendment mandates that [courts] presume that speakers, not the government, know best both what they want to say and how to say it." *Riley v. Nat. Fed. of the Blind of N.C., Inc.*, 487 U.S. 781, 790–91 (1988).

The First Amendment protects student association funding and fundraising, no less than other regulated speech. As the Second Circuit summarized:

> The level of funding a [student] group receives may serve as an expression of approval or disapproval of the group's message. And the amount allocated to a group, whether a lot or a little, can skew debate on issues on which the group advocates a position.

*Amidon v. Student Ass'n of State Univ. of N.Y. at Albany*, 508 F.3d 94, 101 (2d Cir. 2007); *see also Viewpoint Neutrality Now!*, 516 F.Supp.3d at 925 (citing *Forsyth County v. Nationalist Movement*, 505 U.S. 123, 133 (1992)). The Board's violation of the First Amendment through its prior restraint is evident from even a cursory examination of the unbridled discretion exercised by the Board in refusing LeadMN's 2021 fee proposal.

As summarized by the Board's Finance Subcommittee Chair:

> Our responsibility is to make a decision on [LeadMN's proposed] fee increase. And now we've heard what they intend to do with the fee increase. And ***so the question would be, is that something we want to go along with?***

(Kimble Decl. Ex. 2 at 2:13:55-2:14:32 (emphasis added).) This understanding of the Board's discretion contravenes the "very purpose of the First Amendment . . . ." *Riley v. Nat. Fed. of the Blind of N.C., Inc.*, 487 U.S. 781, 791 (U.S. 1988). The Board failed to accept that "even with the purest of motives, the government may not substitute its judgment as to how best to speak for that of speakers and listeners; free and robust debate cannot thrive if directed by the government." *Id*.

Subdivision 2 of Section 136F.33 allows changes to LeadMN's fees, but mandates that such changes be submitted to and approved by the Board which purportedly may "revise or reject" a proposed change in LeadMN's fees without limitation or guidelines in statute or Board policy. The Board's understanding of this discretion allowed it to reject LeadMN's 2021 fee proposal:

- For any reason, or more accurately, for no publicly disclosed reason or rationale;

- Without any findings or written decision susceptible to legal challenge and judicial review;

- Without any binding guideline or limitations more rigorous than "is that something we want to go along with?"

24

- Without any criteria dictating when the Board may or must deny or may or must grant any submitted fee proposal;

- Without consideration by the full Board;

- Without any deadline mandating if or when the full Board must vote up or down on a fee proposal;

- Without any avenue for judicial review; and

- Without regard for the majority vote of student representatives at LeadMN's General Assembly who had approved LeadMN's fee proposal and intended uses of the fees.

The Board's processes and policies allowing it to reject for student association fee proposals with unbridled discretion—knowing this decision would limit LeadMN's speech and advocacy—constitutes an unlawful prior restraint and violate the First Amendment. *See, e.g.*, *Viewpoint Neutrality Now!*, 516 F.Supp.3d at 920-23 (citing *Southworth II*, 307 F.3d at 579); *Joseph H. Munson Co., Inc.*, 467 U.S. at 964 n. 12; *Lakewood*, 486 U.S. at 757. And the Board's processes and practices regarding approval of requested funding by LeadMN or Students' United is unlawful even if the Board had never exercised its discretion to suppress speech:

> First, the mere existence of the licensor's unfettered discretion, coupled with the power of prior restraint, intimidates parties into censoring their own speech, even if the discretion and power are never actually abused. . . . Self-censorship is immune to an "as applied" challenge, for it derives from the individual's own actions, not an abuse of government power.

> Second, the absence of express standards makes it difficult to distinguish, "as applied," between a licensor's legitimate

> denial of a permit and its illegitimate abuse of censorial power. Standards provide the guideposts that check the licensor and allow courts quickly and easily to determine whether the licensor is discriminating against disfavored speech. Without these guideposts, post hoc rationalizations by the licensing official and the use of shifting or illegitimate criteria are far too easy, making it difficult for courts to determine in any particular case whether the licensor is permitting favorable, and suppressing unfavorable, expression.

*Lakewood*, 486 U.S. at 757-58.

Prior restraints are unlawful regardless of whether they relate to approval of a parade permit, access to a government created forum, or access to funding to be used for speech. *See Shuttlesworth v. City of Birmingham*, 394 U.S. 147 (1969) (parade permit); *Forsyth County v. Nationalist Movement*, 505 U.S. 123 (1992) (assembly ordinance); *Viewpoint Neutrality Now!*, 516 F.Supp.3d at 920-23 (citing *Southworth II*, 307 F.3d at 579) (student group funding); *Amidon*, 508 F.3d at 101 (student group funding). In *Secretary of State of Maryland v. Joseph H. Munson Co., Inc.*, the Supreme Court considered a content- and viewpoint-neutral statute that designed to protect charities from excess fees by forbidding payments for fundraising expenses of "more than 25% of the amount raised." 467 U.S. at 950. Lower courts approved the statute because it "included a provision authorizing a waiver of the percentage limitation" when the "25% limitation would effectively prevent a charitable organization from raising contributions." *Id*. at 952. The Supreme Court disagreed, finding the fundraising limitation would potentially limit some charitable fundraising efforts which inevitably involve protected speech. *Id*. at 963-64. The Court found arguments regarding the waiver provision unavailing.

> [P]lacing discretion in the hands of [a state] official to grant or
> deny a license . . . creates a threat of censorship that by its very
> existence chills free speech. [C]harities whose First
> Amendment rights are abridged by the fundraising limitation
> simply would have traded a direct prohibition on their activity
> for a licensing scheme that, if it is available to them at all, is
> available only at the unguided discretion of" a state official.

*Id.* n. 12.

Here, the Board's asserted power to reject or restrain LeadMN's funding used for private speech is an unlawful "prior restraint." *See*, *e.g.*, *Blue Moon Ent., LLC v. City of Bates City, Mo.*, 441 F.3d 561, 565 (8th Cir. 2006). "[P]rior restraints on speech and publication are the most serious and the least tolerable infringement on First Amendment rights." *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976). Any such regulation bears "a heavy presumption against its constitutional validity" and "without narrow, objective, and definite standards to guide the licensing authority, is unconstitutional." *Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 558 (1975) (quoting *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 n. 10 (1963)); *see also Blue Moon*, 441 F.3d at 565. The Board's unlimited discretion is not constrained by any "narrow, objective, and definite standards to guide" its funding decisions, unlawfully may "impose a restraint for a [un]specified and" indefinite period, and do not "provide for prompt judicial review." *Blue Moon*, 441 F.3d at 565. Either Section 136F.22 or binding Board policy must prevent the Board continuing to exercise such "unbridled discretion." *Id.* Such standards are necessary because if public officials are allowed "unduly broad discretion in determining whether to grant or deny a permit, there is a risk that [they] will favor or disfavor speech based on its content." *Thomas v. Chicago Park Dist.*, 534 U.S. 316, 323

(2002); *see Viewpoint Neutrality Now!*, 516 F.Supp.3d at 920 (citing *Southworth II*, 307 F.3d at 579). LeadMN has accurately pleaded its prior restraint claim. Defendants' motion must be denied.

## V.    The Board Is Not Immune from the Prospective Injunctive Relief LeadMN Seeks

The Board is required by statute under Section 136F.22 to collect LeadMN's fees, and to credit those fees to LeadMN's account.[8] An order mandating that the Board cease its violations of the First Amendment and perform its statutory duty "is the sort of prospective relief that can be sought in federal court from state officials sued in their official capacities, notwithstanding the state's sovereign immunity, under *Ex Parte Young*." *Bennie v. Munn*, 822 F.3d 392, 397 (8th Cir. 2016). Contrary to the Board's mischaracterization, LeadMN has not requested and does not seek money damages. (Defs Mem. p. 22.) Likewise, LeadMN has not asked the Court to "require[] state officials 'to use state funds to make reparation for the past.'" (Defs Mem. p. 23 (quoting *Edelman v. Jordan*, 415 U.S. 651, 664 (1974)).)

LeadMN does not dispute that settled law dictates that "no money damages are available" under the *Ex parte Young* exception to the Eleventh Amendment. *Gibson v. Arkansas Dep't of Correction*, 265 F.3d 718, 720 (8th Cir. 2001). However, the applicability of *Ex parte Young*'s exception turns on a "straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief

---

[8] The Board does not dispute this, stating in its memorandum that "Students pay the fee, which are collected by each state college and university and credited by the system office to Lead MN." (Defs Mem. p. 4).

properly characterized as prospective." *Verizon Maryland, Inc. v. Pub. Serv. Comm'n of Maryland*, 535 U.S. 635, 645 (2002) (quoting *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 296 (1997)).

Defendants ignore LeadMN's Complaint and seek to recasts LeadMN's unequivocal request for prospective injunctive relief as a retrospective request for money damages. (Defs Mem. p. 4.) This straw person argument cannot change the relief LeadMN actual seeks. Nor can their arguments change controlling Eighth Circuit law finding "no Eleventh Amendment immunity against prospective relief even if such relief has a monetary impact upon the state." *Mikkelson by Mikkelson v. Piper*, No. CV 15-3439 (DWF/BRT), 2017 WL 2881125, at *9 (D. Minn. July 6, 2017) (citing *Love v. McCown*, 38 Fed.Appx. 355, 355-57 (8th Cir. 2002); *Randolph v. Rodgers*, 253 F.3d 342, 344, 348 (8th Cir. 2001)). The U.S. Supreme Court has never held that prospective injunctive relief must have no impact on the state treasury:

> State officials, in order to shape their official conduct to the mandate of the Court's decrees, would more likely have to spend money from the state treasury than if they had been left free to pursue their previous course of conduct. Such an ancillary effect on the state treasury is a permissible and often an inevitable consequence of the principle announced in Ex parte Young, supra.

*Edelman v. Jordan*, 415 U.S. 651, 668 (1974).

Under controlling law, LeadMN's request for prospective injunctive relief may require the Board to fulfill its ongoing statutory duty to collect LeadMN's fees without violating the First Amendment. Even if this injunction has an ancillary, prospective effect on the state treasury, this ramification does not prevent such relief or immunize

Defendants from suit. Ironically, Minnesota's treasury is not implicated here. LeadMN's fees are paid by the students who receive its benefits, not Defendants. *See, e.*g., *Arizona Students' Ass'n v. Arizona Bd. of Regents*, 824 F.3d 858, 863 (9th Cir. 2016); *Koala v. Khosla*, 931 F.3d 887, 891 (9th Cir. 2019). The order necessary to prospectively remedy Defendants' violations will not increase or decrease the Board's or the state' financial burden. The Board is already performing this statutory function. An order mandating that the Board collect fees prospective at the level properly approved by student representatives is necessary and will allow LeadMN to speak, but such an order will not result in a transfer of funds from MNSCU/the state to LeadMN. The Eleventh Amendment does not bar this suit or the relief LeadMN requires.

## CONCLUSION

For all of the foregoing reasons, Defendants' motion to dismiss must be denied.

Dated: May 13, 2022

**CROSSCASTLE PLLC**

By:  *s/ Samuel W. Diehl.)*
     Samuel W. Diehl (#388371)
 333 Washington Avenue N.
 Ste 300-9078
 Minneapolis, MN 55401
 P: (612) 429-8100
 F: (612) 234-4766
 Email: sam.diehl@crosscastle.com

***Counsel for Plaintiff Minnesota State College Student Association, Inc., d/b/a LeadMN***

4892-0989-3407, v. 3

30