UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Minnesota State College Student
Association, Inc., d/b/a LeadMN

Plaintiff,

vs.

Jay Cowles, Rudy Rodriguez, Asani
Ajogun, Victor Ayemobuwa, Alex Cirillo,
Dawn Erlandson, Jerry Janezich, Roger
Moe, Javier Morillo, April Nishimura,
Oballa Oballa, Kathy Sheran, George Soule,
Cheryl Tefer, and Michael Vekich, in their
official capacities as Trustee Members of
the Board of Minnesota State
Colleges and Universities.

Defendants.

Civil Case No: 22-cv-771 (ECT-ECW)

**MEMORANDUM OF LAW IN
OPPOSITION TO PLAINTIFF'S
MOTION FOR PRELIMINARY
INJUNCTION**

## INTRODUCTION

Plaintiff's motion for a preliminary injunction should be denied.  LeadMN is the

statewide student association for Minnesota State community and technical colleges.  In

May 2021, LeadMN submitted a proposal to the Minnesota State Board of Trustees to

increase its fees paid by students from $0.35 per credit hour to $0.61 per credit hour.  The

proposal was referred to the Board's Finance Committee, which voted down the proposed

fee increase.  Approximately nine months later, LeadMN initiated this lawsuit and brought

a facial and as-applied challenge related to the denial of the fee proposal.  LeadMN alleges

the at-issue statute is unconstitutional because it provides unbridled discretion to the Board to reject the fee proposal.  For its as-applied challenge, LeadMN alleges the Board's decision constituted First Amendment retaliation.

The Board respectfully requests the Court deny LeadMN's motion for preliminary injunction because it is not likely to succeed on the merits and the remaining *Dataphase* factors have not been satisfied.[1]

## STATEMENT OF FACTS

### I.   STATUTORY AND PROCEDURAL FRAMEWORK FOR SETTING TUITION AND FEES.

Minnesota State is the third largest system of state colleges and universities in the United States and the largest in the state with 30 colleges, 7 universities, and 54 campuses.[2] The Board consists of 15 members appointed by the Governor.  Minn. Stat. § 136F.02, subd. 1.  The members are compensated at a rate of $55 per day spent on board activities, plus certain expenses.  Minn. Stat. § 136F.02, subd. 2 (incorporating Section 15.0575 as to compensation); Minn. Stat. § 15.0575, subd. 3.  The Board has authority to set tuition and fees.  Minn. Stat. § 136F.06 ("The board shall . . . set tuition and fees[.]"); *see also* Minn. Stat. § 136F.70, subd. 1 ("The board shall set rates of tuition for the various instructional

---

[1] LeadMN has sued all trustees of the Board of Minnesota State Colleges and Universities, in their official capacities.  Defendants are referred to herein as the Board.

[2]    *See*    Minnesota    State,    Extraordinary    Impact, https://www.minnstate.edu/system/index.html (last visited May 16, 2022).

programs."); *id.*, subd. 2 ("The board may prescribe fees to be charged students for student unions, state college and university activities, functions, and purposes.").[3]

When setting tuition or fees, the Board balances five values:

1.     Affordable access to higher education: Minnesota State will champion a quality affordable higher education that all Minnesotans can access.

2.     Sustainability: Minnesota State seeks to provide the resources needed for colleges and universities to support quality higher education and long term financial viability.

3.     Equity: Minnesota State students taking similar academic programs are charged similar rates across Minnesota State colleges and universities.

4.     Transparency: Minnesota State students will know what they are paying for and how their total tuition and fee charges are calculated.

5.     Flexibility for innovation and emerging markets: Minnesota State seeks to support the flexibility to be innovative, respond to the marketplace, and address emerging program and course development requirements.

Doc. 12-2.   Required fees include the statewide association fee.  *Id.*; *see also* Minn. Stat. 136F.22.

## II.   STATUTORY AND PROCEDURAL FRAMEWORK FOR FUNDING LEADMN.

LeadMN is the statewide student association authorized by the Board for its community and technical colleges.  Minn. Stat. § 136F.22, subd. 1; *see also* Compl. ¶¶ 1, 11.  All community and technical college students are automatically members of LeadMN, and the Board is required by statute to recognize one and only one student association for college students at any one time.   *Id.*  "Each statewide association shall set its fees to be

---

[3] The Board is not subject to Rule 14 rulemaking standards.  Minn. Stat. § 136F.06, subd. 1 ("Sections 14.01 to 14.47 do not apply to policies and procedures of the board.").

collected by the board and shall submit any changes in its fees to the board for review.  The board may revise or reject the fee change." *Id.*  Students pay the fee, which are collected by each state college and university and credited by the system office to Lead MN.  *Id.*  How the money is spent is "determined by [the] association"—not the Board.  *Id.*, subd. 2.

### III.   HISTORY OF FEES TO LEADMN.

The current fee for LeadMN is $0.35 per credit.[4]  For the Fall 2021 semester, the fee generated approximately $326,000 in total fees to LeadMN.[5]  The fee generated approximately $290,000 in the Spring 2022 semester.[6]

LeadMN was incorporated in 1998 when the Minnesota Technical College Student Association merged with the Minnesota Community College Student Association.  *See* Doc. 12-6, at 223.[7]  The history of fees for LeadMN is as follows:

- 1999:  Fee went up to $.25 from $.23

- 2002:  Fee went up to $.30

- 2003:  Fee went down to $.28

- 2005:  Fee went up to $.30

- 2006:  Fee went up to $.31

- 2015:  Fee went up to $.35

*See* Doc. 12-6, at 226.

---

[4] Doc. 12-3.
[5] Doc. 12-4.
[6] Doc. 12-5.
[7] The June 2021 LeadMN fee proposal begins at Doc. 12-6, at 164.

## IV.    MAY 2021 BOARD MEETING & FINANCE COMMITTEE MEETING.

In May 2021, LeadMN proposed to increase the amount of its fee from $0.35 per credit hour to $0.61 per credit hour beginning fall semester 2021—a 74% increase.  Doc. 12-7, at 184.[8]  The first reading of the proposal occurred during the Finance Committee meeting.  Doc. 12-8, at 8.  Finance Committee Chair Moe invited Vice Chancellor Maki along with Priscilla Mayowa, LeadMN President, and Axel Kylander, LeadMN Vice President, to present the LeadMN Fee Proposal.  *Id.* at 21.

LeadMN's request was accompanied by an explanation of the expected use of the fees, some of which included the provision of mental health services to students.  The proposal stated, "[o]ur service expansion will focus on the creation of a benefits navigator program to serve as a single point of contact for students by providing coordination of services on campus and in the community."  Doc. 12-7, at 184.   It explained LeadMN was proposing a "peer to peer" model on topics including "mental health support" and "health services."  *Id.*   In other words, it appears from the face of the proposal that LeadMN proposed providing mental health services and case management services to students.

## V.    JUNE 16, 2021 FINANCE COMMITTEE MEETING.

The Finance Committee met on June 16, 2021, for a second reading and consideration of LeadMN's request.[9]  Doc. 12-9, at 25.  Again, representatives of LeadMN

---

[8] The May 2021 LeadMN proposal begins at Doc. 12-7, at 180, which corresponds to page 51 of the Finance Committee packet.

[9] An audio of the recording of the June 16, 2021 Finance Committee meeting is attached as Exhibit 2 [Doc. 12-1] to the Declaration of Janine Kimble submitted in support of (Footnote Continued on Next Page)

attended and spoke. *Id.* The discussion included trustee concerns related to potential legal liability for Minnesota State if it approved a proposal that permitted LeadMN to obtain private data from students and provide mental health services. Finance Committee Hearing, June 2021, Kimble Dec. Ex. 2 [Doc. 12-1], at 1:20:20-1:21:28. General Counsel Gary Cunningham stated he had concerns about potential liability, especially in the mental health area and in the data security area. *Id.* at 1:22:57-1:24:10. Another trustee asked about overlap—the possibility that LeadMN's proposal regarding the benefits navigator may supplement, interfere with, aid, or complement work campuses do already. *Id.* at 1:27:22-1:29:19. Senior Vice Chancellor for Academic and Student Affairs Ron Anderson commented there were "a number of areas that we see as overlap." *Id.* at 1:29:33-1:29:43; *see also id.* at 1:29:26-1:32:29. Regarding career navigators, the Senior Vice Chancellor stated he saw "significant overlap with things that are already provided at the campus level." *Id.*, at 1:32:29-1:32:35; *see also id.* at 1:32:29-1:33:14.

Following discussion, the Finance Committee voted 2 in favor and 5 opposed, which means the proposal did not pass out of committee. Doc. 12-9, at 25.[10] When a proposal is not voted out of a committee, the proposal does not get received again by the Board. *Id.* at 7.

---

Defendants' motion to dismiss. The Finance Committee's discussion of LeadMN's proposal begins at 1:01:52 of the audio recording.

[10] The Trustees who voted on the proposal in the Finance Committee were Nishimura; Alwal; Janezich; Sheran; Soule; Vekich; Moe.

## VI.    JUNE 16, 2021 BOARD MEETING.

Because the proposal was not voted approvingly out of the Finance Committee, it was removed from the consent agenda. *Id.* The Board discussed the Finance Committee outcome but did not vote on the proposal.[11]

## VII.    LEADMN COMPARED TO STUDENTS UNITED.

As discussed above, LeadMN is the student association for students of the thirty 2-year institutions (community colleges and technical colleges) in the Minnesota State system. Minn. Stat. § 136F.22, subd. 1; *see also* Compl. ¶¶ 1, 11. Students United, on the other hand, is the student association for students at the seven 4-year universities in the Minnesota State system. Minn. Stat. § 136F.22, subd. 1; *see also* Compl. ¶ 38. The fees for each group are levied against the students who attend the relevant institution, so the two organizations are not competing with each other for funds. Although the per credit fee for LeadMN is $.35 and the per credit fee for Students United is $.61, the amount collected is similar.[12] Because the fees are collected per credit hour, the amount may vary over time.

---

[11] An audio recording of the June 16, 2021 Board of Trustees meeting is attached as Exhibit 3 [Doc. 12-1] to the Declaration of Janie Kimble submitted in support of Defendants' motion to dismiss. The Board's discussion of LeadMN's proposal begins at 24:10 of the audio recording. The reference to the removal from the consent agenda begins at 20:29 of the audio recording.

[12] Doc. 12-3.

## Minnesota State Colleges and Universities
## Statewide Student Associations-- Revenues Raised by Fees

| | MN State College Student Association *dba LeadMN* | | MN State University Student Association *dba Students United* | |
|---|---|---|---|---|
| | Revenue | Rate | Revenue | Rate |
| 2001 | 523,463 | 0.25 | 482,151 | 0.33 |
| 2002 | 553,583 | 0.25 | 597,347 | 0.39 |
| 2003 | 704,772 | 0.30 | 618,833 | 0.39 |
| 2004 | 680,736 | 0.28 | 623,766 | 0.39 |
| 2005 | 679,888 | 0.28 | 620,603 | 0.39 |
| 2006 | 717,624 | 0.30 | 620,806 | 0.39 |
| 2007 | 759,028 | 0.31 | 681,323 | 0.43 |
| 2008 | 791,244 | 0.31 | 692,947 | 0.43 |
| 2009 | 824,579 | 0.31 | 706,216 | 0.43 |
| 2010 | 916,258 | 0.31 | 730,057 | 0.43 |
| 2011 | 921,411 | 0.31 | 740,013 | 0.43 |
| 2012 | 883,746 | 0.31 | 725,254 | 0.43 |
| 2013 | 867,520 | 0.31 | 707,276 | 0.43 |
| 2014 | 828,697 | 0.31 | 691,252 | 0.43 |
| 2015 | 791,227 | 0.31 | 674,955 | 0.43 |
| 2016 | 859,278 | 0.35 | 663,665 | 0.43 |
| 2017 | 832,985 | 0.35 | 656,247 | 0.43 |
| 2018 | 815,112 | 0.35 | 705,393 | 0.47 |
| 2019 | 798,699 | 0.35 | 888,642 | 0.61 |
| 2020 | 782,775 | 0.35 | 858,908 | 0.61 |
| 2021 | 721,097 | 0.35 | 814,336 | 0.61 |

Declaration of Kathleen Hanon ["Hanon Dec."] Ex. A, at p. 2   A fiscal year runs July 1 to June 30.  So fiscal year 2022 runs from July 1, 2021, to June 30, 2022.  Hanon Dec. ¶ 3.  Further, for many years, the amount to Students United has been more per credit hour than for LeadMN.

Like LeadMN, Students United advocates on behalf of students and sometimes opposes Board action.  *See, e.g.*, Students United Remarks to the Board, March 15-16, 2022   Board   Meetings,   *available   at*   https://www.minnstate.edu/board/docs-meetingmaterials/2022/032022_Remarks_StudentsUnited.pdf (last visited May 16, 2022) (expressing "worry" that the revised masking policy "places undue burden on the individual to wear a mask for their own protection, especially as it pertains to our immunocompromised and high-risk students, faculty, and staff").

## VIII.  LEADMN'S ALLEGATIONS.

LeadMN alleges the Board denied its request to increase fees by 74% (from $.35 to $.61) because of LeadMN's unfavored speech.  (Compl. ¶ 5.)  Specifically, LeadMN alleges the Board retaliated against LeadMN because LeadMN gave "public testimony and advocacy opposing the Board's efforts to increase student tuition."  (Compl. ¶ 63; *see also id.* ¶ 137.)  LeadMN alleges this is First Amendment retaliation.  (Compl. ¶ 114.)  LeadMN further alleges the Board refused to accept the fee increase proposal because of the content/viewpoint of LeadMN's speech, assembly, and/or public advocacy.  (Compl. ¶ 115.)  LeadMN further alleges the statute is unconstitutional because it delegates without limitation the discretion to the Board to deny fee increases.  (Compl. ¶¶ 122, 130, 138.)

## IX.   LEADMN'S EXHIBITS.

LeadMN attached a number of exhibits that LeadMN claims support its motion. Each one is discussed below; none of the exhibits support LeadMN's conclusions of retaliation.

Exhibit A [Doc. 18-1] is a group text message between trustees.  Plaintiff accurately quotes the texts, but mischaracterizes text exchange as "[Trustee Erlandson] suggested that Trustees use the Board's authority related to LeadMN's fee proposal to retaliate against LeadMN for its public testimony and advocacy opposing the Board's efforts to increase student tuition."  The text messages do not imply a retaliatory intent.  Trustee Erlandson (who is not a member of the Finance Committee) asks "Do legislators know they oppose tuition yet are seeking yet another fee increase?"  But the message itself offers no serious inference of retaliatory intent or even, as Plaintiff implies, intent to inform legislators of the tuition/fee concerns.  Plaintiff's leap to retaliatory intent is conclusory at best.

Exhibit B [Doc. 18-2] refers to the Minnesota Association of Professional Employees (MAPE) and "LeadMN 2.0" but Plaintiff does not present any evidence indicating who is on the text message chain and the reference to "my students" implies one person is college-level, not Board-level.  Nothing in this message exchange suggests any request or "solicitation" from the board for opposition to the fee increase proposal.

Exhibit C [Doc. 18-3] says nothing more than that MAPE requested an opportunity to provide comments during a Finance Committee meeting regarding the fee proposal.

There is no implication in email of any collusion or "proposed testimony" from MAPE beyond request to comment.

Exhibit D [Doc. 18-4] provides no indication that anyone generated "opposition" to the proposal, but rather it is an unclear suggestion that someone from Minnesota State needs to attend the College president's meeting and "help presidents understand the process." On the face of the email, there is no reference to any "opposition" to the proposal, but rather educational efforts to educate stakeholders (college presidents) regarding the process.

Regarding Exhibit E [Doc. 18-5], nothing in the email suggests any efforts by the Board to generate "opposition"; rather, it appears to be a communication between two separate stakeholders expressing their disagreement with the proposal.

Regarding Exhibit F [Doc. 18-6], the email is responding to forwarded message that is cutoff in the exhibit. Nothing on the face of the email suggestions any relation to the fee proposal from LeadMN; and the total lack of context removes any ability to infer as such. Further, the email simply extends thanks "to the Century team and Senate President Singleton for their leadership." It makes no mention of opposition effort; and makes no reference to a "MNSCU" team at Century. The email on its face more accurately suggests the leadership team at Century. Also the email briefly refers to the receipt of two letters that are not included with the exhibit and therefore lacks any substantive information as to the topic or inferences contained in the email itself.

Exhibit G [Doc. 18-7] is an email that briefly references the LeadMN request and implementing a response.   Nothing in this message suggests an intent to "scuttle" or oppose the proposal.[13]

Exhibit H [Doc. 18-8] is a text exchange that does not include any Board members. At most, the exhibit reflects comments by non-Board members towards Mike Dean, but there is no implication the comments extend to LeadMN.

Exhibit I [Doc. 18-9] is a document that reflects Minnesota State talking points about the proposal, not the Board's.  These notes make it clear that the central initiative of the fee proposal, as viewed by Minnesota State, was the benefits navigator service.  There are no comments regarding any opposition to the proposal general nor are there any comments regarding any alleged speech or outreach activities by LeadMN.

Exhibit J [Doc. 18-10] includes a phrase "how to handle this" regarding LeadMN proposal but does not reflect opposition.  The agenda is for a meeting that does not include any Board members.

Exhibits K and L [Docs. 18-11 & 18-12] are communications that do not include any Board members, nor do they indicate communication or solicitation on the part of the Board.

---

[13] LeadMN argues and alleges violations of the Open Meeting Law but does not explain how that is relevant to any issue before the Court.  LeadMN brings no Open Meeting Law claim.

## LEGAL STANDARD

"[W]hether a preliminary injunction should issue involves consideration of (1) the threat of irreparable harm to the movant; (2) the state of balance between this harm and the injury that granting the injunction would inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest." *Dataphase Systems, Inc. v. C L Systems, Inc.*, 640 F.2d 109, 114 (8th Cir. 1981).

In a case such as this, Plaintiffs bear the heavy burden of establishing as a threshold matter that they are likely to succeed on the merits. The Eighth Circuit reasoned in *Planned Parenthood of Minn., N.D., S.D. v. Rounds* as follows:

> [A] more rigorous standard 'reflects the idea that governmental policies implemented through legislation or regulations developed through presumptively reasoned democratic processes are entitled to a higher degree of deference and should not be enjoined lightly.' If the party with the burden of proof makes a threshold showing that *it is likely to prevail on the merits, the district court should then proceed to weigh the other Dataphase factors*.

530 F.3d 724, 731 (8th Cir. 2008) (emphasis added; citation omitted). Plaintiffs have not and cannot meet their burden.

## ARGUMENT

### I.   LEADMN IS NOT LIKELY TO SUCCEED ON THE MERITS.

#### A. LeadMN Makes No First Amendment Retaliation Argument. If It Did, It Would Fail.

Plaintiff argues "for purposes of this motion, the Court need not determine the Board's actual motive for rejecting LeadMN's proposed funding." (Pl. Mem. [Doc. 17], at 22.) In other words, Plaintiff presents no argument or evidence in this motion that the

Board engaged in First Amendment retaliation.  Instead, Plaintiff's entire argument for the preliminary injunction motion is that the Board exercised unbridled discretion which operated as a prior restraint on speech.  (*Id.* at 22-23.)  But because it is a claim that is pleaded, the Board addresses it in an abundance of caution.

A First Amendment retaliation claim has three elements.  LeadMN must allege:  (1) it engaged in protected activity; (2) the Board took adverse action against LeadMN that would chill a person of ordinary firmness from continuing the activity; and (3) the adverse action was motivated in part by LeadMN's exercise of its constitutional rights. *Eggenberger v. W. Albany Twp.*, 820 F.3d 938, 943 (8th Cir. 2016).

This claim fails because the adverse action (denying a fee increase proposal) would not chill a person of ordinary firmness from continuing the activity and the adverse action was not motived by LeadMN's exercise of constitutional rights.  In *Eggenberger*, as a matter of law, the defendant did not do anything to chill speech because all the defendant did was infringe on plaintiff's ability to access documents.  *Id.*  Here, too.  The Board did nothing to chill LeadMN's speech, nor would the action chill a person of ordinary firmness from continuing the activity.  LeadMN continues to collect fees, just not at the rate they requested.  Indeed, the denial occurred in June 2021 and LeadMN does not allege *any* chilled speech, although they did not bring suit until March 2022.  Further, the public website indicates LeadMN continues to engage in advocacy, including a February 2022 Advocacy Day at the Capitol.  *See* LeadMN, Past Events https://www.leadmn.org/past-events (last visited May 16, 2022), *archived at* https://perma.cc/437M-MCJK.  LeadMN

continues to submit written comments to the Board, including critical statements, for example, "The lack of action by the Chancellor to address the culture with college presidents and on campus is a dereliction of duty.  The culture in the system office is one that would rather just sweep problems under the rug than hold people accountable."[14]

As to factor (3), the action (denial of the proposed fee increase) was not retaliatory. As explained above, the Finance Committee specifically discussed LeadMN's proposal, including its plan to use money to fund mental health services for students, and a concern related to potential Minnesota State liability.  *See supra* at 6-7.   There is no evidence of discriminatory intent on the part of the actual voters.   The Finance Committee members who voted on the fee proposal in June 2021 were Nishimura; Alwal; Janezich; Sheran; Soule; Vekich; and Moe.  The evidence submitted in support of Plaintiff's motion either do not reflect communications with decisionmakers and/or do not reveal a retaliatory intent whatsoever.  (*See supra* at 10-13.)   In one text, Trustee Erlandson suggested someone should inform state legislators that LeadMN "oppose[d] tuition [increases proposed by the Board] yet are seeking yet another fee increase?"   (Compl. ¶ 64; *see also* Doc. 18-1.) "Trustee Michael Vekich responded to Trustee Erlandson's text, 'Concur.' He added that he had 'operational questions' he intended to 'address with [Finance Committee] chair Moe."  (Compl. ¶ 65; *see also* Doc. 18-1.)   Further, multiple exhibits do not include any trustees on the Finance Committee.  Statements by non-decisionmakers are not probative

---

[14] Doc. 12-10; *see also* Doc. 12-11.

of decisionmaker intent. *See Browning v. President Riverboat Casino–Missouri, Inc.*, 139 F.3d 631, 635 (8th Cir. 1998).

Finally, LeadMN alleges the retaliation in 2021 was because in 2017 LeadMN told the Board that it must do more to address racial disparities and LeadMN opposed adding new student fees in 2018. (Compl. ¶¶ 27-28.) LeadMN presents no evidence that the decision in 2021 had anything to do with this speech. Additionally, the time frame is too remote to infer any retaliatory intent. *See Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (where timing is suggested as proof of causation, the time between an employee's complaint and the employer's action must be "very close"); *EEOC v. Product Fabricators, Inc.*, 763 F.3d 963, 973 (8th Cir. 2014) (a gap of two months between the protected activity and the adverse action "'is too long'" (citations omitted)).

## B. The Board's Decision Was Not Based on The Content of LeadMN's Proposed Speech.

The Board's measured consideration and rejection of LeadMN's 2021 fee request was a quasi-legislative act under its statutory authority and therefore subject to significant deference from the court on review.[15]

---

[15] To the extent LeadMN may dispute this classification, the only alternative would be that the budgetary decisions of the Board in refusing to levy an increased fee on students attending two-year colleges on behalf of LeadMN are a "quasi-judicial" decision. If that is the case, then this matter would still be properly dismissed for lack of jurisdiction as quasi-judicial decisions may only be appealed via a writ of certiorari. *See Anderson v. Cty. of Lyon*, 784 N.W.2d 77, 81 (Minn. Ct. App. 2010) ("Judicial review of an administrative agency's quasi-judicial decision, 'if available, must be invoked by writ of certiorari.' (citation omitted)).

"An agency exercises a legislative as opposed to a quasi-judicial function when it balances cost and noncost factors and makes choices among public policy alternatives." *In re Qwest's Wholesale Service Quality Standards*, 678 N.W.2d 58, 62 (Minn. Ct. App. 2004). "When an agency exercises a legislative function, its decision is affirmed unless it is shown, by clear and convincing evidence, to be in excess of statutory authority or to have unjust, unreasonable, or discriminatory results." *Id.*; *cf. Arvig Tel. Co. v. Northwestern Bell Tel. Co.*, 270 N.W.2d 111, 117 (Minn. 1978) (identifying rate increase allocations by public commissions as example of legislative actions that will be upheld "unless shown to be in excess of statutory authority or resulting in unjust, unreasonable, or discriminatory rates by clear and convincing evidence"). The Court cannot substitute its judgment for that of the agency when the agency's finding is properly supported by the evidence. *In re Qwest's*, 678 N.W.2d at 62.

This case is similar to agency legislative decisions in the utility rate-making context that are also frequently given deference on review by the courts. Like those cases, the Board in the present case was called upon not merely to determine the allocation of accumulated funds, but instead whether or not to approve the *increase* of fee rates levied against students attending two-year colleges within the Board's purview. In doing so, the Board was asked to consider and balance numerous cost and non-cost factors as well as public policy concerns, including potential liability for providing the proposed mental health services to students through student fees and students' financial ability to bear the additional burden of increased student fees. All of these considerations, in addition to

numerous others, illustrate the broad discretionary determinations required of the Board in weighing the disputed fee increase request. In reviewing the Board's exercising of such discretionary determinations, the Court should avoid judicial intervention absent clear and convincing evidence of an unjust or unreasonable determination on the part of the Board. *Cf. Hilling v. N. States Power Co.*, No. 3-90 CIV 418, 1990 WL 597044, at *4 (D. Minn. Dec. 12, 1990) (noting federal courts must avoid intervening in " 'exclusively local concerns, namely determining what is a just and reasonable rate for retail, intrastate electricity'" (quoting *Carr v. S. Co.*, 731 F. Supp. 1067, 1071–72 (S.D. Ga. 1990)).

### C.  LeadMN Is Not Similarly Situated to Students United.

LeadMN alleges a different student association (i.e., Students United) was treated differently by the Board.  (Compl. ¶ 126.)   In other words, LeadMN tries to imply that the two groups are similarly situated and therefore because the Board has approved Students United's past fee requests, it must approve LeadMN's.  The fundamental flaw in this argument is that LeadMN is not similarly situated to Students United.

Students United is the student association for the Minnesota State University students.  (Compl. ¶ 38.)  In 2017, the fee for Students United increased to $0.47.  (Compl. ¶ 52.)  In 2018, the fee for Students United increased from $0.47 to $0.61.  (Compl.  53.) Unlike the incremental proposals from Students United, LeadMN's 2021 proposal would have been an increase of student fee rates for 2-year college students at Minnesota State institutions of 74%. At no time has the Board entertained a proposal from Students United that would result in a fee increase of 74%.  That alone is a key distinguishing feature that

distinguishes the two organizations and their relative proposals. Additionally, the present dispute, unlike *See Southworth v. Bd. of Regents of Univ. of Wisconsin Sys.*, 307 F.3d 566 (7th Cir. 2002), or its progeny, does not involve any question of sharing/allocating a communal funding or the approval of a student group to operate. LeadMN's request was to increase student fees levied against students attending 2-year institutions under Minnesota State's umbrella. Students United's separate fees, levied against a wholly different student population, have no relevance to the considerations of LeadMN's request.

LeadMN alleges Students United did not oppose Board's "recent proposals to increase student tuition." (Compl. ¶ 55.) The only tuition increase challenge referenced in the Complaint is LeadMN's challenge to tuition increases at "community and technical colleges" (Compl. ¶ 26). Of course Students United would not challenge such tuition changes, as their constituents do not attend those institutions. Students United represents students at Minnesota State's 4-year universities. There is not any constituency overlap between Students United and LeadMN. They serve different student bodies and , attend different institutions.

Finally, there is no allegation that Students United proposed to use the student fees increase to provide mental health services to students—which was a reason LeadMN's student fee request was denied.

### D. Even If The Board's Decision Was Based on LeadMN's Proposed Content of Speech, It Had Nothing To Do With LeadMN's Viewpoint.

Even if the Board's decision not to approve the fee increase was because of the content of LeadMN's speech (mental health and career navigator), it had nothing to do with viewpoint.[16]   A content-based decision occurs when a government regulates "particular speech because of the topic discussed or the idea or message expressed." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015)).   Viewpoint discrimination, on the other hand, occurs when a government targets "particular views taken by speakers on a subject." *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 829 (1995); *see also Viewpoint Neutrality Now! v. Regents of Univ. of Minnesota*, 516 F. Supp. 3d 904, 919 (D. Minn. 2021).   This case is not about *what* LeadMN was going to *say* about mental health or *what* was going to be said during mental health sessions, but instead that the service overlapped with services provided by colleges.   There was also a concern about students obtaining private data and mental health data about other students, because LeadMN's proposal was a peer-to-peer model.   Again, there is nothing in the record indicating the decision had anything to do with the viewpoint of LeadMN with respect to mental health services.

Moreover, LeadMN's view of the law makes no sense.   What if LeadMN wanted to hire its own professors and teach courses for credit?   What if LeadMN wanted to hire a company to build a residential hall?   These are core college functions, which are already funded through tuition and state appropriation.   It makes no sense that the law would

---

[16] Concerns about liability were another reason the fee proposal was denied.   That reason has absolutely nothing to do with the content of speech.

prohibit the Board from considering the *overlap* in services the state-wide student association proposed providing compared to what is already provided on campus.

### E. Minnesota Statutes Section 136F.22 Does Not Violate the First Amendment.

LeadMN claims that Minnesota Statutes Section 136F.22 is facially unconstitutional because it confers unlimited discretion to the Board to reject a fee request of LeadMN. This statute establishes that the Legislature delegated its power to the Board in this area. LeadMN's argument fails for many reasons.

#### i.    Section 136F.22 Will Not Lead To The Suppression of Speech.

Facial challenges are used "sparingly and only as a last resort." *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 580 (1998) (citation and quotation marks omitted). LeadMN can prevail on its facial challenge only if it shows there is a substantial likelihood that application of the statute will lead to suppression of speech. *Id.*; *see also Victory Through Jesus Sports Ministry Found. v. Lee's Summit R-7 Sch. Dist.*, 640 F.3d 329, 337 (8th Cir. 2011) (quoting *Finley*, 524 U.S. at 580). Here, the Complaint does not plausibly allege applying the statute will suppress speech, much less a substantial likelihood it will suppress speech. Whether a fee proposal is approved is unrelated to whether LeadMN exists—the Board is required to recognize a statewide association, which is LeadMN. Further, whether a fee proposal is approved is unrelated to whether LeadMN can speak or what it can speak about. The Board cannot determine how LeadMN spends its money. Because applying the statute will not suppress speech, LeadMN's facial challenge fails. This case is more akin to cases discussing government *subsidy* of speech.

The First Amendment prohibits "plac[ing] obstacles in the path" of speech, *Regan v. Taxation with Representation*, 461 U.S. 540, 549 (1983) (citation and quotation marks omitted). But it does not require the government to subsidize speech. *Id.* Even if an organization does not have "as much money as it wants, and thus cannot exercise its freedom of speech as much as it would like," the Constitution does not create an "entitlement to funds" as a group may believe is necessary "to realize all the advantages of that freedom." *Id.* at 550 (citation and quotation marks omitted). Further, the Constitution does not require the government to subsidize all speech equally. A government subsidy "that discriminates among speakers does not implicate the First Amendment unless it discriminates on the basis of ideas." *Leathers v. Medlock*, 499 U.S. 439, 450 (1991); *see also Finley*, 524 U.S. at 587-88 (noting the government "may allocate competitive funding according to criteria that would be impermissible were direct regulation of speech ... at stake" and that such funding is not "discriminat[ion] on the basis of viewpoint [but] ... merely ... fund[ing] one activity to the exclusion of the other" (citation and quotation marks omitted)).

Here, LeadMN's speech is subsidized by the fee paid by students, approved by the Board, and collected by Minnesota State. They are not required to get Board approval to operate, and instead simply seeking a fee increase from the Board. Indeed, the Board was required to recognize a student association and it recognized LeadMN. Minn. Stat. § 136F.22, subd. 1 ("The board shall recognize one statewide student association for the state universities and one for the community and technical colleges."). "Shall" is mandatory.

Minn. Stat. § 645.44, subd. 16.  LeadMN obtains funding from sources other than the Board.  Doc. 12-7, at 186 ("LeadMN has successfully diversified our income by aggressively raising money from foundations to support our programming work. During the last fiscal year, 34% of our income came from donations and foundation grants.").

LeadMN implies an appeal proceeding is required, but it is not.

Like every other unit of federal, state, and local government, the University makes thousands of policy decisions—e.g., decisions to raise or lower tuition, to expand or shrink the size of the English Department, to require or not require applicants to take standardized tests, or to create or not create a limited public forum. Nothing in the Constitution requires that the government must provide a way to "appeal" every policy decision that it makes—including a decision to establish a limited public forum.

*Viewpoint Neutrality Now! v. Regents of Univ. of Minnesota*, 516 F. Supp. 3d 904, 930 (D. Minn. 2021).  Whether an appeal process exists is entirely unrelated to LeadMN's First Amendment claim, because it is not required.

  ii. <u>The Unbridled Discretion Analysis Does Not Apply Because Speech Is Not Directly Implicated.</u>

The unbridled discretion analysis does not apply to the undisputed facts in this case. The analysis originally applied, and still applies, in the licensing context.  In the licensing context, the reason why the "unbridled discretion" analysis exists is because there are certain specific areas of decision making that are unduly prone to viewpoint-based discrimination.   "Where the licensing official enjoys unduly broad discretion in determining whether to grant or deny a permit, there is a risk that he will favor or disfavor speech based on its content."  *Thomas v. Chicago Park Dist.*, 534 U.S. 316, 323 (2002).

Courts are similarly concerned when a licensing law gives the government "substantial power to discriminate based on the content or viewpoint of speech" and where the law has a "close enough nexus to expression, or to conduct commonly associated with expression, to pose a real and substantial threat of the identified censorship risks." *City of Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750, 759-60 (1988) (annual license for newspaper news racks, where the circulation of newspapers is expression or conduct "commonly associated with expression").

Where some courts have expanded the application of unbridled discretion to student groups, the situations involve student groups or associations within a single educational institution and involve the distribution of shared funding resources or access to shared community forums that had been opened up by the institutions. *See Southworth*, 307 F.3d 566.

This case has none of the qualities of a licensing case and is also unlike *Southworth*. Unlike in *Southworth*, here by statute, the Board "shall" recognize a statewide association, which is LeadMN. Minn. Stat. § 136F.22, subd. 1. All community and technical college students are members of LeadMN and the Board is required by statute to recognize one and only one student association for college students at any one time. *Id.* How the money spent is "determined by [the] association"—not the Board. *Id.*, subd. 2. There are no competing groups with which the Board would need neutral criteria for deciding between. There is no other similarly-situated organization being granted access or funding otherwise denied to LeadMN. There is no evidence therefore of any viewpoint

discrimination as there is no other viewpoint on display.  Laws that do not permit licensing determinations "carry with them little danger of censorship."  *City of Lakewood*, 486 U.S. at 760-61.

When a government (including, for example, a college or university) has to decide which of a multitude of student groups get access to student fee money, there may be a concern that the decision makers will distribute the funds based on the groups' viewpoints. Here, no other student association serves the 2-year colleges under Minnesota State's umbrella.  Indeed, the statute only permits one recognized association.  Therefore, there is no relevant comparator to allege viewpoint discrimination or an improper application of unbridled discretion as there is other organization to select or prejudice.

This case is more similar to setting tuition and fees generally.  The undersigned could find no case bringing a First Amendment claim against a university where a plaintiff alleged the university violated the constitution when it set tuition or fees at a certain (too high or too low) amount.  Such decisions are not subject to First Amendment claims.  *See also Ass'n of Christian Sch. Int'l v. Stearns*, 679 F. Supp. 2d 1083, 1106 (C.D. Cal. 2008), *aff'd*, 362 F. App'x 640 (9th Cir. 2010) (course review process is not subject to unbridled discretion challenge).

A recent case in the district of Minnesota that applied *Southworth* is distinguishable. That case, *Viewpoint Neutrality Now! v. Regents of Univ. of Minnesota*, 516 F. Supp. 3d 904 (D. Minn. 2021), involved a challenge to the manner in which already-collected student-service fees were distributed.  Specifically, the court applied *Southworth* to

plaintiffs' claim that the process used to determine who may apply for media group funding was unconstitutional because it vested unbridled discretion in the decision-making body; the case was about access. *Id.* at 923. Here, in contrast, there is no discretion regarding *who* may apply for the fee increase—it is the recognized statewide association. Similarly, the Board does not control the manner of distribution—all statewide association fees collected from community and technical college students go to LeadMN and are spent by LeadMN in any manner it desires. *See* Minn. Stat. § 136F.22, subds. 1, 2.

### iii.   The Statute Is Not a Prior Restraint of Speech.

LeadMN argues the Board's process for rejecting student association fee proposals is an unlawful prior restraint. (Pl. Mem., at 23.) Generally, a prior restraint arises when a public official denies use of a public forum before the actual expression. *Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 553 (1975). Here, LeadMN is not being restrained. The statute does not allow the Board to determine how it spends its money. Minn. Stat. § 136F.22, subd. 2.

LeadMN cites *City of Lakewood*, 486 U.S. at 759-60. That case involved licenses for news racks. It required newspapers annually to apply for news rack licenses. *Id.* at 759. The case was about prohibiting use of news racks without a license. In *Viewpoint Neutrality Now!*, 516 F. Supp. 3d at 919, the issues were non-media groups wanting to apply for media funding and who was allowed to apply for media-group funding. The other cases cited by LeadMN are also about licenses and permits. When a permit or license is denied, the group cannot operate or assemble. Here, in contrast, LeadMN exists, it gets

money from students, and speaks.  LeadMN identifies *no* speech or assembly it wants to engage in—but cannot—because their fee proposal was denied.

## II.  LEADMN'S PROPOSED REMEDIES ARE UNCONSTITUTIONAL.

### A. LeadMN's Proposed Order Violates the Eleventh Amendment.

LeadMN requests a preliminary injunction that Court orders the Board to collect a fee for LeadMN of at least $.61 per credit.  (Compl. page 27; Doc. 19, at ¶ 1a.)  The undersigned assumes LeadMN is also requesting that the Court order the Board to *distribute* that fee to LeadMN.  But asking the Board to pay LeadMN violates the Eleventh Amendment.  The Eleventh Amendment provides:

> The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

Const., Amend. XI.  Thus, under its plain language, the Eleventh Amendment prohibits federal courts from hearing suits brought against an unconsenting state.  *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984); *see also Grover-Tsimi v. State of Minn.*, 449 F. App'x 529, 530 (8th Cir. 2011).[17]  A State is not a "person" under Section 1983.  *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989).  Actions against officials acting in their official capacity are the same as suits against the state.  *Id.*  The *Ex parte Young* exception to sovereign immunity allows federal courts to grant prospective

---

[17] The Board of Trustees can assert the Eleventh Amendment because it is an arm of the State.  *See Cooper v. St. Cloud State Univ.,* 226 F.3d 964, 968-69 (8th Cir. 2000); *Portz v. St. Cloud State Univ.*, 297 F. Supp. 3d 929, 939-40 (D. Minn. 2018); *Onyiah v. St. Cloud State Univ.*, 655 F. Supp. 2d 948, 969 n.12 (D. Minn. 2009).

relief against state officials in order to enjoin their future compliance with federal law. *Edelman v. Jordan*, 415 U.S. 651, 664 (1974). A federal court may not impose retroactive relief that requires state officials "to use state funds to make reparation for the past." *Id.* at 665. When a plaintiff asks for money to be paid from public funds, the request violates the Eleventh Amendment. *Barton v. Summers*, 293 F.3d 944, 949 (6th Cir. 2002). Similarly, when an action is in essence one for the recovery of money from the state, Eleventh Amendment immunity applies. *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 277 (1997).

In *Vaqueria Tres Monjitas, Inc. v. Irizarry*, 587 F.3d 464, 478 (1st Cir. 2009), the court analyzed whether the requested relief ran afoul of the Eleventh Amendment. In that case, the money in question would come directly from consumers of milk in the form of increased milk prices. The money would not go to the state at any point. The court contrasted that situation from one where a party sought money from taxes because a tax is collected by the government and retained in its treasury before distribution. *Id.* at 479. The court concluded, "because no state funds are implicated by the district court's order, we hold that the Eleventh Amendment's prohibition against retrospective relief does not apply." *Id.* Here, the situation is akin to a tax in terms of process. A fee is assessed on third parties (students), the funds are collected by the state, and are distributed to the association.

In *Regents of the Univ. of California v. Doe*, 519 U.S. 425, 431 (1997), the Supreme Court rejected the argument that the Eleventh Amendment did not apply because any

damages award would be paid by the Department of Energy. The Court held, "[t]he Eleventh Amendment protects the State from the risk of adverse judgments even though the State may be indemnified by a third party." *Id.* The Court reaffirmed that principle in *Lewis v. Clarke*, 137 S. Ct. 1285, 1292-93 (2017), where the Court stated, "[t]he critical inquiry is who may be legally bound by the court's adverse judgment, not who will ultimately pick up the tab." Similarly, in *Hadley v. N. Arkansas Cmty. Tech. Coll.*, 76 F.3d 1437, 1441 (8th Cir. 1996), the Eighth Circuit refused to analyze—for Eleventh Amendment purposes—whether a state college *could* pay a judgment from sources other than state funds. The court observed such an analysis would be speculative. *Id.*[18]

Consistent with *Doe*, in *Paschal v. Jackson*, 936 F.2d 940, 944 (7th Cir. 1991), the Seventh Circuit rejected the premise that the source of funds mattered to an Eleventh Amendment analysis, explaining that any judgment would be entered against the state. *Id.* And it was irrelevant how the state obtained funds to pay the judgment. *Paschal* has the correct view—that it would be unwieldy to ask courts to investigate a state's fiscal structure to determine whether the Eleventh Amendment applies. Instead, this Court should adopt "an approach that disregards the source of state funds." *Id.* Because LeadMN asks this

---

[18] Appellate courts have reached different conclusions regarding whether the source of funds matters. *See Greater New Orleans Fair Hous. Action Ctr. v. U.S. Dep't of Hous. & Urb. Dev.*, 639 F.3d 1078, 1083-84 (D.C. Cir. 2011) (citing cases). Some have held that if the source of funds is not directly from the state fisc (i.e., if the funds are from a third party or will be reimbursed by a third party), the Eleventh Amendment is not implicated. But the cases so holding appear to be contrary to Supreme Court and Eighth Circuit precedent, as explained above.

Court to enter an order requiring the Board to pay LeadMN money, the proposed relief violates the Eleventh Amendment and must be denied.

### B. IF PLAINTIFF IS CORRECT THAT THE STATUTE PERMITS UNBRIDLED DISCRETION IN VIOLATION OF THE FIRST AMENDMENT, THE STATUTE IS VOID.

Where a statute vests unbridled discretion in violation of the First Amendment, the statute is void on its face. *City of Lakewood*, 486 U.S. at 756. In addition to the Eleventh Amendment issued discussed above, the first request for relief fails because if LeadMN prevails in this lawsuit, the statute will be void. So, if the *Dataphase* factors were satisfied (they are not), the proper preliminary injunction would be for the Court to order the Board not to enforce the unlawful statute. *See Am. Patriot Express v. City of Glens Falls*, 474 F. Supp. 3d 508, 541 (N.D.N.Y. 2020), *appeal dismissed* (Feb. 5, 2021), *reconsideration denied*, No. 120CV0672LEKCFH, 2020 WL 5593929 (N.D.N.Y. Sept. 18, 2020) ("Defendants are hereby enjoined and restrained, until further order of the Court, from enforcing these provisions").

### C. CONSIDERATION OF IRREPARABLE INJURY, RELATIVE HARMS, AND THE PUBLIC INTEREST WEIGH AGAINST GRANTING A PRELIMINARY INJUNCTION.

LeadMN has not shown a likelihood of success on the merits and therefore the motion for preliminary injunction should be denied. LeadMN has also not satisfied any of the remaining *Dataphase* factors.

First, Plaintiffs' need for immediate relief is undercut by their own delay in bringing a motion for injunctive relief. In May 2021, LeadMN submitted a proposal to the Board

to increase its fees paid by students from $0.35 per credit hour to $0.61 per credit hour. The proposal was referred to the Board's Finance Committee, which voted down the proposed fee increase. LeadMN did not bring this lawsuit until nine months later. Doc. 1.

LeadMN's delay in bringing this case and its motion weighs heavily against granting LeadMN's requested injunctive relief. *See, e.g.*, *Hubbard Feeds, Inc. v. Animal Feed Supplement, Inc.*, 182 F.3d 598, 603 (8th Cir. 1999) (holding that plaintiff's delay in seeking preliminary injunction "belies any claim of irreparable injury pending trial," and recognizing that delay in seeking injunction, standing alone, may justify denying request); *Aviva Sports, Inc. v. Fingerhut Direct Mktg., Inc.*, Civ. No. 09-1091, 2010 WL 2131007, at *1 (D. Minn. May 25, 2010) (Ericksen, J.) ("[T]he failure to act sooner undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no irreparable injury." (internal quotation marks and citations omitted)).

Second, the injunction LeadMN seeks is not in the public interest and the harm it would cause outweighs the harms alleged by LeadMN. LeadMN's motion would require this Court to adopt a remarkable proposition: a statewide student association can request any fee increase (of any amount, on any topic whatsoever) and the Board could not deny it. This outcome would directly harm students who have to pay the fees.

## CONCLUSION

LeadMN brings an action challenging the Board's decision to deny a proposed student fee increase and challenging a state statute regarding the amount of student fees

collected.  LeadMN's as-applied challenge fails because the decision not to approve the fee request was not for any First Amendment-protected reason.  LeadMN seeks a preliminary injunction requiring the Board to increase its student fees and additional requested relief.  LeadMN is not likely to succeed on the merits.  For that reason and the others stated herein, the motion should be denied.

Dated:  May 16, 2022             Respectfully submitted,

KEITH ELLISON
Attorney General
State of Minnesota


s/ Janine Kimble
JANINE KIMBLE
Assistant Attorney General
Atty. Reg. No. 0392032

ALEXANDER W. HSU
Assistant Attorney General
Atty. Reg. No. 0399275

445 Minnesota Street, Suite 1400
St. Paul, Minnesota 55101-2131
(651) 757-1415 (Voice)
(651) 297-7206 (TTY)
janine.kimble@ag.state.mn.us
alexander.hsu@ag.state.mn.us

ATTORNEYS FOR DEFENDANTS

|#5207148-v1