UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Minnesota State College Student
Association, Inc., *doing business as
LeadMN*,

      Plaintiff,

v.

Jay Cowles, Rudy Rodriguez, Asani Ajogun,
Victor Ayemobuwa, Alex Cirillo, Dawn
Erlandson, Jerry Janezich, Roger Moe,
Javier Morillo, April Nishimura, Oballa
Oballa, Kathy Sheran, George Soule, Cheryl
Tefer, and Michael Vekich, *in their official
capacities as Trustee Members of the Board
of Minnesota State Colleges and
Universities*,

      Defendants.

File No. 22-cv-00771 (ECT/ECW)

**OPINION AND ORDER**

---

Samuel W. Diehl, CrossCastle PLLC, Minneapolis, MN, for Plaintiff.

Janine Kimble and Alexander W. Hsu, Office of the Minnesota Attorney General, St. Paul, MN, for Defendants.

---

Plaintiff Minnesota State College Student Association, Inc., which does business as "LeadMN," represents some 100,000 students enrolled in the two-year community and technical colleges within the Minnesota State Colleges and Universities (or "MNSCU") system. In this § 1983 case, LeadMN alleges that Defendants—trustees serving on the MNSCU Board sued in their official capacities—violated LeadMN's First Amendment rights when, in June 2021, they rejected a LeadMN-proposed 74% student-fee increase.

LeadMN and Defendants have filed competing motions.  Defendants seek dismissal of most of the case on its merits.  They seek dismissal of LeadMN's request for collection and distribution of an increased student fee for lack of subject-matter jurisdiction.  ECF No. 8.  LeadMN seeks a wide-ranging preliminary injunction that would, among other things, require the MNSCU Board to collect from students and distribute to LeadMN the requested fee increase.  ECF No. 14.

Defendants' motion to dismiss will be granted in large part because all but one of LeadMN's First Amendment theories are implausible and because the Eleventh Amendment precludes LeadMN from seeking to recover student fees, whether retroactively or prospectively.  LeadMN's motion for a preliminary injunction will be denied because LeadMN is not likely to prevail on the merits of its remaining First Amendment-retaliation theory and LeadMN's showing of irreparable harm is questionable.

I[1]

The MNSCU system consists of thirty public community and technical colleges and seven public universities in Minnesota.  Compl. ¶ 7.  MNSCU is governed by fifteen

---

[1]    In accordance with the standards governing a facial attack on subject-matter jurisdiction under Rule 12(b)(1) and a motion to dismiss under Rule 12(b)(6), the facts are drawn entirely from the Complaint and documents embraced by it.  *See Osborn v. United States*, 918 F.2d 724, 729 n.6 (8th Cir. 1990) (Rule 12(b)(1)); *Hartman v. Bowles*, 39 F.4th 544, 545 (8th Cir. 2022) (Rule 12(b)(6)).  Defendants submitted voluminous materials with their motion and assert that these materials are embraced by the Complaint.  These materials include the LeadMN proposal, Finance Committee and full Board meeting packets and minutes, audio recordings of Finance Committee and Board meetings, Board policies, fee reports, and letters from LeadMN to Trustees.  Though these materials have been reviewed thoroughly, their consideration is for the most part unnecessary to deciding Defendants' motion.  Consideration of any part of these materials implies a determination that the item is embraced by the Complaint.

trustees, each appointed by Minnesota's Governor with the advice and consent of the Minnesota Senate, who together constitute the MNSCU Board of Trustees.  *Id.* ¶ 8.  LeadMN's Complaint names all fifteen trustees as Defendants.  *Id.* at 1 (caption), ¶ 8.

"The mission of the board is to provide programs of study that meet the needs of students for occupational, general, baccalaureate, and graduate education."  Minn. Stat. § 136F.05; Compl. ¶ 9.  The Board "possess[es] all powers necessary to govern the state colleges and universities and all related property."  Minn. Stat. § 136F.06, subd. 1; *see* Compl. ¶ 10.

Of particular relevance here, "[t]he board shall . . . set tuition and fees . . . ."  Minn. Stat. § 136F.06, subd. 1; *see also id.* § 136F.70, subds. 1, 2 (the Board "shall set" rates of tuition and "may prescribe fees to be charged students for student unions, state college and university activities, functions, and purposes").  "Each statewide association shall set its fees to be collected by the board and shall submit any changes in its fees to the board for review.  The board may revise or reject the fee change."  *Id.* § 136F.22, subd. 2; *see* Compl. ¶ 40.  The fees are "spent as determined by that association."  Minn. Stat. § 136F.22, subd. 2.

Though no statute or regulation addresses how or why the MNSCU Board may revise or reject fee changes, the Board has adopted a policy "titled 'Statewide Student Association' related to Section 136F.22," which "largely corresponds to the language of [the statute] regarding the collection of fees[] but adds that the Board must revise or reject a requested change 'during the two board meetings immediately following the fee change

submission.'"  Compl. ¶¶ 40–41; *see also id.* ¶ 85; Kimble Decl. Ex. 8 [ECF No. 12-6 at 223].

The Board must "recognize one statewide student association for the state universities and one for the community and technical colleges."  Minn. Stat. § 136F.22, subd. 1; *see* Compl. ¶ 36.  LeadMN is the Board-recognized association for the community and technical colleges.  Compl. ¶ 37.  LeadMN therefore represents the more than 100,000 students at the thirty MNSCU community and technical colleges and receives the fees collected by the Board from its student constituents.  *Id.* ¶¶ 1, 11.

"LeadMN is an independent, student-led association" and "is governed by, and conducts advocacy through, student leaders elected from its student members."  *Id.* ¶¶ 1, 16; *see also id.* ¶ 11.  LeadMN's General Assembly, which is comprised of student representatives from all MNSCU colleges, is LeadMN's highest decision-making authority.  *Id.* ¶ 17; *see also id.* ¶¶ 18–20.

LeadMN engages in a variety of First Amendment-related activities.  LeadMN's bylaws describe its purposes, which include, among others, to advocate for students in the relevant colleges, to facilitate and support students being heard, and to facilitate communication among students.  *Id.* ¶ 21.  "LeadMN provides information to students [and] creates opportunities for students to purposefully assemble to communicate and debate with other students, to participate in decisions regarding LeadMN's public positions and advocacy, to participate in leadership and advocacy training, and to become leaders."  *Id.* ¶ 22.  "LeadMN's leaders represent MNSCU students and engage in public advocacy on their behalf."  *Id.* ¶ 23.  LeadMN's advocacy "includes petitioning/requesting that

elected and appointed government leaders make decisions and exercise their powers or decide contentious issues in favor, or for the good, of the students that LeadMN represents," which LeadMN does by "speaking with elected and appointed government leaders, offering testimony at legislative hearings and Board meetings, and communicating publicly regarding issues important to MNSCU students." *Id.* ¶¶ 22–23. "LeadMN's advocacy on behalf of students means its leaders must challenge, attempt to influence, and potentially criticize the [MNSCU] Board and MNSCU's administration." *Id.* ¶ 25.

In 2021, LeadMN's General Assembly approved a budget with a proposal to increase the per-credit fee, from $0.35 to $0.61, a roughly 74% increase. *Id.* ¶¶ 43–44. The per-credit fee for student members of LeadMN has been $0.35 since 2015. *Id.* ¶ 44. The increase would fund "new and additional efforts" as part of a plan adopted by LeadMN's General Assembly "to improve student outreach (including communication with and engagement of students), to better facilitate student-to-student communications, to offer new and additional support services to students (such as peer-to-peer support and nonprofessional counseling), to increase and improve LeadMN's solicitation and fundraising efforts . . . , and to create a student newspaper." *Id.* ¶ 43.

LeadMN informed the MNSCU Board in April 2021 that it proposed to increase its fee. *Id.* ¶ 45. "Before and after LeadMN submitted its fee proposal, [Board] [t]rustees were aware that LeadMN uses funds collected on its behalf by the Board for speech, assembly, and public advocacy, including raising issues and seeking redress with elected and appointed government leaders on behalf of the students it represents." *Id.* ¶ 46; *see also id.* ¶ 56. "When [the Board] considered LeadMN's fee proposal in May and June

2021, [t]rustees knew that if they approved the proposal LeadMN would have additional funds that LeadMN would use for speech, assembly, and public advocacy protected by the First Amendment," and MNSCU's Chancellor, Devinder Malhotra, also "knew that some of the additional fees collected by the Board would be used for speech and public advocacy." *Id.* ¶¶ 48, 57.

The MNSCU Board's Finance Committee discussed LeadMN's fee-increase proposal on May 19, 2021. *Id.* ¶¶ 78–80. The Finance Committee took no action, and the May 19 Meeting Minutes "state that LeadMN's request was 'an informational item, there was no vote taken.'" *Id.* ¶ 81. Minutes of the full Board's May 2021 meeting reflect that Finance Committee Chair Roger Moe "informed the Board that the Finance Committee 'heard a first reading from LeadMN on a Fee Proposal.'" *Id.* ¶ 87.

The proposal was discussed again at a Finance Committee meeting on June 16, 2021, where Committee Chair Moe "asked Committee members to consider a motion stating, 'The Finance Committee recommends that the Board of Trustees accepts the increase of the MSCSA (dba LeadMN) fee from $.35 to $.61 per credit hour beginning fall semester 2021.'" *Id.* ¶ 88. The motion was made and seconded, but Finance Committee members voted not to approve the motion by a vote of five to two. *Id.* The Committee did not consider alternatives to the motion or revising the proposal, including an alternative "that would fund those aspects of LeadMN's proposal that the Committee did not find objectionable, or that [third parties] did not find objectionable." *Id.* ¶¶ 90–92.

At the full Board's meeting on June 16, 2021, trustees discussed the proposal, and "Board Chair Cowles informed [t]rustees that LeadMN's proposal would not be voted on

by the Board because the Finance Committee had not approved a motion asking the Board to approve LeadMN's proposal." *Id.* ¶¶ 93, 99–100. "The only reference to LeadMN's proposal in the minutes of the Board's June 16 meeting is 'LeadMN Fee Proposal (Second Reading) did not pass in Finance Committee and will be removed from the consent agenda.'" *Id.* ¶ 94. No findings or written decision regarding the proposal were issued, no "alternatives to authorize a partial fee increase for LeadMN or a fee increase to be spent on speech that the Board did not find objectionable" were considered, and no vote or other action was taken, at that meeting or at another time. *Id.* ¶¶ 95–98. "Before 2021, the Board had never rejected a student association's proposed fee increase and had never engaged in substantive deliberations regarding a proposed fee increase." *Id.* ¶ 51.

LeadMN alleges that MNSCU Board trustees, Chancellor Malhotra, and MNSCU leaders and administrators "covertly worked to generate" and "coordinat[e]" opposition to LeadMN's proposal. *Id.* ¶¶ 59, 61, 67. This included discussing the proposal among themselves outside of public meetings and communicating with third parties to discuss opposition to the proposal. *Id.* ¶¶ 60–69, 71–74 (detailing discussions and communications). LeadMN also alleges that the Board and Chancellor Malhotra were "frustrated" and "unhappy" with LeadMN's speech and advocacy and that their disapproval of these other activities played a role in the Board's rejection of LeadMN's fee-increase proposal. *Id.* ¶¶ 2, 24–35, 58.

LeadMN further alleges that the experience of non-party Minnesota State University Student Association, Inc., doing business as Students United—the student association for the universities in the MNSCU system—has been different. The per-credit fee for Students

United is $0.61—the fee LeadMN proposed—and has been since 2018. *Id.* ¶¶ 38, 45. The process to approve that 2018 increase did not involve discussions between the MNSCU Board and third parties or coordinated opposition, and it was approved without discussion through the Board's consent agenda. *Id.* ¶¶ 52–54, 71, 74, 77. LeadMN alleges that Students United, unlike LeadMN, had not been critical of Chancellor Malhotra or the Board. *Id.* ¶ 55.

LeadMN's Complaint alleges a single count for violation of First Amendment rights to freedom of speech, assembly, and to petition the government for redress of grievances. *Id.* ¶¶ 103–42. Though it's not entirely clear, LeadMN seems to allege essentially three First Amendment theories. The first is that the MNSCU Board refused (and continues to refuse) to approve, collect, and distribute the requested student-fee increase "in retaliation for LeadMN's speech, assembly, and/or public advocacy protected by the First Amendment." *Id.* ¶ 114; *see also id.* ¶¶ 118, 137. The second is that the MNSCU Board's refusal to approve, collect, and distribute the student fee is an impermissible "content-based and viewpoint-based restriction of speech and of assembly." *Id.* ¶ 136; *see also id.* ¶¶ 115, 117, 134, 135. LeadMN refers to this as a "prior restraint" theory. Pl.'s Mem. in Opp'n [ECF No. 22] at 21 n.6. LeadMN's third theory is that the absence of standards—or, as LeadMN describes it, the presence of "unbridled" or "unfettered" discretion—governing the MNSCU Board's review of student-fee requests "allows it to engage in unlawful retaliation, unlawful content discrimination, or unlawful viewpoint discrimination without detection" in violation of cases interpreting the First Amendment to require the presence of standards. *Id.* ¶¶ 122, 130; *see also id.* ¶¶ 119–27. LeadMN seeks sweeping declaratory

and injunctive relief—including that the Board and its trustees be enjoined from refusing to collect a student fee for LeadMN of at least $0.61 per credit—and attorney fees and costs. *Id.* at 27–28, ¶¶ A–D.

II

It makes better sense to begin with Defendants' Rule 12(b)(6) motion. This is an unusual case in which the jurisdictional aspect of Defendants' motion—which targets one component of the relief LeadMN seeks—need not precede, and is informed by, consideration of the merits. And granting this motion or any part of it would moot or perhaps narrow the issues to be considered as part of LeadMN's motion for a preliminary injunction.

In reviewing a motion to dismiss for failure to state a claim under Rule 12(b)(6), a court must accept as true all of the factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor. *Gorog v. Best Buy Co.*, 760 F.3d 787, 792 (8th Cir. 2014) (citation omitted). Although the factual allegations need not be detailed, they must be sufficient to "raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation omitted). The complaint must "state a claim to relief that is plausible on its face." *Id.* at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

A

To state a First Amendment-retaliation claim under 42 U.S.C. § 1983, LeadMN must allege that: "(1) [it] engaged in a protected activity, (2) the government official[s] took adverse action against [it] that would chill a person of ordinary firmness from continuing in the activity, and (3) the adverse action was motivated at least in part by the exercise of the protected activity." *Bennie v. Munn*, 822 F.3d 392, 397 (8th Cir. 2016) (citation omitted).

There isn't much question that LeadMN alleges facts plausibly showing that it engaged in a protected activity. LeadMN's Complaint includes many allegations to the effect that LeadMN engaged in public speech and advocacy directed against the MNSCU Board and others aligned with the Board. *E.g.*, Compl. ¶¶ 2, 22–35, 107–08. LeadMN's description of its protected activities is quite broad. The upshot of these allegations seems to be that LeadMN has often exercised its First Amendment rights to oppose positions or actions taken by MNSCU and the Board. *See id.*

Regarding the third element, LeadMN's Complaint includes allegations plausibly showing that the MNSCU Board's refusal to approve LeadMN's student-fee proposal was motivated by LeadMN's advocacy—or to be precise, that the Board's non-approval would not have occurred absent the Board's retaliatory motive. *See De Rossitte v. Correct Care Sols., LLC*, 22 F.4th 796, 804 (8th Cir. 2022). LeadMN alleges that the MNSCU Board: knew of LeadMN's advocacy, Compl. ¶¶ 46–48, 56–57; was dissatisfied with LeadMN's advocacy, *id.* ¶ 58; engaged in non-public communications to coordinate opposition to the

fee-increase request, *id.* ¶¶ 59–62, 67, 71, 74; and engaged in communications showing a retaliatory motive, *id.* ¶¶ 63–64, 84.

Whether LeadMN has alleged facts plausibly showing that the Board's failure to approve the proposed fee increase would chill a person of ordinary firmness from continuing with the protected activity LeadMN identifies is a closer question. According to the Eighth Circuit:

> The ordinary-firmness test is . . . designed to weed out trivial matters from those deserving the time of the courts as real and substantial violations of the First Amendment. . . . In applying this "test," we are mindful of the words of Judge Posner in *Bart v. Telford*, 677 F.2d 622, 625 (7th Cir. 1982):
>
> > The effect on freedom of speech may be small, but since there is no justification for harassing people for exercising their constitutional rights it need not be great in order to be actionable.
>
> The test is an objective one, not subjective. The question is not whether the plaintiff herself was deterred, though how plaintiff acted might be evidence of what a reasonable person would have done. . . . What would a person of "ordinary firmness" have done in reaction to the [adverse action]? Would he or she have simply ignored [it], or would he or she have been slowed down, at least to some degree?

*Garcia v. City of Trenton*, 348 F.3d 726, 728–29 (8th Cir. 2003). "In some cases, embarrassment, humiliation and emotional distress may be sufficient to support a § 1983 claim." *Naucke v. City of Park Hills*, 284 F.3d 923, 928 (8th Cir. 2002). But an adverse action is more likely shown when an official causes the plaintiff to experience "concrete consequences." *Scheffler v. Molin*, 743 F.3d 619, 622 (8th Cir. 2014). In *Garcia*, for instance, a mayor's issuance of $35 in retaliatory parking tickets over less than two months

was enough to chill a person of ordinary firmness and supported a jury verdict on the plaintiff's retaliation claim.  348 F.3d at 729.

The Ninth Circuit has addressed this "chill" question in a somewhat factually similar case: *Arizona Students' Ass'n v. Arizona Board of Regents*, 824 F.3d 858 (9th Cir. 2016). There, the plaintiff—Arizona Students' Association (or "ASA")—represented students enrolled at Arizona's public universities.  *Id.* at 862.  The defendant—Arizona Board of Regents—collected a $2.00-per-semester fee from public university students on the ASA's behalf and remitted the collected fees to the ASA to fund its operations.  *Id.* at 862–63.  In connection with a 2012 statewide election, the ASA and Board of Regents took opposite positions on "Proposition 204, a state ballot initiative that would increase funding for public education."  *Id.* at 863.  Allegedly in retaliation for the ASA's support of the initiative, the Board of Regents held a special meeting at which it voted to suspend collection of the student fee and "withheld the fee income it already had collected for the [current] semester."  *Id.*  In reversing the district court's dismissal of the ASA's claims for prospective injunctive and declaratory relief, the Ninth Circuit determined that the ASA alleged a plausible First Amendment-retaliation claim.  *See id.* at 867–71.  In concluding that the ASA had alleged facts plausibly showing that the Board's suspension and withholding of the student fee would chill ASA's speech, the court observed that the Board's "retaliatory acts directly undermined the ASA's ability to pursue its core purpose—to advocate for policies that improve the affordability, accessibility, and quality of public higher education."  *Id.* at 868–69.  The court continued: "The ASA's complaint asserts that [the Board's] conduct is more than a threat to encumber speech; the Board's

actions have actually limited the ASA's speech by eliminating the ASA's primary source of income." *Id.* at 869. The court observed also that the "inherent power asymmetry between the Board and students" made it "highly likely that the Board's alleged retaliation would chill and discourage a student or student organization of similar fortitude and conviction from exercising its free-speech rights." *Id.*

There is one significant difference between this case and *Arizona Students' Ass'n*. In contrast to *Arizona Students' Ass'n*, the MNSCU Board did not *eliminate* LeadMN's funding. LeadMN's complaint is that its funding *wasn't increased*. Therefore, LeadMN likely could not—and does not seem to—allege that the absence of funding prevents it from engaging in the same First Amendment-protected activities it has pursued in the recent past. LeadMN has available today the same resources it had available before its claims in this case arose. In other words, insofar as LeadMN's funding level is concerned, the MNSCU Board's denial of the requested student-fee increase changed nothing.[2]

A different "chill" theory—one found plausible in *Arizona Students' Ass'n*—supports this element of LeadMN's retaliation claim. In the abstract, it seems plausible that the MNSCU Board's retaliatory refusal to approve the fee increase would cause a reasonable person, be it an organization or some of its members, to self-censor so that the Board might look more favorably on the requested fee increase (were the Board to revisit

---

[2]    In its memorandum in opposition to Defendant's Rule 12(b)(6) motion, LeadMN argues: "There is no dispute that the Board's refusal to collect LeadMN's proposed fee has *dramatically reduced* funding LeadMN must have to speak and fulfill its expressive mission and purposes." Pl.'s Mem. in Opp'n at 7 (emphasis added). The Complaint paragraphs cited to support this assertion do not. There is no apparent basis for the assertion that LeadMN's funding was "dramatically reduced."

it) or perhaps future fee-increase requests. LeadMN's complaint includes allegations tilting toward that theory. LeadMN alleges, for example, that the Board's decision created a "risk" of intimidation and self-censorship, Compl. ¶ 5, and that LeadMN "feel[s] pressure to censor [its] speech to please the Board and the Chancellor in order to obtain approval for fees needed for its advocacy," *id.* ¶ 131. *See also* ¶ 139 ("The Board's actions, policies, practices and/or customs, on their face and as applied to LeadMN, unlawfully chill, deter, and restrict, and chilled, deterred, and restricted, LeadMN and its members' exercise of its [sic] right to speech, assembly, and to engage in public advocacy.").[3] Regardless, the Eighth Circuit has made clear that what matters is "not whether [LeadMN itself] was deterred," the question is whether a hypothetical "person of 'ordinary firmness'" would have been chilled, or "slowed down, at least to some degree." *Garcia*, 348 F.3d at 728–29. On this question, it is plausible that the prospective financial magnitude of the MNSCU Board's failure to approve the fee increase and the power disparity between LeadMN and the Board with respect to LeadMN's funding, *see* Minn. Stat. § 136F.22, subd. 2, would prompt a hypothetical person of ordinary firmness to self-censor or pump the brakes on protected activities considered hostile to the Board in order to increase the prospects that the fee increase, or perhaps a future fee increase, might be approved. *Az. Students' Ass'n*, 824 F.3d at 869.

---

[3]   Oddly, LeadMN's Complaint also includes allegations that the Board's action did *not* chill LeadMN. *E.g.*, Compl. ¶ 32 ("LeadMN continues to publicly advocate for issues that are important to MNSCU students, regardless of their popularity with the Board."). This and similar allegations will be accounted for in the analysis of LeadMN's preliminary injunction motion.

B

LeadMN's second First Amendment theory is that the MNSCU Board's refusal to approve, collect, and distribute the student fee is an impermissible "content-based and viewpoint-based restriction of speech and of assembly."  Compl. ¶ 136; *see also id.* ¶¶ 115, 117, 134, 135.

Defendants and LeadMN take different approaches with respect to this claim. Citing Minnesota cases, Defendants begin by likening their refusal to approve the fee increase to a quasi-legislative decision that is entitled under Minnesota law to "deference on review by the courts."  Defs.' Mem. in Supp. [ECF No. 11] at 13–15.  Defendants then argue that the Board's non-approval was prompted by practical concerns, "not the content of [LeadMN's] speech or any viewpoints espoused therein."  Defs.' Reply Mem. [ECF No. 28] at 13.  LeadMN alleges that the Board refused to approve the fee increase because of the content and viewpoint of LeadMN's speech and argues that the Board's non-approval "cannot survive strict scrutiny."  Pl.'s Mem. in Opp'n at 16.  These arguments seem disconnected from the federal courts' usual approach to adjudicating First Amendment claims challenging state action as not content- or viewpoint-neutral.

According to the usual approach, the first question concerns the nature of the forum. *Victory Through Jesus Sports Found. v. Lee's Summit R-7 Sch. Dist.*, 640 F.3d 329, 334 (8th Cir. 2011) ("In defining the parameters of a speaker's First Amendment right of access to public property, the Supreme Court looks first to the nature of the forum the public entity is providing.").  "A university establishes limited public forums by opening property limited to use by certain groups or dedicated solely to the discussion of certain subjects."

15

*Intervarsity Christian Fellowship/USA v. Univ. of Iowa*, 5 F.4th 855, 863 (8th Cir. 2021). And it seems settled that a fund created by the collection of student fees is a limited public forum. *Board of Regents of the Univ. of Wis. Sys. v. Southworth*, 529 U.S. 217, 234 (2000); *see Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 830 (1995) (recognizing that a student activities fund is a limited public forum "more in a metaphysical than in a spatial or geographic sense, but the same principles are applicable"); *see also Viewpoint Neutrality Now! v. Regents of Univ. of Minn.*, 516 F. Supp. 3d 904, 918–22 (D. Minn. 2021); *Koala v. Khosla*, 931 F.3d 887, 900–02 (9th Cir. 2019) (discussing the scope of the forum at issue and concluding that the university "created a limited public forum encompassing all student activity funding"). "[W]hen a university does [establish a limited public forum], it may restrict access to that limited public forum so long as the access barrier is reasonable and viewpoint neutral"; "it may not discriminate against speech on the basis of its viewpoint." *Intervarsity Christian Fellowship/USA*, 5 F.4th at 863 (cleaned up); *see also Viewpoint Neutrality Now!*, 516 F. Supp. 3d at 919 ("In placing limits on the forum, the government cannot engage in viewpoint discrimination, but it can engage in content discrimination to preserve 'the purposes of that limited forum.'"); *id.* at 920 ("In addition to being viewpoint neutral, a restriction on access to a limited public forum must be 'reasonable in light of the purpose served by the forum.'"); *Koala*, 931 F.3d at 900.

Applying these principles here shows that LeadMN's theory that it is the subject of a "content-based and viewpoint-based restriction of speech and of assembly," Compl. ¶ 136, is implausible. The MNSCU Board's refusal to approve the student-fee increase cannot reasonably be understood as a restriction on LeadMN's access to the then-existing

limited public forum—that is, the amount of student fees collected and distributed to LeadMN before the requested increase. Nothing has changed. LeadMN's access to the limited public forum of the funds collected for its use remains the same as it was before the Board declined to approve the student-fee increase and LeadMN filed this lawsuit, and LeadMN's access to the forum remains unrestricted. (LeadMN alleges specifically in its Complaint that neither the Trustees nor others decide how to spend the money collected on its behalf. *Id.* ¶¶ 80, 105.) LeadMN might intend to argue that the Board's refusal to increase the fee is a restriction on access, but that would misstate the scope of the limited public forum. Consider *Koala*. There, the forum encompassed existing funding—not a hypothetical larger amount that might have existed. And here, unlike *Koala*, the entirety of that forum is available without restriction to LeadMN. The Board has not closed even a portion of the forum or attempted to redefine it. *See Koala*, 931 F.3d at 903 ("We agree that a government is not obligated to indefinitely maintain a limited public form, but we know of no case in which the government has been allowed to define a forum one way at its inception, then redefine it in response to speech it deems offensive and close only the portion of the forum where that speech occurs." (citation omitted)). If anything, LeadMN here seeks to (1) redefine the forum to include the higher fee it proposed and then (2) object to a lack of access to that redefined forum. A hypothetical helps to show the implausibility of this approach. Assume the limited public forum isn't a fund comprised of student fees, but a physical space within one of the MNSCU colleges. Applied in that hypothetical context, LeadMN's claim would be—not that it lacked access to the space—but that the MNSCU Board refused to approve and fund improvements to, or perhaps expansion of,

that space.  Just as with LeadMN's claim regarding the student fees, it is difficult to understand how this situation, without more, might trigger a First Amendment content- or viewpoint-discrimination claim.[4]

What's more, accepting LeadMN's theory would seem to require a significant expansion of First Amendment law.  When the MNSCU Board exercises its power to "set tuition and fees," Minn. Stat. § 136F.06, subd. 1, its decision may have some incidental impact on the exercise of First Amendment rights, particularly the resources available to support speech or assembly, in many areas of the educational setting.  Here, LeadMN alleges that the Board's refusal to approve the fee increase means it has less resources available for advocacy.  It is easy to imagine the same being alleged by other stakeholders. If, for example, LeadMN voted not to increase tuition, it is conceivable that faculty may

---

[4]     LeadMN alleges that Students United, the recognized student association representing students at MNSCU's universities, is a similarly situated group that was treated differently.  The treatment of other, similarly situated speakers with different viewpoints than a plaintiff could show that a restriction imposed on a plaintiff was not viewpoint neutral. *See, e.g.*, *Odermatt v. New York City Dep't of Educ.*, 694 F. App'x 842, 845 (2d Cir. 2017); *Cuviello v. City & Cnty. of San Francisco*, 940 F. Supp. 2d 1071, 1085 (N.D. Cal. 2013); *see also Pahls v. Thomas*, 718 F.3d 1210, 1238 (10th Cir. 2013) ("When a law or policy, though facially legitimate, is selectively enforced or subject to exceptions, it may suggest that content or viewpoint discrimination is afoot.").  Here, LeadMN's allegations regarding Students United do not save LeadMN's "content- and viewpoint-neutrality" theory for at least three reasons.  First, because the Board did not restrict LeadMN's access to the then-existing student-fee fund, allegations regarding the Board's treatment of even a similarly situated organization seem beside the point.  Second, it's difficult to understand how Students United is similarly situated to LeadMN.  For starters, it did not share access to the LeadMN limited public forum (or fund) generated by the student fees imposed at MNSCU community and technical colleges.  It had access to a different limited public forum created by the student fees imposed at MNSCU universities. Third, LeadMN neither alleges nor argues that the fund to which it has access is so inferior to the fund available to Students United as to show a lack of viewpoint neutrality, and it cites no authority that might suggest or support the assertion of such a theory.

object to the lack of greater resources available to engage in First Amendment activities.

It is difficult to imagine all the factors that might prompt a stakeholder to complain in this

situation.  In other words, it is difficult to know where LeadMN's theory might end.

Regardless, the Supreme Court has spoken to this issue:

> "[A]lthough government may not place obstacles in the path of
> a [person's] exercise of . . . freedom of [speech], it need not
> remove those not of its own creation."  Although TWR does
> not have as much money as it wants, and thus cannot exercise
> its freedom of speech as much as it would like, the Constitution
> "does not confer an entitlement to such funds as may be
> necessary to realize all the advantages of that freedom."

*Regan v. Taxation with Representation of Wash.*, 461 U.S. 540, 549–50 (1983) (citations

omitted).  LeadMN hasn't explained how its "content- and viewpoint-neutrality" theory

might be squared with this aspect of *Regan*.

## C

LeadMN's third First Amendment theory is that the absence of standards governing

the Board's consideration of student-fee requests "allows it to engage in unlawful

retaliation, unlawful content discrimination, or unlawful viewpoint discrimination without

detection[]" in violation of cases interpreting the First Amendment to require the presence

of standards.  Compl. ¶¶ 122, 130.  This theory could be understood as either an as-applied

or facial challenge.  It fails either way.

Some courts "have concluded that the unbridled-discretion doctrine is a component

of the viewpoint-neutrality analysis that applies to limited public forums."  *Viewpoint

Neutrality Now!*, 516 F. Supp. 3d at 922; *see Southworth v. Bd. of Regents of Univ. of Wis.

Sys.*, 307 F.3d 566, 580 (7th Cir. 2002).  In other words, to be constitutional, the challenged

regime "must not vest unbridled discretion in the decision-makers responsible for enforcing those restrictions." *Viewpoint Neutrality Now!*, 516 F. Supp. 3d at 922. Under this approach—where the presence of unbridled discretion is an element of the viewpoint-neutrality analysis—LeadMN's claim remains implausible because, as explained in the previous section, the threshold element of a restriction on access remains absent.

Other courts seem to have addressed the asserted grant of unbridled discretion in the context of a facial challenge. *Victory Through Jesus Sports Ministry Found.*, 640 F.3d at 337–38. LeadMN's claim runs into a different problem under this approach. Though LeadMN cites many cases entertaining First Amendment challenges to educational institutions' processes for allocating student-services fees, LeadMN cites no case entertaining a facial First Amendment content- or viewpoint-neutrality challenge to school officials' decisions to establish, retain, or alter the amount of student fees (or, for that matter, tuition). And as the Eighth Circuit noted in *Victory Through Jesus Sports Ministry Foundation*, "[n]either the Supreme Court nor this court has ever applied a stringent, facial standard of judicial oversight to the discretionary decisions of school officials administering a nonpublic educational forum." 640 F.3d at 337.

III

Defendants advance a jurisdictional challenge to one aspect of the relief LeadMN seeks. Specifically, Defendants argue that the Eleventh Amendment bars a federal court from ordering the Board to distribute a $0.61 per-credit student fee to LeadMN as LeadMN requests. A court reviewing a motion to dismiss for lack of subject-matter jurisdiction must determine whether the movant is making a "facial" attack or a "factual" attack. *Branson*

20

*Label, Inc. v. City of Branson, Mo.*, 793 F.3d 910, 914 (8th Cir. 2015).  Here, Defendants

present a facial attack because they rely only on LeadMN's Complaint and appear to accept

as true all the Complaint's factual allegations concerning jurisdiction.  *See Titus v. Sullivan*,

4 F.3d 590, 593 (8th Cir. 1993).  In analyzing a facial attack, a court "restricts itself to the

face of the pleadings, and the non-moving party receives the same protections as it would

defending against a motion brought under Rule 12(b)(6)."  *Carlsen v. GameStop, Inc.*, 833

F.3d 903, 908 (8th Cir. 2016*)* (quoting *Osborn v. United States*, 918 F.2d 724, 729 n.6 (8th

Cir. 1990)).   "The plaintiff has the burden of proving subject matter jurisdiction."

*Compart's Boar Store, Inc. v. United State*s, 829 F.3d 600, 604 (8th Cir. 2016).

    The Eleventh Amendment generally bars suits against "an unconsenting State . . .

brought in federal courts by her own citizens as well as by citizens of another state."

*Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984) (quotation omitted).

The Eleventh Amendment also bars claims for damages against state employees in their

official capacities.  *Kentucky v. Graham*, 473 U.S. 159, 169 (1985); *Andrus ex rel. Andrus

v. Arkansas*, 197 F.3d 953, 955 (8th Cir. 1999).  This is because "[a] suit against a public

official in his official capacity is actually a suit against the entity for which the official is

an agent."  *Elder-Keep v. Aksamit*, 460 F.3d 979, 986 (8th Cir. 2006) (citing *Graham*, 473

U.S. at 165); *see Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989) (explaining

that a suit against a state official in his or her official capacity "is no different from a suit

against the State itself").  But under an exception to this general rule, recognized in *Ex

parte Young*, 209 U.S. 123 (1908), "a private party can sue a state officer in his official

capacity to enjoin a prospective action that would violate federal law."  *281 Care Comm.*

*v. Arneson*, 638 F.3d 621, 632 (8th Cir. 2011).  "In *Ex parte Young*, the Supreme Court recognized [Eleventh Amendment] sovereign immunity does not bar 'certain suits seeking declaratory and injunctive relief against state officers in their individual capacities' based on ongoing violations of federal law."  *Kodiak Oil & Gas (USA) Inc. v. Burr*, 932 F.3d 1125, 1131 (8th Cir. 2019) (internal citation omitted) (quoting *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 269 (1997)).  "The *Ex parte Young* doctrine rests on the premise 'that when a federal court commands a state official to do nothing more than refrain from violating federal law, he is not the State for sovereign-immunity purposes.'" *Kodiak Oil*, 932 F.3d at 1131 (quoting *Va. Off. for Prot. & Advoc. v. Stewart*, 563 U.S. 247, 255 (2011)); *see Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002) ("In determining whether the doctrine *of Ex parte Young* avoids an Eleventh Amendment bar to suit, a court need only conduct a straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." (cleaned up)).

There is no question Defendants may invoke Minnesota's Eleventh Amendment immunity.  *See Portz v. St. Cloud State Univ.*, 297 F. Supp. 3d 929, 938 (D. Minn. 2018) (citing *Humenansky v. Regents of Univ. of Minn.*, 152 F.3d 822, 824 (8th Cir. 1998)).  The dispositive question is whether LeadMN's request for distribution of a $0.61 per-credit fee is properly characterized as prospective.  In its Complaint, LeadMN seeks an order that would, among other things, "enjoin Defendants and the Board from . . . refusing to collect a fee for LeadMN of at least $.61 per credit."  Compl. at 27, ¶ C.  Defendants understand this request would, if granted, require them not merely to *collect* but also to *distribute* the

fund created by the student-fee increase to LeadMN. Defs.' Mem. in Supp. at 22. LeadMN appears not to dispute this characterization of its requested relief—*i.e.*, that it seeks to enjoin the Board from refusing "to collect . . . and to credit those fees to LeadMN's account." Pl.'s Mem. in Opp'n at 28; *see id.* at 28–30. LeadMN's position seems to be that Eleventh Amendment immunity does not apply because "LeadMN's fees are paid by the students who receive its benefits, not Defendants." *Id.* at 30. In other words, LeadMN argues, "Minnesota's treasury is not implicated here." *Id.*

Defendants have the better argument on the law. The Supreme Court addressed the issue in *Regents of the University of California v. Doe*, 519 U.S. 425 (1997). In that case, the plaintiff, Doe, asserted "that the University agreed to employ him as a mathematical physicist at the Lawrence Livermore National Laboratory, which the University operates pursuant to a contract with the federal government." *Id.* at 426. Doe alleged that the University breached this contract when it refused to hire him after determining he could not obtain the required security clearance. *Id.* at 427. The Ninth Circuit held that Eleventh Amendment did not bar Doe from seeking damages because the University's contract with the federal government made the federal government liable for any judgment rendered against the University. *Id.* at 427–28. The Supreme Court unanimously reversed. It explained:

> Respondent [Doe] seeks to detach the importance of a State's legal liability for judgments against a state agency from its moorings as an indicator of the relationship between the State and its creation and to convert the inquiry into a formalistic question of ultimate financial liability. But none of the reasoning in our opinions lends support to the notion that the presence or absence of a third party's undertaking to indemnify

the agency should determine whether it is the kind of entity that should be treated as an arm of the State.

Just as with the arm-of-the-state inquiry, we agree with the dissenting judge in the Court of Appeals that with respect to the underlying Eleventh Amendment question, it is the entity's potential legal liability, rather than its ability or inability to require a third party to reimburse it, or to discharge the liability in the first instance, that is relevant. Surely, if the sovereign State of California should buy insurance to protect itself against potential tort liability to pedestrians stumbling on the steps of the State Capitol, it would not cease to be "one of the United States."

Accordingly, we reject respondent's principal contention— that the Eleventh Amendment does not apply to this litigation because any award of damages would be paid by the Department of Energy, and therefore have no impact upon the treasury of the State of California. The Eleventh Amendment protects the State from the risk of adverse judgments even though the State may be indemnified by a third party.

*Id.* at 430–31; *see Paschal v. Jackson*, 936 F.2d 940, 944 (7th Cir. 1991) ("We prefer an [Eleventh Amendment] approach that disregards the source of state funds. To do otherwise forces courts to engage in a detailed audit of the defendant's finances to determine whether the defendant department or subdivision is indeed 'the state.' The district court hit the nail on the head: 'Where Illinois gets the money to satisfy a judgment is no concern of the plaintiff or the court; what matters is that the judgment runs against the state.'" (citation omitted)).

LeadMN seems to advance two arguments implying that *Doe* does not bar the fee distribution it seeks in this case, but neither is persuasive. LeadMN first asserts that the Eleventh Amendment does not bar prospective relief, though the relief may have some monetary impact on the state. Pl.'s Mem. in Opp'n at 29. This is true but beside the point.

24

The cases LeadMN cites to support this proposition recognize merely that the entry of even purely prospective injunctive relief may cause the state to spend more than it otherwise might. In *Edelman v. Jordan*, for example, the Supreme Court, after recognizing that even "[t]he injunction issued in *Ex parte Young* was not totally without effect on the State's revenues," explained that the Eleventh Amendment does not bar the entry of injunctive relief that causes a state "to spend [more] money from the state treasury than if they had been left free to pursue their previous course of conduct." 415 U.S. 651, 667–68 (1974). Here, we're not talking about purely prospective injunctive relief. LeadMN seeks an order that would require the Board to collect and distribute an increased pool of student fees. There is nothing in the mix with respect to this claim for relief except money. *See Ernst v. Rising*, 427 F.3d 351, 369–72 (6th Cir. 2005); *Barton v. Summers*, 293 F.3d 944, 948 (6th Cir. 2002). *Edelman* and cases like it are therefore inapplicable.

Second, LeadMN cites two Ninth Circuit cases, *Arizona Students' Ass'n* and *Koala*, for the proposition that a state's obligation to distribute student fees does not implicate the Eleventh Amendment because the "fees are paid by the students who receive its benefits, not Defendants." Pl.'s Mem. in Opp'n at 30. LeadMN argues that, as a result, "[t]he order necessary to prospectively remedy Defendants' violations will not increase or decrease the Board's or the state'[s] financial burden." *Id.* This seems another way of saying that the Eleventh Amendment doesn't bar LeadMN's claim because any judgment against the state would be satisfied by a third party—here, the students LeadMN represents. *Doe* rejects this argument (as already noted), and *Arizona Students' Ass'n* and *Koala* don't support it. The court's consideration of this specific issue in *Arizona Students' Ass'n* is not clear. The

court recognized that "the Eleventh Amendment bars the ASA's requests for money damages and other retrospective relief." 824 F.3d at 865. And while the court determined that the ASA's challenge to the defendant's "fee-collection policies" survived Eleventh Amendment immunity, it did not discuss *Doe* or address specifically whether the ASA would be allowed to seek the payment of student fees. *See id.* at 856–66.[5] And in *Koala*, the plaintiff disavowed any request for funding. As the court explained: "We must accept as true that *The Koala* seeks only a return of eligibility to apply for funding, not an order directing the state to fund it." 931 F.3d at 895. For this reason, the court determined that the operative complaint "does not run afoul of the sovereign immunity doctrine." *Id.* The bottom line, then, is that the Eleventh Amendment bars LeadMN's request that Defendants be enjoined from refusing to collect and distribute a fee for LeadMN of $0.61 per credit.

*

Before turning to LeadMN's motion for a preliminary injunction, it is helpful to review and summarize what is left of this case. LeadMN has a First Amendment-retaliation claim. As relief for this claim, LeadMN may pursue its requests for declaratory relief that retaliation occurred and injunctive relief that would prevent Defendants from revising, rejecting, or refusing to approve a fee submitted by LeadMN for review under Minn. Stat. § 136F.22, subd. 2, in retaliation for LeadMN's exercise of First Amendment rights. *See* Compl. at 27, ¶ C(iii), (ix). Apart from LeadMN's attorney-fee claim, LeadMN's other requests for relief are tied to rejected First Amendment theories.

---

[5]     If *Arizona Students' Ass'n* held that the ASA could seek payment of student fees, that holding would be rejected here as contrary to *Doe*.

IV

A preliminary injunction is an "extraordinary remedy." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (citation omitted). "In deciding whether to issue a preliminary injunction, the district court considers four factors: '(1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that [the] movant will succeed on the merits; and (4) the public interest.'" *Sleep No. Corp. v. Young*, 33 F.4th 1012, 1016 (8th Cir. 2022) (quoting *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981) (en banc)). The core question is whether the equities "so favor[] the movant that justice requires the court to intervene to preserve the status quo until the merits are determined." *Dataphase*, 640 F.2d at 113 (footnote omitted). "The burden of establishing the four factors lies with the party seeking injunctive relief." *CPI Card Grp., Inc. v. Dwyer*, 294 F. Supp. 3d 791, 807 (D. Minn. 2018) (citing *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003)).

Begin with the third factor—the probability that LeadMN will succeed on the merits of its First Amendment-retaliation claim. "While no single factor is determinative, the probability of success factor is the most significant." *Home Instead, Inc. v. Florance*, 721 F.3d 494, 497 (8th Cir. 2013) (cleaned up); *Sleep No. Corp.*, 33 F.4th at 1016. LeadMN must show that it has a fair chance of prevailing, not that is has a greater than fifty percent likelihood of prevailing. *Sleep No. Corp.*, 33 F.4th at 1016–17.

LeadMN's Complaint and the record of evidence submitted by LeadMN and Defendants show that LeadMN does not have a fair chance of prevailing on the merits of

its First Amendment-retaliation claim. Recall that, to prevail on this claim, LeadMN must show that: "(1) [it] engaged in a protected activity, (2) the government official[s] took adverse action against [it] that would chill a person of ordinary firmness from continuing in the activity, and (3) the adverse action was motivated at least in part by the exercise of the protected activity." *Bennie*, 822 F.3d at 397 (citation omitted).

The Complaint's allegations undermine LeadMN's ability to show that the Board's refusal to approve the student-fee increase would chill a person of ordinary firmness. An adverse action is more likely shown when an official causes the plaintiff to experience "concrete consequences." *Scheffler*, 743 F.3d at 622. And "how [a] plaintiff acted might be evidence of what a reasonable person would have done . . . in reaction to the [adverse action]." *Garcia*, 348 F.3d at 729. Here, LeadMN's Complaint includes allegations that it was not chilled. Specifically, LeadMN alleges that it "continues to publicly advocate for issues that are important to MNSCU students, regardless of their popularity with the Board." Compl. ¶ 32. LeadMN also alleges that it "has used and will continue to use fees collected by the Board to fund protected speech, assembly, and public advocacy (which includes LeadMN petitioning/requesting that elected and appointed government leaders make decisions and exercise their powers or decide contentious issues in favor of or for the good of the students that LeadMN represents)." *Id.* ¶ 108.

The evidence LeadMN cites to show that the Board's failure to approve the fee increase was motivated by the protected activity is underwhelming. For example, LeadMN describes one exhibit—a series of text messages—as showing that one trustee proposed "us[ing] the Board's authority related to LeadMN's fee proposal to retaliate against

LeadMN for its public testimony and advocacy opposing the Board's efforts to increase student tuition." Pl.'s Mem. in Supp. [ECF No. 17] at 11 (citing ECF No. 18-1). The evidence LeadMN cites to support this assertion is more benign than incriminating. In the initial text, Defendant and trustee Dawn Erlandson asks: "Do legislators know they oppose tuition yet are seeking yet another fee increase?" ECF No. 18-1. More than showing a retaliatory motive, this text comments on the inconsistency between LeadMN opposing tuition increases while advocating for a roughly 74% increase to student fees. This is a fair point to raise. Other evidence introduced by LeadMN reflects the presence of non-retaliatory justifications for the Board's action. One email, for example, reflects the presence of frustration among LeadMN's student-constituents with the proposed fee increase and its intended uses. ECF No. 18-5. Another document LeadMN relies on seems simply to summarize LeadMN's proposal, its intended uses, and concerns regarding both the proposal's justification and intended goals. ECF No. 18-9. The evidence submitted by Defendants, on the other hand, shows that Finance Committee members shared non-retaliatory concerns regarding potential legal liability and duplication of effort associated with LeadMN's plan to use the increased student fees to provide mental health and benefits-navigation services. ECF No. 12-1. At this stage, the better take on this evidence is that it does not show that LeadMN has a fair chance of prevailing on the retaliatory-motive element of its First Amendment-retaliation claim.

Irreparable harm "occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages." *Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 319 (8th Cir. 2009). "The movant

must show that irreparable injury is *likely* in the absence of an injunction, not merely a possibility of irreparable harm before a decision on the merits can be rendered." *Tumey v. Mycroft AI, Inc.*, 27 F.4th 657, 665 (8th Cir. 2022) (cleaned up) (emphasis in original). "It is well-established that '[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Powell v. Noble*, 798 F.3d 690, 702 (8th Cir. 2015) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).

Here, LeadMN argues that its asserted loss of First Amendment freedoms is enough to show that it will suffer irreparable harm. This contention is not enough to justify granting LeadMN's preliminary injunction motion. To the extent LeadMN's asserted loss of First Amendment freedoms concerns its public advocacy, the Complaint's allegations to the effect that LeadMN continues to engage in the same advocacy today as it did before the Board refused to approve the fee increase negate—or at least seriously undermine—this assertion. Compl. ¶ 32 (alleging that LeadMN "continues to publicly advocate for issues that are important to MNSCU students, regardless of their popularity with the Board[]"); *id.* ¶ 108 (alleging that LeadMN "has used and will continue to use fees collected by the Board to fund protected speech, assembly, and public advocacy"). LeadMN's delay in bringing this motion also undermines its claim of irreparable harm. The Finance Committee considered and rejected LeadMN's proposal in May 2021, and the Board refused to approve the proposal the following month. But LeadMN did not file this case until March 31, 2022, ECF No. 1, and it did not move for an injunction for roughly another month (and only after Defendants filed their motion to dismiss). *See Minn. RFL Republican Farmer Labor Caucus v. Freeman*, 486 F. Supp. 3d 1300, 1311 (D. Minn.

2020), *aff'd*, 33 F.4th 985 (8th Cir. 2022).  Regardless, LeadMN has identified no harm that is so substantial as to warrant the issuance of a preliminary injunction here when the merits do not.

The final two *Dataphase* factors do not change things.  The balance-of-harms factor "involves assessing the harm the movant would suffer absent an injunction, as well as the harm the other parties would experience if the injunction issued."  *Prairie Field Servs., LLC v. Welsh*, 497 F. Supp. 3d 381, 404 (D. Minn. 2020) (cleaned up).  When the government is the opponent, this factor merges with the public interest factor.  *Nken v. Holder*, 556 U.S. 418, 435 (2009).  The record does not permit a determination that the balance of harms favors either LeadMN, Defendants, or some separate and distinct public interest.  LeadMN identifies no particular harms or interests beyond generalized First Amendment freedoms.  Those are unquestionably important in the abstract.  Nonetheless, the record here shows the presence of many other substantial interests.  And it would be a mistake to give the abstract interests LeadMN identifies dispositive weight in relation to the other interests reflected in the record and the other *Dataphase* factors.

## ORDER

Based on the foregoing, and all of the files, records, and proceedings herein, **IT IS ORDERED THAT:**

1.   Defendants' Motion to Dismiss [ECF No. 8] is **DENIED in part** and **GRANTED in part**.  The motion is **DENIED** as to Plaintiff's First Amendment-retaliation claim and in all other respects is **GRANTED**.

2.      This action is **DISMISSED WITHOUT PREJUDICE** for lack of subject-matter jurisdiction insofar as Plaintiff seeks to enjoin Defendants from refusing to collect and distribute a fee for Plaintiff of at least $0.61 per credit.

3.      Plaintiff's Motion for Preliminary Injunction [ECF No. 14] is **DENIED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**


Date:  August 8, 2022                         s/ Eric C. Tostrud
                                              Eric C. Tostrud
                                              United States District Court